**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA**

| | | |
|---|---|---|
| ASHLEY DIAMOND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 5:15-cv-00050-MTT-CHW |
| | ) | |
| BRIAN OWENS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

James M. Knoepp, GA Bar No. 366241
Southern Poverty Law Center
1989 College Ave. NE
Atlanta, GA  30317
Tel: (404) 521-6700
jim.knoepp@splcenter.org

A. Chinyere Ezie,* NY Bar No. 496774
David Dinielli,* CA Bar. No. 177904
Samuel Wolfe,* AL Bar No. 2945E63W
Southern Poverty Law Center
400 Washington Ave.
Montgomery, AL  36104
Tel: (334) 956-8200
chinyere.ezie@splcenter.org
david.dinielli@splcenter.org
sam.wolfe@splcenter.org

*Counsel for Plaintiff*

*\*Applications for admission
pro hac vice forthcoming*

February 20, 2015

# TABLE OF CONTENTS

**INTRODUCTION**                                                          1

**FACTS**                                                                 2

    I.    Background on Gender Dysphoria                          2

    II.   Plaintiff's Gender Dysphoria and History of Treatment   3

    III.  Plaintiff's Custody in GDC and GDC's Policies on Gender Dysphoria
Treatment                                                                 3

        A. GDC Personnel Initially Confirm Plaintiff's Need for Hormone Therapy   3

        B. Defendants Repeatedly Refuse To Provide Plaintiff Medically Necessary
Care                                                                      5

        C. GDC Healthcare Professionals and a Gender Dysphoria Expert Confirm
Plaintiff's Urgent Need for Hormone Therapy                               7

        D. Consequences of Defendants' Refusal to Provide Treatment   9

**ARGUMENT**                                                              9

    I.    Plaintiff Is Substantially Likely To Succeed On the Merits   9

        A. Plaintiff's Gender Dysphoria and Risk of Self-Harm Are Objectively
Serious Medical Needs                                                     10

        B. Defendants Have Shown Deliberate Indifference to Plaintiff's Serious
Medical Needs                                                             11

        C. Plaintiff's Request for Relief Is Not Moot   17

    II.   Plaintiff Will Suffer Irreparable Injury Absent an Injunction   18

    III.  The Balance of Harms Strongly Favors Plaintiff   19

    IV.  An Injunction is in the Public Interest   19

    **CONCLUSION**                                                    20

## CASES

Allard v. Gomez,
    9 F. App'x 793 (9th Cir. 2001) ............................................. 15

Ancata v. Prison Health Servs., Inc.,
    769 F.2d 700 (11th Cir. 1985) ....................................... 12, 13

Barrett v. Coplan,
    292 F. Supp. 2d 281 (D.N.H. 2003) ...................................... 15

Battista v. Clarke,
    645 F.3d 449 (1st Cir. 2011) ............................................... 10

Belcher v. City of Foley, Ala.,
    30 F.3d 1390 (11th Cir. 1994) ................................... 11, 13, 14

BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Servs., LLC,
    425 F.3d 964 (11th Cir. 2005) ............................................. 20

Brooks v. Berg,
    270 F. Supp. 2d 302 (N.D.N.Y. 2003) .................................... 15

Brown v. Johnson,
    387 F.3d 1344 (11th Cir. 2004) ........................... 11, 12, 13, 16

Brown v. Zavaras,
    63 F.3d 967 (10th Cir. 1995) ............................................... 10

Colwell v. Bannister,
    763 F.3d 1060 (9th Cir. 2014) ............................................. 14

Cuoco v. Moritsugu,
    222 F.3d 99 (2d Cir. 2000) ................................................. 10

De'lonta v. Angelone,
    330 F.3d 630 (4th Cir. 2003) ......................................... 11, 14

Estelle v. Gamble,
    429 U.S. 97 (1976) ..................................................... passim

Farmer v. Brennan,
    511 U.S. 825 (1994) .......................................................... 12

i

Fields v. Smith,
   712 F. Supp. 2d 830 (E.D. Wis. 2010), aff'd, 653 F.3d 550 (7th Cir. 2011) .......................... 10

Fields v. Smith,
   653 F.3d 550 (7th Cir. 2011) .................................................................................. 14

Gammett v. Idaho State Bd. of Corr.,
   No. CV05-257-S-MHW, 2007 WL 2186896 (D. Idaho July 27, 2007) ........................... 18, 19

Greeno v. Daley,
   414 F.3d 645 (7th Cir. 2005) .................................................................................. 16

H.C. v. Jarrard,
   786 F.2d 1080 (11th Cir. 1986) .............................................................................. 13

Helling v. McKinney,
   509 U.S. 25 (1993) ................................................................................................ 10

KH Outdoor, LLC v. City of Trussville,
   458 F.3d 1261 (11th Cir. 2006) ........................................................................ 9, 19, 20

Konitzer v. Frank,
   711 F. Supp. 2d 874 (E.D. Wis. 2010) ...................................................................... 10, 16

Kothmann v. Rosario,
   558 F. App'x 907 (11th Cir. 2014) ...................................................................... 10, 15, 16

Kuhne v. Fla. Dep't of Corr.,
   745 F.3d 1091 (11th Cir. 2014) .............................................................................. 10, 11

Laube v. Haley,
   234 F. Supp. 2d 1227 (M.D. Ala. 2002) ...................................................................... 19

League of Women Voters of Fla. v. Browning,
   863 F. Supp. 2d 1155 (N.D. Fla. 2012) ...................................................................... 19

Lynch v. Lewis,
   No. 7:14-CV-24(HL), 2014 WL 1813725 (M.D. Ga. May 7, 2014) ................................... 15

