**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**

| | | |
|---|---|---|
| ASHLEY DIAMOND,<br>Plaintiff, | )<br>)<br>) | |
| v. | )<br>) | Civ. No. _____ |
| BRIAN OWENS, Commissioner<br>of the Georgia Department of Corrections,<br>in his official capacity, | )<br>)<br>)<br>) | |
| SHARON LEWIS, Medical Director,<br>Georgia Department of Corrections, in her<br>individual and official capacities, | )<br>)<br>)<br>) | |
| SHAY HATCHER, Warden of Rutledge State<br>Prison, in his individual and official capacities, | )<br>)<br>) | **VERIFIED COMPLAINT** |
| RUTHIE SHELTON, Deputy Warden of<br>Care and Treatment, Rutledge State Prison,<br>in her individual and official capacities, | )<br>)<br>)<br>) | |
| MARTY ALLEN, Warden, Valdosta State<br>Prison, in his individual and official capacities, | )<br>)<br>) | |
| DAVID MCCRACKEN, Mental Health Services<br>Director, Valdosta State Prison,<br>in his individual and official capacities, | )<br>)<br>)<br>) | |
| JOHN THOMPSON & DONNA<br>SILVER, in their individual and official capacities<br>Defendants. | )<br>)<br>)<br>) | |

**PRELIMINARY STATEMENT**

1.     Plaintiff Ashley Diamond ("Plaintiff" or "Ms. Diamond") is a transgender woman[1] with gender dysphoria, presently in the custody of the Georgia Department of Corrections ("GDC"). Defendants are individuals who, during the time of Ms. Diamond's

---

[1] Feminine pronouns are used to refer to Plaintiff, consistent with Plaintiff's gender identity, modern judicial practice, and the advice of mental health professionals who work with transgender persons.

incarceration, have had authority and responsibility for her treatment, safety, and care.

2.     Despite knowing that gender dysphoria is a serious medical condition that causes physical injury and mental anguish when left untreated, Defendants have refused to provide Ms. Diamond with medically necessary care.

3.     With no exercise of individualized medical judgment whatsoever, Defendants have refused to provide Ms. Diamond the hormone therapy that she requires as treatment for her gender dysphoria, and received consistently for seventeen years prior to her incarceration. Defendants have also barred Ms. Diamond from outwardly expressing her female gender identity, even though it is another medically necessary form of care.

4.     Instead of responding to Ms. Diamond's requests for gender dysphoria treatment, Defendants have subjected Ms. Diamond to harassment and reprimand based on her failure to conform to masculine stereotypes. Ms. Diamond has been thrown into solitary confinement for "pretending to be a woman," had her female clothing confiscated, and repeatedly been told to look and act like a man.

5.     As a result of her continued denial of care, Ms. Diamond's body has been violently transformed, she has been forced to transition back from a man to a woman, and she has experienced physical symptoms of withdrawal. In addition, Ms. Diamond has repeatedly attempted suicide and engaged in compulsive acts of self-harm, and continues to be at substantial risk of suicide and permanent physical injury.

6.     Defendants do not dispute that Ms. Diamond has gender dysphoria requiring treatment; instead, they have denied Ms. Diamond care pursuant to an unconstitutional custom or policy that ignores the treatment recommendations and medical judgments of GDC healthcare personnel who are qualified in the treatment of gender dysphoria, and prevents them

from following the medically accepted standards of care.

7.      In addition to ignoring her serious health needs, Defendants have disregarded Ms. Diamond's substantial vulnerability to sexual assault — a problem that is well-documented within GDC, and for which transgender inmates as a group are especially at risk.

8.      Since beginning her incarceration, Ms. Diamond, a non-violent offender, has been housed in a series of closed-security facilities for adult male felons considered to be the most violent and dangerous inmates in GDC custody, and become the victim of repeated, unspeakable sexual assaults.

9.      Although Ms. Diamond has reported her sexual assaults to Defendants and begged for safer placements within GDC, Defendants have refused to take any reasonable steps to aid in her protection to this day.

10.     Ms. Diamond brings this action pursuant to 42 U.S.C. § 1983, after fully exhausting her administrative remedies, to seek redress for Defendants' deliberate indifference to her serious medical needs and her continued vulnerability to sexual assault, which constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution, made applicable to the State through the Fourteenth Amendment.

11.     Ms. Diamond seeks damages and injunctive relief, as well as a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

## JURISDICTION AND VENUE

12.     This action arises under 42 U.S.C. § 1983.

13.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3), which confer original jurisdiction to federal district courts in suits seeking to redress the deprivation of rights secured by the Constitution of the United States, in this case the Eighth Amendment.

14.     This Court has personal jurisdiction over each and every Defendant because they are residents of Georgia who were employed in Georgia and acting under color of state law during all relevant times.

15.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Ms. Diamond's claims occurred in this District.

**PARTIES**

16.     Plaintiff Ashley Diamond is a transgender woman with gender dysphoria, who has been in GDC custody since March 27, 2012 after violating probation for an earlier theft offense. During that time, Ms. Diamond has been housed at a series of GDC facilities, including Baldwin State Prison, Rutledge State Prison and Valdosta State Prison. Ms. Diamond's release date is currently November 1, 2023.

17.     Defendant Brian Owens was at all relevant times the Commissioner of GDC. Defendant Owens exercised final policy and decision-making authority over GDC and control over its personnel at all relevant times. Defendant Owens had the duty to ensure the provision of adequate medical care to inmates, and to reasonably protect inmates facing a substantial risk of physical harm, including through the implementation of policies and the training and supervision of GDC staff. Defendant Owens is among those responsible for denying Ms. Diamond medically necessary care and failing to reasonably protect Ms. Diamond from sexual assault, and is sued in his official capacity.

18.     Defendant Sharon Lewis was at all relevant times the Statewide Medical Director for GDC. Defendant Lewis exercised final policy and decision-making authority regarding the care, treatment, and housing placement of transgender inmates and victims of sexual assault; control over GDC healthcare personnel; and the authority to grant or deny medical care to inmates with gender dysphoria. Defendant Lewis had a duty to ensure the

4

provision of adequate medical care to inmates, and to reasonably protect inmates facing a substantial risk of physical harm, including through placement decisions, the implementation of policies, and the training and supervision of GDC staff. Defendant Lewis is among those responsible for denying Ms. Diamond medically necessary care and failing to reasonably protect Ms. Diamond from sexual assault, and is sued in her individual and official capacities.

19.     Defendant Marty Allen was at all relevant times the Warden of Valdosta State Prison, and exercised authority, direction, and control over Valdosta State Prison and its personnel during the period of Ms. Diamond's incarceration there. Defendant Allen had a duty to ensure the provision of adequate medical care to inmates, and to reasonably protect inmates facing a substantial risk of physical harm. Defendant Allen is among those responsible for denying Ms. Diamond medically necessary care and failing to reasonably protect Ms. Diamond from sexual assault, and is sued in his individual and official capacities.

20.     Defendant David McCracken was at all relevant times the Director of Mental Health Services at Valdosta State Prison, its Prison Rape Elimination Act ("PREA") Coordinator, and the leader of its Sexual Assault Response Team. Defendant McCracken had the authority to make decisions regarding the care, treatment, and placement of individuals confined within Valdosta State Prison during the period of Ms. Diamond's incarceration there. Defendant McCracken also had the duty to ensure the provision of adequate medical care to inmates, and to reasonably protect inmates facing a substantial risk of physical harm. Defendant McCracken is among those responsible for denying Ms. Diamond medically necessary care and failing to reasonably protect Ms. Diamond from sexual assault, and is sued in his individual capacity.