Mills v. District of Columbia,
   571 F.3d 1304 (D.C. Cir. 2009) .............................................................................. 19

O'Donnabhain v. Comm'r,
   134 T.C. 34 (2010) ................................................................................................ 10

Phillips v. Mich. Dep't of Corr.,
    731 F. Supp. 792 (W.D. Mich. 1990) ................................................................. 10, 13, 18, 20

Roe v. Elyea,
    631 F.3d 843 (7th Cir. 2011) ................................................................................ 14

Scott v. Roberts,
    612 F.3d 1279 (11th Cir. 2010) ..................................................................... 18, 19, 20

Soneeya v. Spencer,
    851 F. Supp. 2d 228 (D. Mass. 2012) ..................................................................... 14

Spellman v. Hopper,
    142 F. Supp. 2d 1323 (M.D. Ala. 2000) .................................................................. 17

Steele v. Shah,
    87 F.3d 1266 (11th Cir. 1996) ................................................................................ 17

Strickland v. Alexander,
    772 F.3d 876 (11th Cir. 2014) ............................................................................... 17

White v. Farrier,
    849 F.2d 322 (8th Cir. 1988) ................................................................................. 10

## RULES

Fed. R. Civ. P. 65 ................................................................................................... 1, 20

## INTRODUCTION

This case concerns the refusal of the Georgia Department of Corrections ("GDC"), by and through the named Defendants and their agents to provide Plaintiff, a transgender woman with gender dysphoria, urgently needed medical care. Despite being aware of her gender dysphoria diagnosis, seventeen-year history of hormone treatment, and ongoing need for care, Defendants have refused Plaintiff all medically necessary care. Defendants have also maintained an unconstitutional "freeze frame policy" that categorically prohibits prison healthcare officials from initiating gender dysphoria treatment to inmates in need. Defendants have also subjected Plaintiff to punishment for expressing her female gender identity and "pretending to be a woman," in deliberate indifference to her serious medical needs.

Plaintiff seeks a preliminary injunction because she is suffering severe and irreparable physical and psychological harm, based on Defendants' refusal to provide care. Plaintiff's body has been violently transformed by the withdrawal of hormone therapy; she has effectively been forced to transition back to a man from a woman. Plaintiff has also attempted suicide, self-harm, and auto-castration multiple times, and continues to experience a compulsion to castrate herself and end her life — harms that would be remediated with proper gender dysphoria treatment.

Because Plaintiff remains at a substantial risk of irreparable harm, including ongoing mental anguish, bodily injury or death, Plaintiff moves for a preliminary injunction (1) enjoining Defendants from enforcing the policies that operate as a moving force behind their constitutional violations; and (2) requiring Defendants to provide Plaintiff with medically adequate treatment for her gender dysphoria, including, but not limited to, hormone therapy and allowing Plaintiff to express her female gender identity through grooming, pronoun use, and dress.

## FACTS

### I.   Background on Gender Dysphoria

Gender dysphoria, also known as gender identity disorder ("GID") or transsexualism, is a condition in which a person's gender identity — or innate sense of being male or female — differs from the sex assigned at birth. See Declaration of Dr. Randi C. Ettner ("Ettner Decl.") ¶¶ 13-14. Gender dysphoria appears in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V"). Id. Individuals with untreated gender dysphoria experience clinically significant depression, anxiety, and mental impairment, and, when left untreated, additional serious medical problems including suicidality and the compulsion to engage in self-castration and self-harm. Id. ¶¶ 15-18. The clinically accepted standards for the treatment of gender dysphoria are the World Professional Association for Transgender Health's Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People (the "Standards of Care"). Id. ¶¶ 20-21. The Standards of Care apply in incarcerated and non-incarcerated settings, and are recognized as the authoritative treatment protocol for gender dysphoria by medical and mental health professionals worldwide. Id.

The Standards of Care establish that persons with gender dysphoria should be individually assessed by qualified healthcare providers and referred for treatment that can consist of medical interventions including: (1) changes in gender expression and role, such as living full time in another gender role that is consistent with one's internal sense of gender identity; (2) hormone therapy to feminize or masculinize the body; and/or (3) surgery to change primary and/or secondary sex characteristics. Id. ¶¶ 22-30. Counseling can also provide support for some individuals, but it is not a substitute for medical intervention, and exclusive reliance on it constitutes a gross departure from medically accepted practice. Id. ¶¶ 31-33.

2

The Standards of Care also recognize that hormone therapy, in particular, is fundamental to the treatment of gender dysphoria, and that the cessation of hormone treatment leads to significant deterioration and impairment in patients, including a high likelihood of depression, suicide ideation, and surgical self-treatment by auto-castration (removal of the testicles) or auto-penectomy (removal of the penis). Id. ¶¶ 22-27, 66.

## II.   Plaintiff's Gender Dysphoria and History of Treatment

Plaintiff has experienced gender dysphoria since childhood. Diamond Verified Complaint ("Compl.") ¶¶ 36-37. After attempting suicide and being hospitalized at the age of fifteen, Plaintiff began to receive treatment for her gender dysphoria. Id. ¶¶ 38-39. Plaintiff began living as a woman full time and adopted a female gender presentation, female pronouns, and feminine dress. Id. Plaintiff also began taking feminizing hormones, which caused her to develop breasts, soft skin, and other female secondary sex characteristics, while suppressing the development of male sex characteristics such as facial hair. Id. ¶ 40. Hormone therapy and female gender expression are the medically required treatments for Plaintiff's gender dysphoria — treatments Plaintiff has received for almost half her life — and together they provide her clinically significant relief from her gender dysphoria. Id. ¶ 41; see also Ettner Decl. ¶¶ 48-49.