21.     Defendant Shay Hatcher is the Warden of Rutledge State Prison, and exercised

5

authority, direction, and control over Rutledge State Prison and its personnel during the period of Ms. Diamond's incarceration there. Defendant Hatcher had the duty to ensure the provision of adequate medical care to inmates, and to reasonably protect inmates facing a substantial risk of physical harm. Defendant Hatcher is among those responsible for denying Ms. Diamond medically necessary care, and is sued in his individual and official capacities.

22. Defendant Ruthie Shelton was at all relevant times the Deputy Warden of Care and Treatment at Rutledge State Prison, and exercised authority, direction and control over its medical and mental health personnel during the period of Ms. Diamond's incarceration there. Defendant Shelton had a duty to ensure the provision of adequate medical care to inmates, and is among those responsible for denying Ms. Diamond medically necessary care. She is sued in her individual and official capacities.

23. Defendant Donna Silver was at all relevant times employed or retained by GDC to provide treatment and care to inmates at Rutledge State Prison, and acting under the color of state law. Defendant Silver is among those responsible for denying Ms. Diamond medically necessary care. She is sued in her individual and official capacities.

24. Defendant John Thompson was at all relevant times employed or retained by GDC to provide treatment and care to inmates at Rutledge State Prison, and acting under the color of state law. Defendant Thompson is among those responsible for denying Ms. Diamond medically necessary care. He is sued in his individual and official capacities.

## FACTS

Background on Gender Dysphoria

25.     Gender dysphoria, also known as gender identity disorder, is a medical condition in which an individual's gender identity and gender identification differ from the gender assigned at birth, causing clinically significant distress. Individuals with gender dysphoria are referred to as transgender or transsexual.[2]

26.     Gender dysphoria appears in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-V"), where it is described as "[a] marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration," and clinically significant impairment or distress, as manifested by two or more of the following:

> 1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).
> 2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).
> 3. A strong desire for the primary and/or secondary sex characteristics of the other gender.
> 4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
> 5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
> 6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

27.     There is a consensus among competent medical professionals and medical associations around the globe that gender dysphoria is a serious medical condition, and that persons with gender dysphoria have serious medical needs requiring treatment. Left untreated,

---

[2] The terms gender dysphoria, gender identity disorder, and transsexualism are synonyms, and are used interchangeably in GDC records, as well as in the Complaint. The term transgender is also used throughout to refer to individuals with gender dysphoria.

gender dysphoria is known to lead to serious medical problems, including suicidality and the impulse to engage in self-castration and self-harm. Individuals with untreated gender dysphoria also experience clinically significant depression, anxiety, and mental impairment.

28.     The generally accepted standards for the treatment of gender dysphoria are the Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, published by the World Professional Association for Transgender Health (the "Standards of Care").[3]

29.     The Standards of Care have been recognized as the authoritative and clinically accepted treatment for gender dysphoria by the American Psychiatric Association, the American Medical Association, courts that have considered the issue, and members of the medical community at large.

30.     The Standards of Care apply equally to incarcerated and non-incarcerated persons, and have been endorsed by the National Commission on Correctional Healthcare and the U.S. Department of Justice National Institute of Corrections as the medically accepted standard for the treatment of inmates with gender dysphoria.

31.     The Standards of Care establish that persons with gender dysphoria must be individually assessed by qualified healthcare providers, and that medically appropriate treatment consists of the following medical interventions, depending on the individual: (1) outwardly conforming one's gender expression and gender role to match one's internal sense of gender identity, including through pronoun usage, grooming, and dress; (2) receiving hormone therapy to promote the development of secondary sex characteristics that affirm one's sense of

---

[3] The Standards of Care were previously known as the Harry Benjamin International Gender Dysphoria Association Standards of Care, and are also commonly referred to as triadic therapy or triadic treatment.

gender identity; (3) obtaining sex reassignment surgery.

32.     The Standards of Care warn that discontinuing hormone therapy in individuals who have been receiving it is extremely dangerous and can have catastrophic effects. The Standards of Care state "[t]he consequences of abrupt withdrawal of hormones or lack of initiation of hormone therapy when medically necessary include a high likelihood of negative outcomes such as surgical self-treatment by autocastration, depressed mood, dysphoria, and/or suicidality."

33.     Psychotherapy, while recommended to provide affirmation to individuals newly diagnosed with gender dysphoria, is not a substitute for treatments such as hormone therapy where medically required. Because depression, anxiety, suicidality, and emotional distress are symptoms that result when gender dysphoria is not being properly treated, antidepressants and psychotropic medications are ineffective and medically inadequate gender dysphoria treatment.

34.     Attempting to treat gender dysphoria with mental health counseling alone, or in combination with psychotropic drugs, is a gross departure from accepted medical practice that puts individuals with gender dysphoria at a severe risk of physical injury, decompensation, and death.

35.     In addition, attempting "to cure" a person of gender dysphoria by forcing them to disregard their innate sense of gender identity and live as their assigned gender is dangerous and puts them at substantial risk of serious harm.

Ms. Diamond's Gender Dysphoria and Treatment History

36.     Ms. Diamond is a thirty-six year old transgender woman with gender dysphoria. Since childhood, Ms. Diamond has experienced a marked incongruence between her assigned gender and sense of self. Ms. Diamond has also strongly identified as female.

37.     In kindergarten, Ms. Diamond went to school dressed as Jem, her favorite

cartoon superhero, to the confusion and chagrin of her teacher and classmates. Ms. Diamond also began styling her hair like female classmates, wearing feminine clothing while at home, and announced to family members that she was a girl.

38.     However, Ms. Diamond was reprimanded and forced to continue living as male, which sparked suicidality and anguish. Ms. Diamond was hospitalized for a suicide attempt at the age of fifteen.

39.     Following her suicide attempt, Ms. Diamond was diagnosed with gender dysphoria (then called transsexualism) and began to receive treatment. Ms. Diamond began living as a woman and adopted a female gender presentation, female pronouns, and feminine dress.

40.     At seventeen, Ms. Diamond also began hormone therapy consisting of estrogen treatments, progestin creams, testosterone blockers, and anti-androgen medications, to bring her gender identity and physical appearance into greater alignment. Through hormone therapy, Ms. Diamond developed full breasts, a feminine shape, soft skin, and other female secondary sex characteristics, and experienced a reduction in male attributes, allowing her to feel more like herself.

41.     Under the Standards of Care, hormone therapy and female gender expression are medically necessary treatments for Ms. Diamond's gender dysphoria. These treatments, unlike psychotherapy, provide Ms. Diamond clinically significant relief from her gender dysphoria and eliminate her suicidality and compulsion to engage in self-harm. Because Ms. Diamond has received these treatments for nearly half her life, they are also critical to her physical and psychological well-being.

GDC Policies on Gender Dysphoria Treatment

42.     On March 27, 2012, Ms. Diamond entered GDC custody in connection with a

non-violent offense. Prior to being placed in GDC custody, Ms. Diamond had been expressing her female gender identity and receiving regular hormone therapy as treatment for her gender dysphoria for over seventeen years.

43.     Defendants, who exercised authority over the care and treatment of inmates, knew that inmates with gender dysphoria have serious medical needs, and that the medically accepted protocol for the treatment of gender dysphoria is the Standards of Care.