## III.  Plaintiff's Custody in GDC and GDC's Policies on Gender Dysphoria Treatment

Plaintiff entered GDC custody on March 27, 2012 with full breasts and a feminine voice, shape, and appearance. Compl. ¶¶ 42-44. Plaintiff informed each of the Defendants that she was a transgender woman with gender dysphoria, discussed her history of medical care, and requested ongoing treatment. Id. However, Plaintiff's hormone therapy was terminated for the first time in 17 years, and her female garments were confiscated. Id. ¶ 45.

### A.   GDC Personnel Initially Confirm Plaintiff's Need for Hormone Therapy

3

Plaintiff has repeatedly been diagnosed with gender dysphoria by GDC personnel, who have noted her need for continued treatment, and the fact that the withdrawal of care was causing Plaintiff to attempt suicide, auto-castration, auto-penectomy, and other forms of self-harm. Compl. ¶¶ 44, 73-76, 95-96, 116-17; Ettner Decl. ¶¶ 47, 63. In early 2013, Plaintiff's need for hormone therapy and access to female grooming standards as medically necessary care was also confirmed by Dr. Steven Sloan, a GDC psychologist qualified and experienced in the treatment of gender dysphoria. Compl. ¶¶ 75-76. Dr. Sloan performed an individual assessment of Plaintiff and concluded that hormone therapy and female gender expression were the medically necessary treatments under the Standards of Care. Id. Dr. Sloan also concluded that GDC's failure to provide these treatments was jeopardizing Plaintiff's physical and psychological health. Id. Dr. Sloan recommended that GDC resume hormone therapy as treatment for Plaintiff. Id.

The treatment of gender dysphoria within GDC is guided by the Standard Operating Procedure on the Management of Transsexuals ("Transgender SOP" or "Freeze Frame Policy"). Id. ¶ 46. The Transgender SOP recognizes that gender dysphoria is a serious medical need requiring the treatments outlined by the Standards of Care — including hormone therapy, changes in gender role and expression, and at times sex reassignment surgery. Id. ¶ 47; Declaration of A. Chinyere Ezie ("Ezie Decl.") Ex. A. However, as a "freeze frame policy," the policy deviates from the Standards of Care by preventing healthcare personnel from initiating treatment they believe in their judgment to be medically necessary unless (1) inmates are identified during diagnostic intake screenings; and (2) a history of prior treatment can be shown. Compl. ¶¶ 48-50; Ezie Decl. Ex. A. Pursuant to this policy, Dr. Sloan's recommendation that Plaintiff receive hormone therapy as medically necessary care was rejected by Defendant Lewis and Plaintiff was transferred out of Dr. Sloan's care. Compl. ¶ 76.

**B.   Defendants Repeatedly Refuse to Provide Plaintiff Medically Necessary Care**

Plaintiff was next placed at a GDC facility called Rutledge State Prison, and Rutledge personnel received records detailing Plaintiff's gender dysphoria diagnosis, history of hormone treatment, past attempts at self-harm, and requests for ongoing care. Compl. ¶¶ 77-78. Plaintiff also filed petitions regarding her need for medical treatment and eventually met with Defendants Thompson and Silver, GDC healthcare providers, with whom she discussed her 17-year history of receiving hormone therapy, Dr. Sloan's assessment, and her current condition. Id. ¶¶ 79-80.

Defendants Silver and Thompson told Plaintiff they were not qualified in the treatment of gender dysphoria, but denied her request for hormone therapy without referring her for evaluation by a qualified professional. Id. ¶ 81. Instead, Plaintiff was informed that she forfeited the right to receive hormone therapy when she entered GDC. Id. Plaintiff then contacted Defendant Shelton, the Warden of Treatment and Care at Rutledge. Id. ¶ 82; Ezie Decl. Ex. B. Plaintiff asked Defendant Shelton for information concerning her options for treatment, but Defendant Shelton replied "the Department does not offer therapy for this at this time." Ezie Decl. Ex. C. Thereafter, Defendants Silver and Thompson informed Plaintiff once again that she would not be receiving any gender dysphoria treatment while in custody. Compl. ¶ 84.

On or about November 25, 2013, Plaintiff wrote a letter to Defendant Hatcher, the Warden of Rutledge. Id. ¶ 85. Plaintiff explained that her physical health and well-being were jeopardized by the continued denial of medical care, and asked to be referred for medical treatment. Id. Defendant Shelton responded on her and Defendant Hatcher's behalf and instructed Plaintiff to develop better coping mechanisms. Id. ¶ 86.

Thereafter, Plaintiff filed a complaint concerning the denial of appropriate care. Id. ¶ 87. In response, Defendant Hatcher placed Plaintiff in solitary confinement for almost a week for

"pretending to be a woman," and then returned her to solitary or ten more days when she was visited by attorneys who learned of her mistreatment. Id. ¶¶ 88-89.

When Defendant Hatcher visited Plaintiff in solitary confinement, Plaintiff explained that she was not simply "pretending to be a woman," but had serious medical needs requiring treatment, and was suicidal based on the denial of care. Id. ¶ 89. Defendant Hatcher nonetheless continued to punish Plaintiff for her female gender identity and refused to refer her for treatment. Id. ¶ 90. Distraught, Plaintiff attempted to remove her penis and end her life and was hospitalized on an emergency basis. Id.; Ezie Decl. Ex. D. Thereafter, Defendant Lewis wrote to inform Plaintiff that she had reviewed the actions of the GDC personnel who refused to provide her gender dysphoria treatment, and determined that they handled matters appropriately. Compl. ¶ 91; Ezie Decl. Ex. E.