44.     Defendants were also aware of Ms. Diamond's gender dysphoria condition and history of hormone treatment at all relevant times: as a result of her hormone therapy, Ms. Diamond had full breasts, a feminine voice, feminine shape, and a feminine appearance. Her gender dysphoria diagnosis was also repeatedly confirmed during medical and mental health evaluations by GDC personnel. Ms. Diamond also informed Defendants that she was a transgender woman with gender dysphoria, discussed her history of hormone therapy, noted that she attempted suicide as a teenager prior to obtaining care, and requested ongoing treatment.

45.     However, Ms. Diamond's female clothing, brassieres, and undergarments were confiscated, and her hormone therapy was terminated for the first time in 17 years.

46.     Within GDC, the treatment of gender dysphoria is guided by the Standard Operating Procedure on the Management of Transsexuals, VH47-0006 (the "Transgender SOP"). The Transgender SOP is disseminated to all GDC personnel. Defendants, as GDC employees, were familiar with the Transgender SOP and its guidelines.

47.     The Transgender SOP acknowledges that inmates with gender dysphoria have serious medical needs and states that individuals who identify themselves as transgender, including by self-proclamation, should be referred within GDC for special medical evaluations. The Transgender SOP also discusses the treatment regimen described in the Standards of Care,

and acknowledges the importance of providing inmates with gender dysphoria continuity of treatment, including hormone therapy.

48.     However, the Transgender SOP deviates from the medically accepted Standards of Care in important respects. The Transgender SOP limits eligibility for gender dysphoria treatment to inmates who are identified as transgender during their diagnostic intake screenings — even though the GDC personnel who complete these screenings are not required to have any specialized knowledge or training regarding gender dysphoria, and often lack basic familiarity with the condition.

49.     The Transgender SOP also restricts the care available to "maintenance" of existing treatments — preventing healthcare personnel from initiating medical treatment that in their judgment is medically required for an inmate based on the Standards of Care.

50.     Pursuant to this policy, inmates who are diagnosed with gender dysphoria after their initial diagnostic screening, or who cannot show a history of treatment remain ineligible for treatments such as hormone therapy, even when they constitute medically necessary care. Consequently, there is a widespread and pervasive practice at GDC of inmates with gender dysphoria being refused medically appropriate treatment of any kind, and being subjected to ridicule and reprimand by GDC staff for their gender non-congruence, rather than provided necessary medical care.

51.     Defendants were aware of these abuses and the need for staff training, including because a number of GDC inmates have filed complaints or brought lawsuits in recent years regarding their denial of gender dysphoria care.

GDC Policies on Transgender Inmates and Sexual Assault

52.     The Transgender SOP also discusses the importance of securing proper placements for transgender inmates given their particular vulnerability within custody, and

12

outlines a series of procedures to be followed to reduce transgender inmates' foreseeable risk of harm.

53.     Specifically, the GDC Transgender SOP gives Defendant Lewis, in her capacity as the Statewide Medical Director, the responsibility to make decisions regarding the care, treatment and housing placements of transgender inmates. The GDC Transgender SOP also instructs Defendant Lewis to confer and make "informed decisions" regarding the care and assignment of transgender inmates when safety issues arise.

54.     Transgender inmate safety is also addressed in the Prison Rape Elimination Act of 2000, 42 U.S.C. § 15601 *et seq.*, its implementing regulations, 28 C.F.R. § 115 *et seq.*, (collectively "PREA"), which apply to GDC and are discussed in GDC's accompanying Standard Operating Procedure on the Prison Rape Elimination Act and Sexual Assault of /Sexual Misconduct with Offenders, IIA21-0001 (the "PREA SOP"). PREA and the PREA SOP are disseminated to all GDC personnel. Defendants, as GDC employees, were familiar with PREA, the PREA SOP, and their guidelines.

55.     PREA recognizes that transgender inmates face a substantial vulnerability to sexual assault and requires GDC personnel to assess whether an inmate "is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming" during their intake screenings or upon their transfer to a new correctional facility. 28 C.F.R. § 115.41(d)(7).

56.     PREA also requires that GDC personnel consider the placement of gay, lesbian, bisexual, transgender, intersex, or gender nonconforming inmates on a case-by-case basis, and evaluate whether the inmate should be assigned to a male or female facility, and whether their proposed housing placements will reasonably ensure their health and safety. GDC personnel are also instructed to review these housing placements at least twice a year, or when issues arise,

and to assess the need for adjustments — giving serious consideration to a transgender inmate's own views regarding safety. 28 C.F.R. § 115.42(b)-(e).

57.     PREA, the PREA SOP, and GDC's Standard Operating Procedures on the Investigation of Allegations of Sexual Contact, Sexual Abuse, and Sexual Harassment of Offenders (IK01-0006), the Medical and Mental Health Management of Suspected Sexual Abuse, Contact, or Harassment (VG55-0001 and VH85-0002) (collectively the "Sexual Assault SOPs"), provide additional instruction on how GDC personnel should devise housing placements for inmates to prevent sexual assault, and handle instances of sexual assault within GDC facilities.

58.     Under PREA and the PREA SOP, GDC personnel are also required to assess inmates for additional sexual assault risk factors, including whether "the inmate has previously been incarcerated;" "the inmate's criminal history is exclusively nonviolent;" "the inmate has previously experienced sexual victimization;" and the "inmate's own perception of vulnerability," and make individualized determinations about how to ensure inmate safety when assigning housing placements. 28 C.F.R. § 115.41(d)(4)-(9); 28 C.F.R. § 115.42(b).

59.     GDC personnel are required to perform these risk assessments upon an inmate's initial arrival in GDC custody and their transfer to different GDC facilities, and to perform a follow-up risk assessment 30 days thereafter, or following a "referral, request, incident of sexual abuse, or receipt of additional information that bears on the inmate's risk of sexual victimization." Id. § 115.41(f)-(g).

60.     Upon information and belief, the Sexual Assault SOPs also instruct GDC personnel to adopt a zero tolerance and "must tell" policy for sexual assault and sexual misconduct within GDC facilities, whereby personnel must immediately report rumors or

allegations of inmate sexual assaults, and notify prison wardens, Sexual Assault Response Team ("SART") personnel, and Defendant Lewis of sexual assault allegations.

61.     The Sexual Assault SOPs also give prison wardens and SART personnel specific responsibilities with respect to the handling of sexual assault allegations, which include the responsibility to arrange for medical and mental health examinations of suspected sexual assault victims, and revised housing placements. The Sexual Assault SOPs also state that the identities of sexual assault victims are to be treated with confidentiality.

62.     Despite being aware of transgender inmates' substantial vulnerability to sexual assault, there is a widespread and pervasive practice within GDC of transgender inmates being denied safe or appropriate housing placements, and being sexually victimized as a result. Instead of following PREA's requirements or taking reasonable steps to prevent transgender inmates from facing ongoing sexual assault or coercion, GDC staff often disregard inmate safety concerns, blame transgender inmates for provoking their sexual assaults on account of their gender identity or sexual orientation, and refuse to process their sexual assault grievances.

63.     In recent years, GDC has been confronted with numerous complaints and lawsuits by inmates concerning the failures of staff to protect them from assault. However, upon information and belief, staff training regarding the safety needs of transgender inmates with respect to sexual assault remains perfunctory or non-existent.