On December 31, 2013, Plaintiff was transferred to a GDC facility called Valdosta State Prison. Compl. ¶ 92. Upon her arrival, GDC personnel received records detailing Plaintiff's medical history, including her gender dysphoria diagnosis and need for medical treatment. Id. Plaintiff requested an appointment with GDC healthcare staff regarding her medical condition and need to resume treatment. Id. ¶ 95. Plaintiff was evaluated by Drs. Raymond Moody and Heather Harrison, GDC mental health professionals who performed individualized assessments of Plaintiff, and concluded that she should be receiving hormone therapy as treatment and noted her high risk of suicide and auto-castration. Id. ¶¶ 96-97. Dr. Moody sought to commence hormone therapy; however, the request was denied based on GDC's Freeze Frame Policy, which bars the "initiation" of hormone therapy. Id.

In February 2014, and again in May 2014, Plaintiff contacted Defendants McCracken and Owens, the Commissioner of GDC, concerning her gender dysphoria and need for care. Id. ¶¶

6

100-04; Ezie Decl. Exs. F, G. Plaintiff explained that she had been harmed by GDC's refusal to provide her with treatment, but Defendants Owens and McCracken refused to authorize treatment, even though treatment had been recommended by Drs. Moody, Harrison, and Sloan, and continued to enforce the Freeze Frame Policy. Compl. ¶¶ 103, 107-09.

In April and again in May 2014, Plaintiff contacted Defendant Allen, the Valdosta Warden, regarding her gender dysphoria and need for medical treatment. Id. ¶¶ 105, 110. Plaintiff requested that Defendant Allen refer her for treatment for her gender dysphoria, but Defendant Allen refused and instead began subjecting Plaintiff to harassment and reprimand for her gender identity and feminine mannerisms. Id. ¶¶ 110-11. Defendant Allen began referring to Plaintiff as a "he-she-thing," and informed her that she was expected to look and dress as a man. Id. Defendant Allen encouraged his staff to ridicule Plaintiff and instruct her to act male. Id.

Plaintiff complained about Defendant Allen's conduct, and explained that female grooming, expression, and identification were components of the treatment for her gender dysphoria. Id. ¶ 112; Ezie Decl. Ex. H. Plaintiff's complaint was reviewed and rejected on grounds that Plaintiff was "clearly a man, not a woman." Ezie Decl. Ex. H. Plaintiff was also told there was "no medically indicated reason" for her female gender presentation, even though female gender expression is a form of medical treatment under the Standards of Care. Id.; Ettner Decl. ¶ 28. Finally, Plaintiff was warned that she would remain subject to continued discipline for her female gender expression, because "[her] gender was male." Ezie Decl. Ex. H.

### C. GDC Healthcare Professionals and a Gender Dysphoria Expert Confirm Plaintiff's Urgent Need for Hormone Therapy

In May and June 2014, Plaintiff was reevaluated by Dr. Harrison, who had previously recommended hormone therapy for Plaintiff. Compl. ¶ 116. Dr. Harrison noted that Plaintiff was

"being forced to transform from a woman back to a man" as a result of her continued denial of medical care. Id. In August and September 2014, Plaintiff was also evaluated by GDC healthcare personnel who noted that Plaintiff's condition was deteriorating, that Plaintiff was experiencing physiological side effects from the withdrawal of hormones, manifesting hopelessness, and engaging in further attempts at self-castration and self-harm. Id. ¶ 117. The professionals noted that Plaintiff had a history of hormone therapy and was requesting ongoing treatment, but stated that hormone therapy was not being provided to Plaintiff because Defendants Lewis and Owens had refused to authorize it. Id.

In recent months, Dr. Sloan has reevaluated Plaintiff and renewed his concerns about the negative effect of GDC's failure to provide gender dysphoria treatment. Ezie Decl. Ex. I. Dr. Sloan noted that suicide is "a persistent thought" for Plaintiff, and that she is once again binding her testicles, in an attempt to castrate herself. Id. Dr. Sloan also repeated his recommendation that Plaintiff receive hormone therapy in accordance with the Standards of Care. Id. However, Dr. Sloan's treatment recommendations have once again been ignored.

In January 2015, Plaintiff was assessed by Dr. Randi C. Ettner, a forensic psychologist who is an expert in the diagnosis and treatment of gender dysphoria. Ettner Decl. ¶ 34. Dr. Ettner confirmed that Plaintiff suffers from severe and persistent gender dysphoria, and that hormone therapy and female gender expression are the medically necessary treatment. Id. ¶¶ 46-49. Dr. Ettner also determined that Plaintiff was experiencing severe physical and psychological harm due to her lack of appropriate treatment, including clinically significant depression, suicidality, hopelessness, anxiety, desperation, and a regression of hormonally-induced physical effects. Id. ¶¶ 52-60, 67. Dr. Ettner noted that Plaintiff had attempted suicide and auto-castration multiple times and expressed an intention to end her life if forced to continue living as male. Id. ¶¶ 52-53,

8

67. Dr. Ettner concluded that unless hormone therapy for Plaintiff was resumed, Plaintiff would stand an extremely high risk of continued decompensation and suicide. Id. ¶¶ 67-75. Dr. Ettner also concluded that attempting to treat Plaintiff's gender dysphoria with psychotherapy or anti-psychotics instead of hormone therapy would be a gross departure from accepted medical practice and would place Plaintiff in ongoing peril. Id. ¶¶ 69-71.