Ms. Diamond's Early Incarceration at GDC and Events that Put Defendants on Notice of Her Medical and Safety Needs

64.     In March 2012, despite having sizeable breasts, a feminine voice, feminine hips, a feminine appearance, and notifying personnel that she was transgender and on hormone therapy, Ms. Diamond was not evaluated for gender dysphoria, referred for treatment, or given a reasonably safe or appropriate housing placement. Instead, on April 12, 2012, after

completing her intake processing, Ms. Diamond was assigned to Macon State Prison, a closed-security facility for adult male felons.

65.     Within GDC, closed-security facilities are the equivalent of maximum security prisons, and house inmates with "assaultive histories" and other serious crimes on file. Because closed-security facilities house inmates considered to be the most violent and dangerous, gang activity and inmate assaults are also frequent.

66.     Upon information and belief, there is no penological reason for Ms. Diamond's confinement in closed-security facilities, rather than medium-security facilities. Such confinement is inconsistent with PREA and GDC's own policies regarding inmate classification, given Ms. Diamond's status as a transgender woman, a non-violent offender, and an individual being incarcerated within GDC for the first time.

67.     Transgender inmates at closed-security facilities are significantly more prone to sexual assault, in part because they are preyed on by members of gangs.

68.     At medium security facilities such as Johnson State Prison and Central State Prison, sexual assaults against transgender inmates — including inmates receiving hormone therapy and access to female grooming standards — are infrequent.

69.     Less than a month after arriving at Macon State Prison, Ms. Diamond was brutally sexually assaulted by six members of a gang, punched, stomped, and knocked unconscious. Ms. Diamond reported her sexual assault to GDC personnel, and information concerning Ms. Diamond's sexual assault was recorded in her GDC records. Upon information and belief, Defendant Lewis was also notified of Ms. Diamond's assault pursuant to GDC policy.

70.     Following her assault, Ms. Diamond advised GDC personnel that she had

ongoing concerns about her physical safety within closed-security facilities, on account of her being transgender, not affiliated with gangs, and a non-violent offender. Ms. Diamond asked that her placement within closed-security facilities be reviewed. However, even though PREA and GDC policy require GDC personnel to review inmate placements in the event of assault, and give weight to inmate perceptions of safety, on May 24, 2012, Ms. Diamond was transferred to Baldwin State Prison, another closed-security facility housing felons considered to be the most dangerous. Upon entering Baldwin, Ms. Diamond once again became a target for sexual harassment and coercion.

71.     Following months of sexual harassment that she reported to staff, in October 2012, and in January 2013, Ms. Diamond was sexually assaulted by Baldwin inmates. Ms. Diamond reported her sexual assaults to Baldwin personnel, who recorded the assaults in her GDC records. Upon information and belief, Defendant Lewis was also notified of the assaults pursuant to GDC policy, but took no action. Baldwin staff were also slow respond, "lost" complaints that Ms. Diamond filed, "lost" the physical evidence of Ms. Diamond's assaults, failed to conduct an investigation, and told her that she brought her assaults upon herself by being transgender, instead of arranging for safe placement.

72.     Thereafter, Ms. Diamond was evaluated by a series of GDC mental health professionals who diagnosed her with post-traumatic stress disorder ("PTSD"), and concluded that the sexual assaults she endured were having a clinically significant effect on her health and well-being. The mental health professionals also concluded that Ms. Diamond faced continued vulnerability to sexual assault at Baldwin given her transgender status, and the dangerous inmate population. They recommended that Ms. Diamond be transferred from a closed-security facility to a medium security facility for her safety, but provided counseling to address Ms.

Diamond's PTSD and anxiety in the interim.

73.     A series of mental health personnel at Baldwin also diagnosed Ms. Diamond with gender dysphoria and noted that she had been living as a woman since the age of fifteen, had received hormone therapy prior to her incarceration, had begun engaging in self-harm and attempting auto-castration, and recommended ongoing treatment. However, no action was taken with respect to these recommendations and, increasingly distraught, Ms. Diamond attempted suicide on or about February 28, 2013.

74.     On or about April 25, 2013, two months after her suicide attempt, Ms. Diamond was evaluated by GDC mental health personnel who reconfirmed her gender dysphoria diagnosis and history of living as a female. GDC personnel also concluded that Ms. Diamond continued to suffer from PTSD; was feeling fearful and targeted within the prison based on her gender identity; and was experiencing anxiety, fearfulness, nightmares and intrusive thoughts as a result of her sexual assaults. GDC personnel recommended that GDC staff meet with Ms. Diamond regarding her medical needs.

75.     Thereafter, Ms. Diamond was given an appointment with Dr. Stephen Sloan, a GDC psychologist with specialized knowledge concerning gender dysphoria. Dr. Sloan performed an individualized assessment of Ms. Diamond under the Standards of Care, and concluded that hormone therapy and female gender expression were the medically necessary treatments for her gender dysphoria, and that Ms. Diamond stood a substantial risk of self-harm and suicide if care was denied.

76.     Dr. Sloan recommended that hormone therapy be provided to Ms. Diamond. However, Defendant Lewis, the Statewide Medical Director of GDC, refused to authorize treatment. Ms. Diamond's visits with Dr. Sloan were also discontinued, and Ms. Diamond was

transferred to another prison.

Denial of Medical Care at Rutledge State Prison

77. On October 1, 2013, Ms. Diamond was transferred from Baldwin to Rutledge State Prison, a medium security facility for inmates like Ms. Diamond, who are non-violent offenders or lack major adjustment problems. Following her transfer to Rutledge, Ms. Diamond ceased being a victim of sexual coercion or assault — despite her feminine appearance, feminine mannerisms, and status as a transgender woman.

78. Upon her arrival, Rutledge personnel including Defendants Hatcher, Silver, and Thompson, received Ms. Diamond's GDC records and a transfer summary detailing her history of sexual assaults, gender dysphoria diagnosis, history of hormone treatment, past attempts at self-harm, and requests for ongoing care.

79. Ms. Diamond also filed petitions regarding her need for medical treatment, and eventually met with Defendants John Thompson and Donna Silver, two GDC healthcare providers.

80. Ms. Diamond explained that she had received hormone therapy for 17 years prior to arriving at GDC, and had been assessed by Dr. Sloan under the Standards of Care as still requiring hormone treatment. Ms. Diamond also explained that the denial of healthcare was dire to her physical well-being, and that *inter alia*, she had lost breast mass, was experiencing muscle spasms, chronic pain, and compulsion to engage in self-castration.

81. Defendants Silver and Thompson admitted to Ms. Diamond that they were not qualified in the treatment of gender dysphoria, but denied her request for hormone therapy, without referring her for evaluation or treatment with a qualified professional, in accordance with the Standards of Care. Defendant Silver simply informed Ms. Diamond that she had forfeited the right to receive hormone therapy when she became a prisoner.

19

82.     On November 18, 2013, Ms. Diamond contacted Defendant Shelton, the Warden of Treatment and Care, regarding her gender dysphoria and previous attempts to access care. Ms. Diamond asked Defendant Shelton to provide her information concerning the availability of needed treatment.

83.     In a letter dated November 22, 2013, Defendant Shelton informed Ms. Diamond "the Department does not offer therapy for this at this time." Upon information and belief, Defendant Shelton also advised healthcare personnel that GDC's policy was to refuse to initiate gender dysphoria treatment, but that inmates could be referred for general counseling *in lieu* of gender dysphoria treatment.