### D.   Consequences of Defendants' Refusal to Provide Treatment

Plaintiff continues to experience severe anxiety, depression, and mental anguish. Compl. ¶¶ 137-140. Plaintiff has engaged in self-harm and attempted suicide and self-castration on multiple occasions, prompting emergency hospitalizations. Id. ¶ 139; Ezie Decl. Ex. D. Plaintiff's suicide ideation and her compulsion to engage in self-harm, which would be remediated with proper treatment for her gender dysphoria, persist to this day. Compl. ¶ 123; Ettner Decl. ¶¶ 57, 67-69. Plaintiff has also lost breast tissue, her female secondary sex characteristics have diminished, and she continues to experience physical injury in the form of chest pain, muscle spasms, heart palpitations, vomiting, dizziness, hot flashes, vascular dilation, withdrawal symptoms, weight loss, diarrhea, fatigue, and hyperhidrosis. Compl. ¶¶ 138-39.

### ARGUMENT

A preliminary injunction should issue here because Plaintiff meets all four of the traditional factors considered in the Eleventh Circuit: "(1) [she] has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1268 (11th Cir. 2006).

### I.   Plaintiff Is Substantially Likely To Succeed On the Merits

"The Eighth Amendment's prohibition against cruel and unusual punishments protects a prisoner from deliberate indifference to serious medical needs." Kuhne v. Fla. Dep't of Corr., 745 F.3d 1091, 1094 (11th Cir. 2014) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). "[D]eliberate indifference to serious medical needs of prisoners violates the [Eighth] Amendment because it constitutes the unnecessary and wanton infliction of pain contrary to contemporary standards of decency." Helling v. McKinney, 509 U.S. 25, 32 (1993) (citing Estelle, 429 U.S. at 104 (quotation marks omitted)). To prevail, a plaintiff must demonstrate "an objectively serious [medical] need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." Kuhne, 745 F.3d at 1094 (citations omitted). Each of these elements has been met here.

## A.   Plaintiff's Gender Dysphoria and Risk of Self-Harm Are Objectively Serious Medical Needs

It is well-established that gender dysphoria (traditionally referred to as "gender identity disorder" or "GID") constitutes a serious medical need. See O'Donnabhain v. Comm'r, 134 T.C. 34, 61-62 (2010) (noting consensus exists among "every U.S. Court of Appeals that has ruled on the question," and collecting cases); see also Kothmann v. Rosario, 558 F. App'x 907, 910 n.4 (11th Cir. 2014) (assuming gender dysphoria as serious medical need for purposes of appeal).[1] Gender dysphoria has all of the hallmarks of a serious medical need: it is a diagnosable condition, codified in the DSM-V, that requires medical treatment, and one where treatment

---

[1] Indeed, courts to consider the issue have uniformly reached this conclusion. See, e.g., Battista v. Clarke, 645 F.3d 449 (1st Cir. 2011); Fields v. Smith, 712 F. Supp. 2d 830, 862 (E.D. Wis. 2010), aff'd, 653 F.3d 550 (7th Cir. 2011); Konitzer v. Frank, 711 F. Supp. 2d 874, 905 (E.D. Wis. 2010); Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000); Brown v. Zavaras, 63 F.3d 967, 970 (10th Cir. 1995); White v. Farrier, 849 F.2d 322, 325 (8th Cir. 1988); Phillips v. Mich. Dep't of Corr., 731 F. Supp. 792, 799 (W.D. Mich. 1990).

delays "worsen[] the condition" by leading to clinically significant impairment and distress.
Kuhne, 745 F.3d at 1096 (defining serious medical need for purposes of Eighth Amendment);
see also Ettner Decl. ¶¶ 14-30 (discussing gender dysphoria and protocol for medical treatment).

Plaintiff's suicidality and propensity to engage in auto-castration as a result of her denial
of care are likewise serious medical needs. See Belcher v. City of Foley, Ala., 30 F.3d 1390,
1396 (11th Cir. 1994) ("prisoners have . . . a right to be protected from self-inflicted injuries,
including suicide.") (citations omitted); see also De'lonta v. Angelone, 330 F.3d 630, 634 (4th
Cir. 2003) (transgender inmate's "compulsive, repeated self-mutilation of her genitals" following
the termination of hormone therapy constituted a serious medical need). Accordingly, Plaintiff
has two objectively serious medical needs: gender dysphoria and an attendant "need for
protection against continued self-mutilation." De'lonta, 330 F.3d at 634.

## B. Defendants Have Shown Deliberate Indifference to Plaintiff's Serious Medical Needs

Prison officials act with deliberate indifference when they fail to provide inmates
medically necessary care, "whether the indifference is manifested by prison doctors in their
response to the prisoner's needs . . . or by prison guards in intentionally denying or delaying
access to medical care . . . or intentionally interfering with treatment once proscribed." Brown v.
Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (citing Estelle, 429 U.S. at 104-05). Defendants
in this case have shown deliberate indifference because they (1) had subjective knowledge of
Plaintiff's risk of serious harm if treatment were denied; and (2) disregarded that risk "by
conduct that is more than mere negligence." Id.

### 1. Defendants Had Subjective Knowledge of Plaintiff's Risk of Serious Harm.

"Whether a prison official had the requisite knowledge of a substantial risk is a question

11

of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." Farmer v. Brennan, 511 U.S. 825, 842 (1994). Here, the record is replete with evidence that Defendants had actual knowledge of Plaintiff's gender dysphoria, suicidality, and attempts at self-harm, need for hormone treatment, and her substantial risk of continued harm if medical treatment was withheld. Compl. ¶¶ 42-44, 73-76, 95-97, 103-04, 107-10, 116-18; Ezie Decl. Ex. D. Defendants knew that gender dysphoria was a serious medical need requiring treatment under the Standards of Care, based on GDC's own policies which discuss the treatment regimen outlined by the Standards of Care, and the importance of providing continuity of treatment. Compl. ¶¶ 46-48; Ezie Decl. Ex. A. Plaintiff has also been repeatedly diagnosed with gender dysphoria by GDC's own staff who repeatedly noted her history of hormone therapy, her compulsion to engage in self-harm, and ongoing need for hormone therapy in accordance with the Standards of Care. Compl. ¶¶ 73-76, 95-97, 116-18; Ezie Decl. Ex. I. The subjective knowledge requirement has been more than met on these facts.