84.     Shortly after receiving Defendant Shelton's letter, Ms. Diamond was contacted by Defendants Silver and Thompson regarding her requests for medical treatment. Echoing Defendant Shelton, Defendants Silver and Thompson advised Ms. Diamond that she would not be receiving any gender dysphoria treatment while in custody, but could speak to a mental health counselor regarding any underlying feelings of depression and anxiety.

85.     On or about November 25, 2013, Ms. Diamond wrote a letter to Defendant Hatcher concerning her gender dysphoria and denial of treatment. Ms. Diamond told Defendant Hatcher that her physical health and well-being were being jeopardized by the continued denial of medical care, and asked Defendant Hatcher to authorize or refer her for medical treatment.

86.     Defendant Shelton responded to Ms. Diamond by letter on her and Defendant Hatcher's behalf. Defendants' letter acknowledged that Ms. Diamond was suffering from the denial of medical care, however, instead of referring her for evaluation and treatment, Defendants advised Ms. Diamond to develop better coping mechanisms.

87.     Thereafter, Ms. Diamond filed a complaint concerning her continued denial of

20

medical care. Ms. Diamond explained that her gender dysphoria was a serious medical need, but that she had been informed by personnel that no gender dysphoria treatment was available.

88.     In response, Defendant Hatcher placed Ms. Diamond in solitary confinement on December 4, 2013 for nearly a week, for "pretending to be a woman." During that time, Ms. Diamond became suicidal and battled a strong compulsion to engage in self-harm.

89.     Defendant Hatcher returned Ms. Diamond to solitary for ten more days beginning December 20, 2013, after Ms. Diamond was visited by attorneys who learned of her denial of treatment. Defendant Hatcher visited Ms. Diamond in solitary confinement on or about December 26, 2013, and Ms. Diamond explained that she was not simply "pretending to be a woman," but had serious medical needs requiring treatment. Ms. Diamond also told Defendant Hatcher that she was suicidal because of the denial of care.

90.     Defendant Hatcher refused to release Ms. Diamond from solitary confinement or refer her for treatment. Later that day, Ms. Diamond attempted suicide and tried to sever her penis with a razor. Ms. Diamond was hospitalized on an emergency basis. Upon information and belief, Defendants Hatcher and Lewis were also notified of Ms. Diamond's suicide and castration attempts.

91.     Thereafter, Defendant Lewis wrote a letter informing Ms. Diamond that she had reviewed the actions of the GDC personnel who had refused to provide her with gender dysphoria treatment, and determined that they had handled matters appropriately. Upon information or belief, Defendant Lewis instructed GDC personnel to continue their blanket policy of refusing to initiate gender dysphoria treatment, and offering counseling in lieu of medically necessary treatment called for by the Standards of Care.

Failure to Protect and Denial of Medical Care at Valdosta State Prison

92.     On December 31, 2013, Ms. Diamond was transferred from Rutledge State

21

Prison to Valdosta State Prison, another closed-security facility housing felons with assaultive histories considered to be the most dangerous. Upon her arrival at Valdosta, personnel, including Defendants Allen and McCracken, received Ms. Diamond's GDC records and a transfer summary detailing her history of sexual assaults, gender dysphoria diagnosis, history of hormone treatment, past attempts at self-harm, and requests for ongoing care.

93.     During her intake, Ms. Diamond was warned by Valdosta personnel that Valdosta lacked the means to safely house transgender persons like Ms. Diamond, and that she stood a high likelihood of being sexually assaulted based on the inmate population, which included many gang members. However, Ms. Diamond was not offered any safety accommodations. She was simply told by staff to "guard your booty" and be prepared to fight.

94.     On or about January 1, 2014, just one day after her arrival, Ms. Diamond was sexually assaulted by an inmate at Valdosta. Ms. Diamond reported her sexual assault to personnel, and notified them that she continued to be housed with her perpetrator. Upon information and belief, Defendant Lewis was notified of Ms. Diamond's assault, as were Defendants Allen and McCracken in their respective capacities as the Valdosta Warden and SART team leader. However, Defendants Lewis, Allen, and McCracken did not make adjustments to Ms. Diamond's housing placement or take other steps to safeguard her, despite having the authority to do so. Instead, Ms. Diamond continued to be housed in a cell with her perpetrator, who subjected her to continued sexual harassment and coercion.

95.     On January 19, 2014, Ms. Diamond requested an appointment with GDC medical staff concerning her ongoing safety issues and need for gender dysphoria treatment. Thereafter, in late January and early February 2014, Ms. Diamond was evaluated by Drs. Raymond Moody and Heather Harrison, GDC mental health professionals at Valdosta.

96.     As did Dr. Sloan, Drs. Moody and Harrison performed individualized assessments of Ms. Diamond, and concluded that she should be receiving hormone therapy as treatment for her gender dysphoria under the Standards of Care. Drs. Moody and Harrison also concluded that Ms. Diamond was experiencing withdrawal based on the discontinuation of her medical treatment, and stood a high risk for suicide and self-harm, should medical care be denied.

97.     Upon information and belief, Dr. Moody advised Defendant Lewis of their conclusions regarding Ms. Diamond's ongoing need for hormone therapy, and sought to initiate treatment. However, Defendant Lewis denied the request for hormone therapy without evaluating Ms. Diamond, or performing any independent assessment of her need for treatment. Upon information and belief, Drs. Moody and Harrison were told that hormone treatment could not be initiated under the Transgender SOP, even if treatment was considered necessary under the Standards of Care, but inmates could be provided general mental health counseling in lieu of gender dysphoria treatment.

98.     Upon information and belief, Dr. Harrison also advised Defendants Allen and McCracken of Ms. Diamond's ongoing safety issues and need for a transfer to a safer facility, based on her conclusion that Ms. Diamond stood a substantial risk of continued sexual assault at Valdosta based on the inmate composition. However, Defendants Allen and McCracken deferred and delayed on her recommendations to provide Ms. Diamond with a revised placement.

99.     On or about February 9, 2014, Ms. Diamond was sexually assaulted by a gang member at Valdosta. Ms. Diamond reported her sexual assault to personnel, and explained that she had ongoing fears for her safety. Upon information and belief, Defendants Lewis, Allen,

and McCracken were also notified of Ms. Diamond's assault pursuant to GDC policy. However, despite having the authority to revise Ms. Diamond's placement and arrange for safe-keeping, no action was taken.

100.   On February 11, 2014, Ms. Diamond contacted Defendant Owens individually concerning her placement and health and safety concerns. Ms. Diamond notified Defendant Owens that she had been repeatedly sexually assaulted when housed at closed-security facilities with inmates prone to violence. Ms. Diamond told Defendant Owens that following her transfer from Rutledge, a medium security facility, to Valdosta, a closed-security facility, she had renewed fears for her safety.

101.   Ms. Diamond also informed Defendant Owens that GDC personnel were not acting to protect her from continued assault, or considering her gender dysphoria or rape victim status when choosing her placements, as required by PREA and GDC policy. Ms. Diamond also requested that she be transferred from Valdosta to a medium security facility like Central or Johnson, where transgender inmates could be housed more safely. However, no action was taken.

102.   On or about February 26, 2014, Ms. Diamond personally contacted Defendant McCracken regarding her safety. Ms. Diamond informed Defendant McCracken that she was a transgender woman with gender dysphoria, in need of medical care. Ms. Diamond explained that she had been receiving hormone therapy for years, and was in the process of developing a treatment plan for hormone therapy with Dr. Sloan prior to her transfer from Baldwin. Ms. Diamond also explained that she a victim of repeated sexual assaults since entering GDC custody, and had ongoing fears for her safety due to continued sexual harassment and coercion from inmates at Valdosta.