**2. Defendant's Disregarded Plaintiff's Risk of Harm by Conduct that Is More Than Mere Negligence**

*a. Defendants Knowingly Refused to Provide Plaintiff Medically Necessary Care*

"The knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference." Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 704 (11th Cir. 1985). Here, despite knowing of Plaintiff's medical needs, Defendants terminated her gender dysphoria treatment and delayed, deferred, and denied her requests for care or a referral to healthcare providers qualified in the treatment of gender dysphoria. These are textbook examples of deliberate indifference. See, e.g., Brown, 387 F.3d at 1351 (finding inmate stated claim under Eighth Amendment where

12

defendants were aware of his HIV and hepatitis diagnosis "but completely withdrew the prescribed treatment"); Estelle, 429 U.S. at 104-05 (prison officials show deliberate indifference by "intentionally denying or delaying access to medical care"); H.C. v. Jarrard, 786 F.2d 1080, 1086 (11th Cir. 1986) (officials show deliberate indifference by refusing to refer inmates with serious medical needs for diagnostic treatment or specialty care); Ancata, 769 F.2d at 704 (same).

In Phillips v. Michigan Department of Corrections, the court held that prison officials who terminated a plaintiff's hormone therapy, made her "the subject of ridicule and offensive remarks," and "reversed the therapeutic effects of previous treatment" violated the Eighth Amendment. 731 F. Supp. 792, 800 (W.D. Mich. 1990), aff'd, 932 F.2d 969 (6th Cir. 1991). Here, too, instead of continuing Plaintiff's gender dysphoria treatment, Defendants have subjected her to degradation and punishment for her condition, in disregard to her serious medical needs, and the suicidality and physical and mental anguish she is experiencing. Compl. ¶¶ 85-90, 110-13. See Belcher, 30 F.3d at 1396 ("Prison guards who display . . . deliberate indifference to a 'strong likelihood' that a prisoner will take his own life, violate the Eighth Amendment").

Tellingly, this is not a case in which competing medical judgments exist about Plaintiff's need for hormone therapy. To the contrary, when Plaintiff was finally evaluated by GDC healthcare providers experienced in the treatment of gender dysphoria, they unanimously confirmed her medical need for hormones. Compl. ¶¶ 95-97; Ezie Decl. Ex. I. Defendants have simply ignored these recommendations and continued to deny care, without any exercise of individualized medical judgment whatsoever. See Brown, 387 F.3d at 1351 (deliberate indifference includes "intentionally interfering with treatment once proscribed") (citing Estelle,

13

429 U.S. at 104-05).

### b. Defendants Maintained an Unconstitutional Freeze Frame Policy that Disregards Individualized Medical Judgment

In refusing to provide Plaintiff medically necessary care, Defendants also enforced a

Freeze Frame Policy that unconstitutionally forecloses gender dysphoria care to certain inmates

without regard to their medical needs. Constitutionally adequate care under the Eighth

Amendment is care that is "based on an individualized assessment of an inmate's medical needs

in light of relevant medical considerations." Soneeya v. Spencer, 851 F. Supp. 2d 228, 242 (D.

Mass. 2012); accord De'lonta, 330 F.3d at 634. Prison policies which prevent inmates from

receiving individualized medical care thus inflict cruel and unusual punishment in violation of

the Eighth Amendment. See, e.g., Colwell v. Bannister, 763 F.3d 1060, 1068-70 (9th Cir. 2014)

(prison policy which categorically denied cataract surgery to inmates who had at least one "good

eye" violated the Eighth Amendment); Roe v. Elyea, 631 F.3d 843, 862 (7th Cir. 2011) (prison

policy which conditioned treatment for Hepatitis C on administrative factors such as an inmate's

expected length of incarceration violated the Eighth Amendment).

These principles apply fully in the context of gender dysphoria treatment. In Fields v.

Smith, the Seventh Circuit struck down as unconstitutional on its face a state law that barred

prison officials from providing hormone therapy or sex reassignment surgery to inmates with

gender dysphoria. 653 F.3d 550, 559 (7th Cir. 2011). Similarly, in De'lonta v. Angelone, the

Fourth Circuit found that a prisoner with gender dysphoria stated a claim under the Eighth

Amendment to the extent prison officials withheld hormone therapy pursuant to prison policy.

330 F.3d at 634-35. Other courts to consider the issue have concluded the same. See, e.g.,

Soneeya, 851 F. Supp. 2d at 249 (prison policy precludes exercise of medical judgment violates

Eighth Amendment); <u>Allard v. Gomez</u>, 9 F. App'x 793, 795 (9th Cir. 2001) (blanket rule restricting hormone therapy violates Eighth Amendment); <u>Barrett v. Coplan</u>, 292 F. Supp. 2d 281, 286 (D.N.H. 2003) (same).

GDC's Freeze Frame Policy likewise is constitutionally infirm because it forbids the initiation of hormone treatment even where, as here, it is medically indicated. Ettner Decl. ¶¶ 48-49; Ezie Decl. Ex. I. As this Court previously held, the line that the Freeze Frame Policy attempts to draw — between (1) inmates with gender dysphoria, identified during their intake health screening, who received medically-supervised hormone therapy prior to their incarceration, and (2) everyone else — is not defensible. See <u>Lynch v. Lewis</u>, No. 7:14-CV-24 (HL), 2014 WL 1813725, at *2-3 (M.D. Ga. May 7, 2014) (Eight Amendment violation to deny gender dysphoria treatment because inmate was not receiving it prior to incarceration); <u>accord</u> <u>Brooks v. Berg</u>, 270 F. Supp. 2d 302, 312 (N.D.N.Y. 2003) (holding prison officials cannot limit treatment for gender dysphoria to inmates who received medical treatment prior to their incarceration), <u>vacated in part on other grounds</u>, 289 F. Supp. 2d 286 (N.D.N.Y. 2003). Simply put, "there is no exception to [the Eighth Amendment] for serious medical needs that are first diagnosed in prison." <u>Brooks</u>, 270 F. Supp. 2d at 312. Therefore, GDC's Freeze Frame Policy is unconstitutional on its face and as applied to Plaintiff, whose serious medical needs remain untreated as a result.