103.    Ms. Diamond asked Defendant McCracken to review her placement and arrange for her transfer to a safer facility, or a facility where she could at least receive gender dysphoria care. However, despite knowing of Ms. Diamond's health and safety needs, Defendant McCracken deferred and delayed action on Ms. Diamond's requests to be afforded reasonable safety and care.

104.    Ms. Diamond continued to experience suicide ideation and impulses for self-harm as a result of her denial of gender dysphoria treatment and in or around March 2014, Ms. Diamond was hospitalized for suicidality and attempting self-castration.

105.    On or about April 2014, Ms. Diamond personally contacted Defendant Allen regarding her safety concerns at Valdosta. Ms. Diamond explained that she was a transgender woman who had been sexually assaulted and had ongoing fears for her safety. She asked Defendant Allen to review her placement and arrange for her transfer to a safer facility. However, despite having the authority to do so, Defendant Allen refused to act on Ms. Diamond's request for safe placement.

106.    In April 2014 Ms. Diamond was sexually assaulted two more times by inmates at Valdosta with gang affiliations. On each occasion, Ms. Diamond reported her sexual assaults to GDC personnel, and renewed her requests for a transfer to a safer facility. Upon information and belief, Defendants Lewis, Allen, and McCracken were notified of each of Ms. Diamond's assaults pursuant to GDC policy. However, despite having the authority to arrange for safe placement, Defendants took no action. Instead, the GDC personnel who processed Ms. Diamond's complaints told her that she was asking to be sexually assaulted because she was transgender, and would continue to be targeted for sexual abuse and coercion.

107.    On May 13, 2014, Ms. Diamond contacted Defendant Owens once again,

25

through counsel. Ms. Diamond explained that she was being sexually assaulted, but her requests for protection were being ignored. Ms. Diamond also explained that hormone therapy was a medically necessary treatment for her gender dysphoria, that she had been receiving hormone therapy for many years, and had been harmed by GDC's refusal to provide her gender dysphoria treatment.

108.    Defendant Owens knew there was a widespread practice among GDC personnel of denying gender dysphoria treatment to inmates who needed it, stemming in part from their lack of training. Defendant Owens also knew that enforcement of the Transgender SOP was preventing inmates from receiving treatment in accordance with the Standards of Care based on the individualized judgments of their healthcare providers, regarding their need for medical care.

109.    Defendant Owens responded to Ms. Diamond's letter through counsel, but refused to authorize hormone therapy for Ms. Diamond's gender dysphoria or refer her for evaluation or treatment. Instead, Defendant Owens continued to enforce the Transgender SOP, and adopted, ratified, or instructed his subordinates to continue their policy of denying medically necessary treatment.

110.    On or about May 2014, Ms. Diamond personally contacted Defendant Allen again regarding her gender dysphoria and ongoing need for treatment but, in response, Defendant Allen began subjecting Ms. Diamond to harassment on account of her being transgender.

111.    Defendant Allen ridiculed Ms. Diamond for her female gender identity and feminine mannerisms, and began referring to Ms. Diamond as a "he-she-thing" in front of GDC inmates and personnel. Defendant Allen also began reprimanding Ms. Diamond when her

gender presentation deviated from male stereotypes. On May 15, 2014, Defendant Allen disciplined Ms. Diamond for shaping her eyebrows in a feminine manner, and informed her that she was expected to look and dress like a man. Defendant Allen encouraged his staff to ridicule Ms. Diamond for her female gender expression, and to instruct her to act and appear male.

112.    Ms. Diamond complained about Defendant Allen's conduct and her ongoing denial of medical care. She explained that female grooming, expression, and identification were components of her gender dysphoria. Ms. Diamond's complaint was reviewed and rejected by GDC personnel on grounds that Ms. Diamond was "clearly a man, not a woman."

113.    Ms. Diamond was also told there was "no medically indicated reason" for her female gender presentation, even though female gender expression is a form of medical treatment under the Standards of Care. Ms. Diamond was also warned that she would remain subject to continued discipline for her female gender expression, because "[her] gender was male."

114.    In May and June 2014, Ms. Diamond spoke with Defendant McCracken again regarding her placement at Valdosta and need for care. Ms. Diamond reminded Defendant McCracken that she was a transgender woman with gender dysphoria, and a victim of repeated sexual assaults since entering GDC custody. Ms. Diamond explained that she continued to face sexual harassment and coercion at Valdosta, and had ongoing fears for her safety.

115.    Ms. Diamond asked Defendant McCracken to review her placement, and to arrange her transfer to a safer facility, but he delayed and deferred any action on Ms. Diamond's behalf, and she continued to be a constant target for sexual harassment and coercion.

116.    In May and June 2014, Ms. Diamond was reevaluated by Dr. Harrison, who had previously been advised that hormone therapy was not available under GDC Policy. Dr.

Harrison observed that Ms. Diamond's PTSD symptoms and anxiety had worsened due to ongoing issues of personal safety, and concluded that Ms. Diamond should be transferred to a medium security prison for her safety. Dr. Harrison also noted that Ms. Diamond was "being forced to transform from a woman back to a man" as a result of her continued denial of medical care, and was attempting auto-castration as a result.

117.   In August and September 2014, Ms. Diamond was evaluated by GDC healthcare personnel again, who confirmed Ms. Diamond's gender dysphoria and PTSD diagnoses, and noted that Ms. Diamond's condition was deteriorating, that Ms. Diamond was experiencing withdrawal and physiological side effects, was manifesting hopelessness, and engaging in further attempts at self-castration and self-harm based on her continued denial of care. The medical professionals noted that Ms. Diamond had a history of hormone therapy and was requesting ongoing treatment, but stated that hormone therapy for Ms. Diamond was not being provided because it had not been authorized by "ATL" — or Defendants Owens and Lewis.

118.   Thereafter, Ms. Diamond's suicidality and impulses to engage in self-harm intensified, and Ms. Diamond attempted to castrate herself once again. Ms. Diamond was referred for emergency medical treatment, and told that she faced a risk of permanent injury or death if her castration attempts continued.

119.   In September 2014, Ms. Diamond filed a *pro se* lawsuit against Defendants Allen and McCracken regarding her ongoing safety concerns at Valdosta. Ms. Diamond also began writing letters and publicizing her ongoing sexual assaults. After commencing her lawsuit against Defendants Allen and McCracken, Ms. Diamond was finally transferred from Valdosta State Prison.

120.   However, instead being sent to a medium security facility where she could enjoy

28

reasonable safety, she was transferred back to Baldwin State Prison, the closed-security facility where she had previously been a victim of multiple sexual assaults.

121.    On January 22, 2015, Plaintiff was assessed by Dr. Randi C. Ettner, a forensic psychologist who is an expert in the diagnosis and treatment of gender dysphoria. Dr. Ettner confirmed that Plaintiff suffers from severe and persistent gender dysphoria, and that hormone therapy and female gender expression are the medically necessary treatment for her gender dysphoria. Dr. Ettner also determined that Plaintiff was experiencing severe physical and psychological harm due to her lack of gender dysphoria treatment, including clinically significant depression, suicidality, hopelessness, anxiety, desperation, and a regression of hormonally-induced physical effects. Dr. Ettner also noted that Plaintiff attempted suicide and auto-castration multiple times following the withdrawal of gender dysphoria care, and expressed an ongoing intention to end her life if forced to continue living as male.