### c. Any Care Plaintiff Received Was Constitutionally Inadequate

Defendants may claim they complied with their constitutional obligations by offering Plaintiff anti-psychotic medications and counseling sessions, but the relevant inquiry under the Eighth Amendment is whether an inmate was provided "constitutionally adequate medical treatment," not whether she was denied all treatment whatsoever. <u>Kothmann</u>, 558 F. App'x at

910-11; accord Estelle, 429 U.S. at 103-06. "Deliberate indifference may be established by a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment," Brown, 387 F.3d at 1351 (citation omitted). Here, counseling and anti-psychotic medications are grossly inadequate and ineffective treatments for Plaintiff's gender dysphoria — according to experts, and the very GDC healthcare professionals charged with providing such care. Ezie Decl. Ex. I (GDC mental health counselor, stating "[Plaintiff] continues to require hormone therapy and gender role change if she is to receive adequate care"); Ettner Decl. ¶¶ 49, 71. Defendants also failed to abate Plaintiff's risk of suicide, auto-castration, and self-harm — harms that would be abated with adequate gender dysphoria care. See Ettner Decl. ¶¶ 61-71; Ezie Decl. Ex. I; Konitzer v. Frank, 711 F. Supp. 2d 874, 908 (E.D. Wis. 2010) (treatment is "arguably inadequate" where an inmate "keeps exhibiting the behavior seen in [gender dysphoria] sufferers, repeated castration attempts"); see also Greeno v. Daley, 414 F.3d 645, 655 (7th Cir. 2005) (prison officials show deliberate indifference when they "doggedly persist[] in a course of treatment known to be ineffective.").

Courts have repeatedly held that limiting treatment for gender dysphoria to psychotherapy where hormone therapy is medically indicated violates the Eighth Amendment. In Kothmann, the Eleventh Circuit held that prison officials could be held liable where they refused to provide an inmate with gender dysphoria medically necessary hormone therapy, but administered treatments consisting of "anti-anxiety and anti-depression medications, mental health counseling, and psychotherapy." 558 F. App'x at 910-11. Similarly, in Fields, the Seventh Circuit found that a state hormone therapy ban violated the Eighth Amendment even though prisoners were still given access to "psychotherapy as well as antipsychotics and antidepressants." 653 F.3d at 556.

GDC's purported treatments for Plaintiff also constitute a substantial departure from the medically accepted Standards of Care — and one that has put Plaintiff at a substantial risk of suicide and physical and mental anguish. See Ettner Decl. ¶¶ 31-33, 71; see also Steele v. Shah, 87 F.3d 1266, 1269 (11th Cir. 1996) ("[T]he quality of psychiatric care one receives can be so substantial a deviation from accepted standards as to evidence deliberate indifference to those psychiatric needs.").

### C.   Plaintiff's Request for Relief Is Not Moot

Plaintiff's request for injunctive relief is ripe for review because she remains in GDC custody under the control of Defendants Lewis and Owens, and because this case presents issues that are "capable of repetition, yet evading review" with respect to the remaining defendants. Strickland v. Alexander, 772 F.3d 876, 887 (11th Cir. 2014) (discussing doctrine). In a three year span, Plaintiff has been transferred between GDC facilities five times, returned to the same facility on two occasions, and is currently scheduled to remain in GDC custody for eight more years. Compl. ¶ 16. Defendants have also indicated their intention to continue to enforce the Freeze Frame Policy and to continue denying Plaintiff medically necessary care. See generally Compl. Therefore, there is "a reasonable expectation that the same complaining party would be subjected to the same action again" — absent injunctive relief. Strickland, 772 F.3d at 887 (citation omitted). Given Defendants' repeated transfer of Plaintiff — and the exhaustion requirements which are prerequisites to filing suit —the challenged conduct here is also "too short to be fully litigated prior to its cessation or expiration," id., or more specifically, before Plaintiff's receipt of another housing transfer. Thus, the capable of repetition, yet evading review doctrine is plainly applicable here. See Spellman v. Hopper, 142 F. Supp. 2d 1323, 1325 n.1 (M.D. Ala. 2000) (applying doctrine to inmate challenging conditions of his administrative

17

confinement where its duration "was not sufficient for this litigation to be concluded, and may not be sufficient for another similar lawsuit, should he be returned").