122.    Dr. Ettner concluded that unless hormone therapy for Plaintiff was resumed to treat her gender dysphoria and accompanying suicide ideation, the consequences would be predictable and dire. Dr. Ettner also concluded that attempting to treat Plaintiff's gender dysphoria with psychotherapy or anti-psychotics instead of hormone therapy would substantially depart from accepted medical practice and would place Plaintiff in ongoing peril of suicide and self-harm.

123.    Ms. Diamond remains without safe placement or care for her gender dysphoria to this day, and continues to suffer from suicide ideation and the compulsion to engage in self-castration and self-harm on an almost daily basis.

## CLAIM FOR RELIEF

### Count One:
### Refusal to Provide Medically Necessary Care
### in Violation of the Eighth Amendment to the Constitution

(As to All Defendants)

124.     Ms. Diamond incorporates and realleges herein the allegations of the foregoing paragraphs.

125.     At all relevant times, Defendants knew that Ms. Diamond had gender dysphoria, a serious medical need that jeopardizes an individual's physical health and mental well-being when left untreated.

126.     Defendants knew that the medically accepted standards for the treatment of gender dysphoria are the Standards of Care, and that hormone therapy and female gender expression, not psychotherapy, were medically necessary treatments for Ms. Diamond's gender dysphoria. Defendants knew that Ms. Diamond had been receiving these therapies for nearly two decades prior to her incarceration, and that discontinuing Ms. Diamond's hormone therapy placed her at a substantial risk of suicide, self-castration, and physical harm.

127.     Despite this knowledge and despite Ms. Diamond's repeated requests for care, Defendants, while acting under color of state law, have refused to provide Ms. Diamond with any medically necessary treatment for her gender dysphoria, in deliberate indifference to her serious medical needs, and in violation of the Eighth Amendment's prohibition on cruel and unusual punishment.

128.     Alternately, Defendants provided Ms. Diamond care that was so poor, cursory, grossly inadequate, and out of step with accepted professional norms that it constitutes a wanton infliction of pain, not medical treatment at all.

129.     Each of the Defendants directly participated in the Constitutional deprivations

30

alleged.

130.    Defendants Hatcher and Allen showed deliberate indifference to Ms. Diamond's serious medical needs by, *inter alia*, disciplining Ms. Diamond and subjecting her to punishment for expressing her female gender, a medically necessary form of treatment.

131.    Defendants Silver and Thompson showed deliberate indifference to Ms. Diamond's serious medical needs by, *inter alia*, denying her care for her gender dysphoria, refusing to refer her for treatment in accordance with the Standards of Care and informing Ms. Diamond that she lost the right to receive gender dysphoria treatment when she entered prison.

132.    Defendant McCracken showed deliberate indifference to Ms. Diamond's serious medical needs by, *inter alia*, knowing of her need treatment, but disregarding her requests for medical care and refusing to refer her for medical treatment.

133.    Defendants Owens, Lewis and Shelton showed deliberate indifference to Ms. Diamond's serious medical needs by, *inter alia*, refusing to authorize gender dysphoria treatment in accordance with the Standards of Care with no exercise of individualized medical judgment whatsoever, including when treatment had been recommended by qualified GDC healthcare personnel, who performed actual assessments of Ms. Diamond.

134.    Defendant Owens, Lewis, and Shelton showed deliberate indifference to Ms. Diamond's serious medical needs by, *inter alia*, ratifying or condoning the unconstitutional actions of their subordinates, and/or failing to take steps to prevent them from continuing to disregard inmates' need for medically necessary treatment, while fully aware of the constitutional deprivations complained of here.

135.    Defendant Owens, Lewis, and Shelton also showed deliberate indifference to Ms. Diamond's serious medical needs by, *inter alia*, instructing GDC healthcare personnel to

refuse requests to initiate or refer inmates or gender dysphoria treatment, and to ignore their professional medical judgment regarding whether treatment was required under the Standards of Care.

136.    Each of the Defendants also implemented, followed, enforced, and continue to enforce a policy or custom, having the force of law, of refusing requests to initiate gender dysphoria treatment, irrespective of an inmate's medical need, and providing counseling alone when they knew it was grossly inadequate care, that placed inmates at a substantial risk of mental and physical deterioration.

137.    As a direct and proximate result of Defendants' actions, Ms. Diamond has suffered and continues to suffer irreparable physical injury and emotional harm.

138.    Ms. Diamond's body has been violently transformed due to the denial of hormone therapy: Ms. Diamond has lost breast tissue and her female secondary sex characteristics have diminished. Ms. Diamond has also experienced and continues to experience physical injury in the form of chest pain, muscle spasms, heart palpitations, severe vomiting, dizziness, hot flashes, withdrawal symptoms, weight loss, diarrhea, fatigue and hyperhidrosis.

139.    The therapeutic effects of Ms. Diamond's seventeen year history of gender dysphoria treatment have also been reversed. As a result of her denial of treatment, Ms. Diamond has attempted suicide and self-castration on multiple occasions, engaged in cutting and other forms of self-harm. Ms. Diamond's suicidality and compulsion to engage in castration and self-harm persist to this day. She has also suffered and continues to suffer severe depression, anxiety, and mental anguish.

140.    Ms. Diamond remains without medically necessary care and continues to be at a substantial risk of suicide, self-harm, and physical injury. Ms. Diamond will continue to suffer

substantial and irreparable harm absent immediate relief.

**Count Two:**
**Policy or Custom Regarding the Treatment of**
**Gender Dysphoria in Violation of the Eighth Amendment to the Constitution**

(As to Defendants Owens and Lewis)

141.    Ms. Diamond incorporates and realleges herein the foregoing paragraphs.

142.    Defendants Owens and Lewis, who are final policy and decision makers for GDC, have enforced and continue to enforce an unconstitutional freeze-frame policy — the Transgender SOP — that removes decisionmaking regarding the treatment of gender dysphoria from healthcare professionals and prevents them from initiating medically necessary care. The policy subjects inmates like Ms. Diamond to a substantial risk of serious injury and harm in violation of the Eighth Amendment to the U.S. Constitution.

143.    Under the Transgender SOP,[4] which has been and continues to be implemented by Defendant Owens, Lewis, and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, Ms. Diamond has been denied all medically appropriate treatment for her gender dysphoria, in violation of the prohibition on cruel and unusual punishment in the Eighth Amendment, even though no dispute exists regarding her gender dysphoria diagnosis or need for treatment.

144.    As a direct and proximate cause of Defendants' enforcement of the Transgender SOP, Ms. Diamond has suffered and continues to suffer irreparable physical injury and emotional harm and the deprivation of her constitutional rights. She will continue to suffer substantial and irreparable harm absent immediate relief.

**Count Three:**
**Failure to Protect Against Foreseeable Sexual Assault**
**in Violation of the Eighth Amendment to the Constitution**

---

[4] Discuss whether there is a way to clarify where the policy goes wrong.

<u>(As to Defendants Owens, Lewis, Allen, and McCracken)</u>

145.   Ms. Diamond incorporates and realleges herein the foregoing paragraphs.

146.   At all relevant times, Defendants knew that Ms. Diamond, as a transgender woman, faced an extreme and substantial vulnerability to sexual assault and harm in GDC custody. Due to the severity and obviousness of the risks facing transgender inmates like Ms. Diamond, PREA and the Transgender SOP advised that the placements of transgender inmates be carefully considered by Defendants and other GDC personnel.