## II. Plaintiff Will Suffer Irreparable Injury Absent an Injunction

Plaintiff has suffered and is likely to continue to suffer irreparable harm in the absence of an injunction. Defendants' refusal to provide Plaintiff hormone therapy has reversed the therapeutic effects of her 17-year history of gender dysphoria treatment. Plaintiff's body has been violently transformed due to the denial of hormone therapy. Compl. ¶ 138 (discussing physical effects). Plaintiff is also suffering from severe depression, and has attempted suicide and auto-castration on multiple occasions in an effort to end her pain and mental anguish at being forced to transition back from female to male. See generally Compl.; Ettner Decl. ¶¶ 52-57. Plaintiff's suicide ideation and compulsion to engage in self-harm and auto-castration persist to this day and place her at an exceedingly high risk of death or serious bodily injury absent an injunction. See Ettner Decl. ¶¶ 56-57(noting that hopelessness and prior suicide attempts are strong predictors of fatal suicide attempts). These are not harms that can be "undone through monetary remedies." Scott v. Roberts, 612 F.3d 1279, 1295 (11th Cir. 2010). Rather, they are the very definition of irreparable injury; thus, courts have repeatedly issued injunctions enjoining the conduct at issue here. See, e.g., Fields, 653 F.3d at 559 (enjoining enforcement of a state law ban on hormone therapy); Gammett v. Idaho State Bd. of Corr., No. CV05-257-S-MHW, 2007 WL 2186896, at *18 (D. Idaho July 27, 2007) (requiring that hormone therapy be provided to inmate with gender dysphoria); Phillips, 731 F. Supp. at 800 (stating that irreparable harm was clear because the denial of hormone therapy would "wreak havoc on plaintiff's physical and emotional state," and "[s]uch harm is neither compensable nor speculative.").

Absent an injunction, Plaintiff will suffer an additional form of irreparable harm: the

18

continued deprivation of her constitutional rights. "The existence of a continuing constitutional violation constitutes proof of an irreparable harm." Laube v. Haley, 234 F. Supp. 2d 1227, 1251 (M.D. Ala. 2002) (citations omitted); accord Mills v. District of Columbia, 571 F.3d 1304, 1312 (D.C. Cir. 2009). Because Defendants have made clear their intention to continue refusing Plaintiff medically necessary care, an injunction is warranted to protect Plaintiff from continued denial of her constitutional right to be free from cruel and unusual punishment.

## III.  The Balance of Harms Strongly Favors Plaintiff

The balance of harms substantially weighs in favor of granting injunctive relief. Defendants' refusal to provide Plaintiff medically necessary care has placed Plaintiff's mental health and physical health in extreme peril: Plaintiff has repeatedly attempted suicide, auto-castration, and self-harm, and remains at a substantial ongoing, risk of permanent physical injury or death. See Gammett, 2007 WL 2186896, at *15-16 (finding balance of harms "sharply" favored plaintiff, who would experience suicidality and mental harm without gender dysphoria treatment). Defendants, in contrast, will not suffer any harm — much less irreparable harm — from complying with their legal obligation to provide inmates constitutionally adequate care. See generally Scott, 612 F.3d at 1297 (injunctions that target unconstitutional laws or conduct do not harm the state but serve the public interest); KH Outdoor, LLC, 458 F.3d at 1272 (same).

## IV.  An Injunction Is In the Public Interest

The public interest also favors injunctive relief here because Plaintiff seeks to vindicate her right to medically adequate treatment secured by the Eighth Amendment's prohibition on cruel and unusual punishment. The public interest is always served when constitutional rights are vindicated. See, e.g., League of Women Voters of Fla. v. Browning, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) ("The vindication of constitutional rights and the enforcement of a federal

statute serve the public interest almost by definition."); <u>KH Outdoor, LLC</u>, 458 F.3d at 1272

(injunctions targeting unconstitutional policies or conduct are "plainly [] not adverse to the

public interest"); <u>accord</u> <u>Phillips</u>, 731 F. Supp. at 800-01 (finding "the public interest will be

served by safeguarding Eighth Amendment rights" of prisoners with gender dysphoria). The

public interest is likewise served by enjoining enforcement of the Freeze Frame Policy, which

hampers the provision of medically adequate care to inmates, because "the public . . . has no

interest in enforcing an unconstitutional law." <u>Scott</u>, 612 F.3d at 1297.

## CONCLUSION

For the foregoing reasons, this Court should issue a preliminary injunction (1) directing

Defendants to provide Plaintiff with medically appropriate treatment for her gender dysphoria

under the Standards of Care, including, but not limited to providing Plaintiff hormone therapy

and allowing her to express her female gender through grooming, pronouns, and dress; (2)

enjoining Defendants' continued enforcement of the Freeze Frame Policy. The Court should

require no bond or at most a nominal bond under Fed. R. Civ. P. 65(c). It is well within the

discretion of the Court to require "no security at all." <u>BellSouth Telecomm., Inc. v. MCIMetro</u>

<u>Access Transmission Servs., LLC</u>, 425 F.3d 964, 971 (11th Cir. 2005). Plaintiff has no ability to

pay a bond under her current circumstances. That should be no bar to the relief requested.

Dated: February 20, 2015                         Respectfully submitted,

                                                 /s/ James M. Knoepp
                                                 James M. Knoepp, GA Bar No. 366241
                                                 Southern Poverty Law Center
                                                 1989 College Ave. NE
                                                 Atlanta, GA  30317
                                                 Tel: (404) 521-6700
                                                 jim.knoepp@splcenter.org

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the foregoing document will be served on the Defendants in this action, along with copies of the Summons and Complaint. Plaintiff agrees to file a notice with the Court upon completion of Service.

Dated: February 20, 2015

/s/ James M. Knoepp
James M. Knoepp, GA Bar No. 366241
Southern Poverty Law Center
1989 College Ave. NE
Atlanta, GA 30317
Tel: (404) 521-6700
jim.knoepp@splcenter.org

A. Chinyere Ezie,* NY Bar No. 496774
David Dinielli,* CA Bar. No. 177904
Samuel Wolfe,* AL Bar No. 2945E63W
Southern Poverty Law Center
400 Washington Ave
Montgomery, AL 36104
Tel: (334) 956-8200
chinyere.ezie@splcenter.org
david.dinielli@splcenter.org
sam.wolfe@splcenter.org

*Counsel for Plaintiff*

*Applications for admission pro hac vice forthcoming*