147.   Defendants knew that at closed-security facilities, which house inmates considered to be the most dangerous, with assaultive histories and gang affiliations, Ms. Diamond as a transgender woman and non-violent offender, stood an even greater risk of harm.

148.   Defendants also knew that Ms. Diamond suffered repeated sexual assaults at the closed-security facilities where she was housed, and that her placement at Valdosta, yet another closed-security facility, exposed her to continued risks of great harm.

149.   Defendants were notified of Ms. Diamond's ongoing sexual assaults, and Ms. Diamond's repeated requests to be housed in safer conditions. However, despite having the authority to do so, and while acting under the color of state law, Defendants deferred, delayed, and refused to take reasonable steps to protect Ms. Diamond from harm — contrary to their obligations under PREA and GDC policy — in deliberate indifference to her substantial risk of sexual assault, and contrary to the Eighth Amendment and contemporary standards of decency.

150.   Each of the abovementioned Defendants directly participated in the Constitutional deprivations alleged.

151.   Defendant Lewis showed deliberate indifference to Ashley's safety needs by, *inter alia*, disregarding her obligations under PREA and GDC policy to assess the needs of transgender inmates and provide appropriate placements, and failing to take action after

receiving notification of Ashley's ongoing sexual assaults.

152.   Defendants Allen and McCracken showed deliberate indifference to Ashley's safety needs by, *inter alia*, disregarding their obligations under PREA and the Sexual Assault SOPs to assess the needs of sexual assault victims and provide appropriate placements; failing to take action after receiving notification of Ashley's ongoing sexual assaults; and unreasonably denying, delaying, or deferring Ashley's requests for protection.

153.   Defendant Owens and Lewis also showed deliberate indifference to Ms. Diamond's serious medical needs by, *inter alia*, ratifying or condoning the unconstitutional actions of their subordinates, and/or failing to take reasonable steps to prevent them from continuing to disregard the safety needs of transgender inmates like Ms. Diamond, who faced a substantial and foreseeable risk of sexual assault, while fully aware of the deprivations complained of here.

154.   As a direct and proximate result of Defendants' intentional actions, Ms. Diamond has suffered and continues to suffer irreparable physical injury and emotional harm.

155.   Ms. Diamond has been sexually assaulted on more than half a dozen occasions, continues to be subjected to near-daily sexual harassment and coercion. Ms. Diamond has also been diagnosed with anxiety and PTSD.

156.   Due to Defendants' actions, Ms. Diamond's extreme vulnerability to sexual assault will continue indefinitely, absent relief.

### Count Four:
### Failure to Train and Supervise Staff Regarding
### Inmate Safety or Serious Inmate Medical Needs

#### (As to Defendants Owens and Lewis)

157.   Ms. Diamond incorporates and realleges herein the foregoing paragraphs.

158.   Defendants Owens and Lewis, who are final policy and decision-makers for

GDC, failed to properly train their staff concerning the medical and safety needs of transgender inmates and inmates with gender dysphoria, despite knowing of a widespread and pervasive pattern of abuse by GDC personnel that was likely to continue absent training.

159.    Defendants knew that, based on their failure to train GDC personnel, GDC staff had repeatedly denied inmates with gender dysphoria treatment of any kind, and subjected them to discipline and reprimand in lieu of treatment, including by taunting them, calling them names, placing them in solitary confinement, and insisting they act and identify as their assigned gender — in Ms. Diamond's case, male.

160.    Defendants also knew that, based on their failure to train GDC personnel, there was a widespread and pervasive custom of GDC staff disregarding the safety needs of transgender inmates, failing to provide them reasonably safe placements, delaying, deferring, or refusing to reassess the placements of transgender inmates when sexual assaults occur, blaming transgender inmates for their assaults, and refusing to process their sexual assault grievances.

161.    As a direct and foreseeable consequence of Defendants' conscious disregard of the obvious need to train personnel, Ms. Diamond has been denied medically necessary care for her gender dysphoria and reasonable protection from foreseeable sexual assault, in violation of the Eighth Amendment's prohibition on cruel and unusual punishment, and fundamental notions of decency.

162.    Ms. Diamond has suffered and continues to suffer irreparable physical injury and emotional harm as a result of Defendants' failure to supervise and train personnel, and will continue to suffer substantial and irreparable harm absent immediate relief.

## PRAYER FOR RELIEF

163.    WHEREFORE, Plaintiff Ashley Diamond respectfully prays that this Court enter judgment in her favor and against Defendants, providing the following relief:

A. A declaration that Defendants' refusal to provide medically necessary treatment for gender dysphoria violates the Eighth Amendment to the United States Constitution;

B. A declaration that the Transgender SOP, both on its face and as applied to Plaintiff, violates the Eighth Amendment to the United States Constitution;

C. A declaration that Defendants Lewis, Allen and McCracken's failure to protect Plaintiff from foreseeable sexual assault violates the Eighth Amendment to the United States Constitution;

D. A preliminary and permanent injunction directing Defendant Owens and Lewis to provide Plaintiff medically necessary treatment for her gender dysphoria under the Standards of Care, including but not limited to hormone therapy, and permitting Plaintiff to express her female gender identity through grooming, pronoun use, and dress;

E. A preliminary and permanent injunction requiring Defendant Owens and Lewis to train GDC personnel regarding the medical and safety needs of transgender inmates with gender dysphoria;

F. A preliminary and permanent injunction enjoining the enforcement of the Transgender SOP by each Defendant sued in their official capacity;

G. A preliminary and permanent injunction directing Defendants Owens and Lewis to provide Plaintiff reasonably safe placement, including but not limited to through transfer to a medium security or transitional facility;

H. Compensatory damages against each Defendant named in his or her individual capacity, in an amount adequate to compensate Plaintiff for her harms and losses;

I.   Punitive damages against each Defendant named in his or her individual capacity, in an amount to be determined at trial;

J.   Reasonable attorneys' fees and costs, including expert fees, under 42 U.S.C. § 1988; and

K.  All other relief that the Court deems just and proper.

Dated: February 19, 2015                    Respectfully submitted,


                                            /s/ James M. Knoepp
                                            James M. Knoepp, GA Bar No. 366241
                                            Southern Poverty Law Center
                                            1989 College Ave. NE
                                            Atlanta, GA  30317
                                            Tel: (404) 521-6700
                                            jim.knoepp@splcenter.org

                                            A. Chinyere Ezie,* NY Bar No. 496774
                                            David Dinielli,* CA Bar. No. 177904
                                            Samuel Wolfe,* AL Bar No. 2945E63W
                                            Southern Poverty Law Center
                                            400 Washington Ave
                                            Montgomery, AL  36104
                                            Tel: (334) 956-8200
                                            chinyere.ezie@splcenter.org
                                            david.dinielli@splcenter.org
                                            sam.wolfe@splcenter.org

                                            *Counsel for Plaintiff*

                                            *Applications for admission pro hac vice
                                            forthcoming*

**VERIFICATION**

I, Ashley A. Diamond, am the Plaintiff in this action. I hereby declare under penalty of perjury that I have read the foregoing complaint and am familiar with its contents, and the facts set forth therein are true and accurate to the best of my knowledge and belief.

Dated: February 19, 2015

Ashley Diamond