**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**

| | | |
|---|---|---|
| ASHLEY DIAMOND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 5:15-cv-00050-MTT |
| | ) | |
| BRIAN OWENS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND**
**PRELIMINARY INJUNCTION**

A. Chinyere Ezie,* NY Reg. No. 496774
Samuel Wolfe,* AL Bar No. 2945E63W
Southern Poverty Law Center
400 Washington Ave.
Montgomery, AL 36104
Tel: (334) 956-8200
chinyere.ezie@splcenter.org
sam.wolfe@splcenter.org

James M. Knoepp, GA Bar No. 366241
Southern Poverty Law Center
1989 College Ave. NE
Atlanta, GA 30317
Tel: (404) 521-6700
jim.knoepp@splcenter.org

*Counsel for Plaintiff*

*Admitted pro hac vice*

**TABLE OF CONTENTS**

INTRODUCTION                                                                            1

FACTS                                                                                  2

    I.    Defendant's Awareness of Transgender Inmates' Vulnerability to Sexual
Assault                                                                                2

    II.   Early Events that Put Defendants on Notice of Plaintiff's Risk of Sexual Assault
                                                                                       4

    III.  Plaintiff's Continued Victimization in GDC Custody, and Defendants' Failure
to Protect                                                                             6

    IV.  Defendants Approved a Retaliatory Transfer that Places Plaintiff at an
Exceedingly High Risk of Sexual Assault                                                7

ARGUMENT                                                                               11

    I.    Plaintiff Meets The Standard For Preliminary Relief                       11

        A.   Plaintiff is Likely to Succeed on the Merits of her Eighth Amendment
Failure to Protect Claim                                                               11

        B.   Plaintiff Will Suffer Irreparable Injury Absent Injunctive Relief       18

        C.   The Threatened Harm to Plaintiff Outweighs Any Harm to Defendants    19

        D.   Injunctive Relief will Serve the Public Interest                     19

    II.   The Bond Requirement Should Be Waived                                      20

CONCLUSION                                                                             20

# TABLE OF AUTHORITIES

## FEDERAL COURT CASES

Belcher v. City of Foley, Ala.,
    30 F.3d 1390 (11th Cir. 1994) ................................................................. 12

BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Servs., LLC,
    425 F.3d 964 (11th Cir. 2005) ................................................................. 20

Caldwell v. Warden, FCI Talladega,
    748 F.3d 1090 (11th Cir. 2014) ........................................................ 11, 12

Ewe Grp., Inc. v. Bread Store, LLC,
    No. 1:14-CV-2377-TCB, 2014 WL 4702575 (N.D. Ga. Sept. 22, 2014).............................. 10

Farmer v. Brennan,
    511 U.S. 825 (1994).......................................................................... passim

Goebert v. Lee Cnty.,
    510 F.3d 1312 (11th Cir. 2007) ................................................................. 15

Greason v. Kemp,
    891 F.2d 829 (11th Cir.1990) ................................................................. 16

Green v. Hooks,
    No. 6:13-CV-17, 2013 WL 4647493 (S.D. Ga. Aug. 29, 2013)............................ 16

Greene v. Bowles,
    361 F.3d 290 (6th Cir. 2004) ................................................................. 15

Hale v. Tallapoosa Cnty.,
    50 F.3d 1579 (11th Cir. 1995) ........................................................ 14, 16, 17

Helling v. McKinney,
    509 U.S. 25 (1993)............................................................................... 18

Jackson v. Stevens,
    694 F. Supp. 2d 1334 (M.D. Ga. 2010) ................................................. 15

LaMarca v. Turner,
    995 F.2d 1526 (11th Cir. 1993) ................................................................. 17

Laube v. Haley,
    234 F. Supp. 2d 1227 (M.D. Ala. 2002) ........................................... 14, 19

League of Women Voters of Fla. v. Browning,
    863 F. Supp. 2d 1155 (N.D. Fla. 2012)................................................. 19

Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,
    51 F.3d 982 (11th Cir. 1995) ................................................................. 10

Louis v. Meissner,
    530 F. Supp. 924 (S.D. Fla. 1981) ................................................... 10, 11

Lynch v. Lewis,
   No. 7:14-CV-24, 2015 WL 1296235 (M.D. Ga. Mar. 23, 2015)............................................. 16

Mesa Air Grp., Inc. v. Delta Air Lines, Inc.,
   573 F.3d 1124 (11th Cir. 2009) ........................................................................................... 10

Newsome v. Higham,
   No. 7:08-CV-8(HL), 2010 WL 1258013 (M.D. Ga. Mar. 29, 2010)................................. 15, 16

Pocklington v. O'Leary,
   No. 86 C 2676, 1986 WL 5748 (N.D. Ill. May 6, 1986) ....................................................... 18

Rodriguez v. Sec'y for Dep't of Corr.,
   508 F.3d 611 (11th Cir. 2007) ........................................................................................ 13, 17

Royal v. Reese,
   No. 1:14-CV-0025-WSD, 2014 WL 49872 (N.D. Ga. Jan. 7, 2014) ..................................... 10

Scott v. Roberts,
   612 F.3d 1279 (11th Cir. 2010) ...................................................................................... 18, 19

Skinner v. Uphoff,
   234 F. Supp. 2d 1208 (D. Wyo. 2002).............................................................................. 16, 18

Toliver v. Colvin,
   No. 12-CV-00227A(F), 2014 WL 1660609 (W.D.N.Y. Apr. 24, 2014) ................................. 19

United States v. Georgia,
   892 F. Supp. 2d 1367 (N.D. Ga. 2012) ................................................................................ 10

Will v. Mich. Dep't of State Police,
   491 U.S. 58 (1989)................................................................................................................ 1

Williams v. Bennett,
   689 F.2d 1370 (11th Cir. 1982) ............................................................................................ 14

World Triathlon Corp., Inc. v. SRS Sports Ctr. SDN.BHD,
   No. 804CV1594T24TBM, 2005 WL 3445526 (M.D. Fla. Dec. 14, 2005) ............................ 11

Wyatt By & Through Rawlins v. Poundstone,
   892 F. Supp. 1410 (M.D. Ala. 1995) ................................................................................... 19

## FEDERAL STATUTORY AUTHORITIES

42 U.S.C. § 15601 et seq................................................................................................................ 2

18 U.S.C. § 3626(a) .................................................................................................................... 20

## FEDERAL RULES AND REGULATIONS

28 C.F.R. §  115 et seq................................................................................................................. 2

Fed. R. Civ. P. 25(d) ..................................................................................................................... 1

## INTRODUCTION

Plaintiff Ashley Diamond ("Plaintiff" or "Ms. Diamond") is a transgender woman in the custody of the Georgia Department of Corrections ("GDC"), the Commissioner,[1] and Defendant Lewis (collectively "Defendants"), all of whom are charged with Ms. Diamond's safety and care. Ms. Diamond brings this emergency motion because, soon after initiating this lawsuit, she was transferred, apparently in retaliation, to Georgia State Prison – a facility that houses "problematic male adult offenders,"[2] and boasts one of the highest rates of sexual assault of any GDC facility.

Ms. Diamond endured multiple sexual assaults in her three years of custody prior to the recent transfer. These assaults, combined with GDC's failure to provide necessary medical care, have rendered Ms. Diamond particularly vulnerable to additional assaults. This is why her recent transfer – to a high-risk setting in which GDC either cannot or will not protect Ms. Diamond from sexual violence – requires immediate intervention. In just a two week span, Ms. Diamond has fought off an attempted rape in a stairwell. She has been menaced and harassed by inmates who have threatened and physically molested her. Inmates have also masturbated themselves in front of Ms. Diamond, and left notes in her living quarters threatening, among other things, to "cum on her face."

It is difficult to understand how it is that Defendants approved Ms. Diamond's transfer to such a patently unsafe setting. But one GDC official, in a moment of apparent candor, explained to Ms. Diamond that "when you fuck with the GDC, they fuck you back." Ms. Diamond's

---

[1] In February 2015, Homer Bryson replaced Brian Owens as GDC Commissioner and, under settled law, is automatically substituted for him in this action. See, e.g., Fed. R. Civ. P. 25(d); Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."). For the sake of clarity, Bryson and Owens are referred to hereinafter by title, as the "Commissioner."

[2] Georgia Department of Corrections, GA State Prison, http://www.dcor.state.ga.us/GDC/FacilityMap/html/S_50000265.html (last visited March 31, 2015).

transfer has placed her at looming risk of continued sexual assault; Ms. Diamond therefore seeks a temporary restraining order and preliminary injunction directing Defendants to take immediate steps to keep her safe.

## FACTS

**I.    Defendants' Awareness of Transgender Inmates' Vulnerability to Sexual Assault**

Plaintiff is a transgender woman and nonviolent offender who entered GDC custody on March 27, 2012. Plaintiff's Verified Complaint dated February 19, 2015 ("Compl.") ¶ 42. Prior to entering custody, Plaintiff had been living as a woman and receiving hormone therapy as part of her gender dysphoria treatment for over seventeen years. Compl. ¶ 44. Plaintiff arrived at GDC with sizeable breasts, a feminine voice, feminine hips, and a feminine appearance, and informed GDC personnel including Defendants that she was transgender. Id.

At all relevant times GDC personnel, including Defendants, were aware that transgender inmates face a special vulnerability to sexual assault. Id. ¶¶ 52-63. Transgender inmates are frequent targets of sexual assault in GDC, as well as nationwide: nearly thirty-five percent of transgender inmates have experienced sexual assault, and studies have shown they are 13 times more likely to be sexually assaulted on one or more occasions. See Declaration of A. Chinyere Ezie dated March 31, 2015 ("Ezie Decl. II.") Exs. J-L.

The Prison Rape Elimination Act of 2000 ("PREA")[3] and GDC policy acknowledge transgender inmates' vulnerable status, and outline a procedure for prison personnel to follow in order to minimize transgender inmates' risk of sexual assault. Compl. ¶¶ 52-59. Compliance with PREA and GDC policy is mandatory for staff, and information concerning their requirements are disseminated to all GDC personnel. Id. ¶ 54; Ezie Decl. II. Ex. M.

_____

[3]See 42 U.S.C. § 15601 et seq., and its implementing regulations, 28 C.F.R. § 115 et seq.

Pursuant to these policies, GDC personnel are required to assess the placement of transgender inmates on a case-by-case basis – evaluating whether they should be assigned to a male or female facility, and whether their proposed housing placements will reasonably ensure their health and safety. Compl. ¶ 56. GDC personnel are also required to evaluate inmates for additional risk factors for sexual assault including whether they are non-violent offenders, persons incarcerated for the first-time; or persons with a history of sexual victimization – taking into account the inmate's own perceived vulnerability. Compl. ¶ 58.; Ezie Decl. II. Ex. M (stating that inmates receive comprehensive evaluations of their sexual assault risk factors). GDC personnel are supposed to incorporate an inmate's sexual victimization history "into decisions concerning permanent housing assignments or transfers of offenders between institutions." Ezie Decl. Ex. N at 10. GDC personnel are also required to perform assessments periodically, including at intake, upon transfer, and whenever issues arise – giving serious consideration to an inmate's own views regarding safety – revising placements when necessary. Compl. ¶¶ 56, 59.

GDC policy likewise acknowledges the importance of securing proper placements for transgender inmates, and gives the Statewide Medical Director, Defendant Lewis, the responsibility to make decisions regarding the housing placements of transgender inmates. Compl. ¶¶ 52-53; Declaration of A. Chinyere Ezie dated February 20, 2015 ("Ezie Decl. I") Ex. A at 2-3. GDC policy instructs Defendant Lewis to confer and make "informed decisions" regarding the housing assignments of transgender inmates when safety issues arise. Id.

GDC policy also instructs personnel to adopt a "must-tell" policy for sexual assault, whereby they report all incidences of sexual assault to senior GDC officials – including prison wardens, the Commissioner, and Defendant Lewis. Ezie Decl. II. Exs. N-O; Compl. ¶ 60. Additionally, housing for inmates who are sexually victimized is to be "closely monitored and …

3

coordinated across departments to prevent repeated incidents." Ezie Decl. II. Ex. M.

## II.      Early Events that Put Defendants on Notice of Plaintiff's Risk of Sexual Assault

Although PREA and GDC policy establish a straightforward procedure for addressing transgender inmates' safety needs, no safety assessment was ever performed of Plaintiff. Compl. ¶ 64 . Instead, Plaintiff was assigned to Macon State Prison, an adult male facility housing "closed-security" inmates. Id. Closed-security inmates are the most dangerous inmates in GDC custody, and frequently have assaultive histories or serious crimes on file. Compl. ¶ 65. In closed-security environments, transgender inmates are frequent targets of sexual assault, and are preyed on by gangs, whereas at medium-security facilities, assaults are infrequent. Id. ¶¶ 67-68.

Plaintiff's placement in a closed-security environment was inconsistent with GDC's own inmate classification policies. Id.¶ 66. Under GDC policy, Plaintiff is only a medium-security inmate, because she is a non-violent offender incarcerated for the first time. Id. Less than a month after her arrival, Plaintiff was brutally sexually assaulted by six gang members, beaten and knocked unconscious. Id. ¶ 69. Plaintiff's assault was extensively documented in GDC records, and Defendants received notification. Id.; Ezie Decl. II. Ex. P. Plaintiff also informed personnel that she had ongoing concerns about her physical safety and asked that her placement in closed-security environments be reviewed. Compl. ¶ 70.

Although Defendants exercise authority over transgender inmate housing placements in their respective roles, on May 24, 2012, Plaintiff was transferred to another facility housing closed-security inmates – Baldwin State Prison ("Baldwin") – where she quickly became a target for sexual abuse. Id. When Plaintiff complained that she feared another assault was imminent, no action was taken. Id. Instead, Plaintiff was told to conceal her transgender identity to "minimize the risk of being assaulted." Ezie Decl. II. Ex. L at 1. Shortly thereafter, in October 2012, Plaintiff was sexually assaulted again. Compl. ¶ 71.

4

The conduct of GDC staff has contributed to Plaintiff's vulnerability in prison: within GDC, transgender inmates are routinely denied safe housing and medically necessary care, and there is a widespread practice among GDC staff of calling transgender inmates derogatory names such as faggots, sissies, and queers, instead of coming to their aid. See, e.g., Compl. ¶¶ 50-51, 62-63, 87-91, 110-113; Ezie Decl. II. Exs. Q-T. On multiple occasions when Plaintiff has approached GDC officers regarding her issues of safety, she has been told that her sexual assaults were "her fault because she was transgender." Id.; Ezie Decl. II. Ex. Q (Brooks Declaration). Although numerous complaints and lawsuits have been filed in recent years alerting senior GDC officials to the rampant disregard shown to transgender inmates, these practices continue unaffected. See, e.g., Compl.; Ezie Decl. II. ¶ 3; Ezie Decl. II. Exs. Q-T.

Following her October assault, healthcare providers at GDC diagnosed Plaintiff with post-traumatic stress disorder ("PTSD") and told that her sexual assaults were having a clinically-significant effect on her well-being. Id. ¶¶ 71-72. Although GDC healthcare providers recommended that Plaintiff be transferred to a medium-security facility given her continued vulnerability to assault in closed-security settings, no action was taken. Id. Thereafter, in January 2013, Plaintiff was sexually assaulted for a third time. Id. GDC personnel including Defendants received notification of Plaintiff's sexual assault, but were slow to respond, "lost" physical evidence and complaints, failed to meaningfully investigate Plaintiff's claims, and delayed, deferred, and denied her requests for safe placement. Id.

On October 1, 2013, a full-year after her first assault at Baldwin, Plaintiff was transferred to Rutledge State Prison ("Rutledge"), a medium-security prison for inmates, like Plaintiff, who are non-violent and lack major adjustment problems. Id. ¶ 77. Once at Rutledge, Plaintiff ceased being a victim of sexual assault or harassment despite being transgender. However, on December

31, 2015, in retaliation for complaining about staff's refusal to provide her gender-related

medical care, Plaintiff was transferred from Rutledge to Valdosta State Prison ("Valdosta"),

another closed-security facility housing felons considered the most dangerous. Id. ¶¶ 92-93.

## III.   Plaintiff's Continued Victimization in GDC Custody, and Defendants' Failure to Protect

When Plaintiff arrived at Valdosta, personnel admitted that they lacked the means to

house transgender inmates safely, and that she stood a high likelihood of being assaulted. Id.

However, instead of receiving a revised housing placement, Plaintiff was told "guard your

booty" and be prepared to fight. Id. One day after her arrival at Valdosta, Plaintiff was sexually

assaulted by her cellmate. Id. ¶ 94. Senior GDC officials including Defendants, received

notification of Plaintiff's assault, but took no action, and Plaintiff continued to be abused by her

cellmate. Id. Thereafter, GDC healthcare providers confirmed that Plaintiff was suffering from

PTSD and recommended that she be transferred to a medium-security facility; however, no

action was taken. Id. ¶ 98. On or about February 9, 2014, Plaintiff was sexually assaulted for the

fifth time in GDC custody. Id. ¶ 99. Although Defendants and other GDC personnel received

notification of her assaults, they failed once again to take remedial action. Id.

On February 11, 2014, Plaintiff wrote the GDC Commissioner personally concerning the

threats to her safety. Id. ¶ 100-01. Plaintiff explained that she was a transgender woman who had

been repeatedly assaulted in closed-security environments and faced renewed threats at Valdosta.

Id. Plaintiff notified the Commissioner that GDC personnel were not taking steps to protect her

from continued assault, and were ignoring the requirements of PREA. Id. In February and again

in April 2014, Plaintiff conveyed similar messages to senior officials at Valdosta regarding her

safety. Id. ¶¶ 102-03, 105. Plaintiff asked the Commissioner and the others provide her with

protection including through transfer to a medium-security facility where transgender inmates

could be housed safely, but no action was taken. Id.

In April 2014, Plaintiff was sexually assaulted by inmates for the sixth and seventh time, and on both occasions, she reported her sexual assaults to GDC personnel and senior officials, including Defendants, received notification. Id.; Ezie Decl. II Exs N-O. However, despite having the authority to arrange for her safe placement within GDC, Defendants and other GDC officials took no action. Id. Instead, Plaintiff was told that she was asking to be assaulted by virtue of being transgender, and would continue to be targeted. Id.

On May 13, 2014, Plaintiff wrote the GDC Commissioner once again to explain that her health and safety needs were being ignored. Id. ¶ 107. The Commissioner acknowledged Plaintiff's letter but refused to take action. Id. ¶109. Plaintiff and Plaintiff's healthcare providers at GDC also spoke with senior officials regarding the ongoing threats to her safety and her need for placement in a medium-security facility. Id. ¶¶ 114-16. However, GDC officials deferred all action, and Plaintiff's PTSD symptoms worsened. Id. ¶

In September 2014, Plaintiff filed a pro se lawsuit regarding her lack of safety, and began widely publicizing her ongoing sexual assaults – finally leading to her transfer from Valdosta. Id. ¶ 119. However, instead of being sent to a facility that afforded her reasonable safety, Plaintiff was transferred back to Baldwin where she had previously been a victim of repeated sexual assaults. Id. Surrounded by closed-security inmates once again, Plaintiff again became a target for sexual violence. GDC personnel at Baldwin acknowledged that Baldwin was not safe for Plaintiff, and that she stood a severe risk of physical and psychological harm if her assaults persisted. Ezie Decl. II. Ex. U.

**IV.     Defendants Approved a Retaliatory Transfer that Places Plaintiff at an Exceedingly High Risk of Sexual Assault**

On February 19, 2015, Plaintiff commenced this lawsuit, alleging that GDC officials

violated the Eighth Amendment based on their failure to reasonably protect her or provide her adequate medical care. Diamond Decl. ¶ 17. After filing her lawsuit, Plaintiff was stigmatized as a troublemaker by GDC personnel and subjected to a wave of retaliatory conduct. Id. ¶ 18.

On March 10, 2015, a transfer request concerning Plaintiff was submitted to Defendants for review and approval. Id.; Ezie Decl. II. Ex. V. Defendants approved the transfer request and, in the early morning hours of March 17, 2015, corrections officers entered Plaintiff's cell at Baldwin and told her to pack up all of her belongings. Diamond Decl. ¶ 18-19. The officers informed Plaintiff that she was being transferred from Baldwin effective immediately, but refused to disclose the location of her new prison. Id. When Plaintiff asked why she was being transferred, the officers began laughing, referred to her lawsuit, and said "when you fuck with the GDC, they fuck you back." Id. ¶ 20.

Plaintiff was then driven to Georgia State Prison ("GSP"), a facility housing adult male felons considered by GDC to be especially problematic, with one of the highest incidences of inmate sexual assault in the GDC system. Ezie Decl. II. ¶¶ 4. In the days since her transfer, Plaintiff has been subjected to an endless battery of harassment, coercion, threats, and sexual abuse. See Diamond Decl. ¶¶ 22-35. On or about March 19, 2015 – two days after her transfer – Plaintiff was dragged into a stairwell and nearly sexually assaulted by an inmate who entered her dormitory and asked for her by name. Id. ¶¶ 23-24. When Plaintiff notified GDC officers about her attack, she was informed that incidents like that were frequent. Id. ¶ 25.

On or about March 20, 2015, Plaintiff was threatened by an inmate who began following her around her dormitory, exposed himself, and demanded to see her genitals, saying "I know you're a girl. Let me see that pussy. I know you have a pussy." Id. ¶ 26. On or about March 21, 2015, the same inmate grabbed at Plaintiff's genitals and told her she needed protection "because

8

someone is going to get that pussy anyway." Id. ¶ 27. That same day, six different inmates exposed themselves to Plaintiff and began masturbating when she entered the prison yard. Id. ¶ 28. On or about March 22, 2015, the inmate who previously demanded to see Plaintiff's genitals lunged at her, grabbed her buttocks, and told her she needed his "cobra cock." Id. ¶ 29. Although Plaintiff has complained to staff about the inmate's conduct, he remains in her dormitory and continues to subject Plaintiff to frequent abuse. Id.

Since her arrival at GSP, Plaintiff has also received a multitude of threatening and explicit letters – handed to her in passing, left in her dormitory, and slipped into her cell. Id. ¶ 30. One letter describes an inmate's intention to "cum on [Plaintiff's] face," while another advises Plaintiff of her need for protection. Id. ¶¶ 31-32. In another letter, an inmate identifies himself as the friend of a gang member who raped Plaintiff at Macon State Prison, and demands to see her. Id. ¶ 32. Since reporting these incidences to GDC staff, Plaintiff has been threatened with retaliation by gang members. Id. ¶ 33.

Multiple GDC officials have informed Plaintiff that there is no protective housing available at GSP for inmates who, like Plaintiff, are at high risk for sexual assault or fear continued sexual victimization. Id. ¶ 36. Not only have officials proved unwilling to come to Plaintiff's aid, they have mocked her for being transgender and accused her of being a troublemaker." Id. ¶ 37. One officer even informed Plaintiff "they've got something for your ass at Reidsville." Id.

On or about March 24, 2015, after Plaintiff's attorneys voiced concerns about her safety, Plaintiff was confronted by an administrator who threatened her with solitary confinement unless she wrote a statement saying that things were fine at GSP and she felt safe in her current housing placement. Id. ¶ 38. Plaintiff prepared the statement out of fear and under duress, because she

knew that being been placed in solitary confinement would put her at high risk of suicide and

self-harm. Id. ¶¶ 39-41. Plaintiff remains at exceedingly high risk of harm and lives in perpetual

fear of the next attack – exacerbating her PTSD and causing mental anguish. Id. ¶¶ 34-35, 42.

## STANDARD OF REVIEW

The standard for issuing a preliminary injunction equally applies to temporary restraining

orders. See, e.g., United States v. Georgia, 892 F. Supp. 2d 1367, 1371-72 (N.D. Ga. 2012); Ewe

Grp., Inc. v. Bread Store, LLC, No. 1:14-CV-2377-TCB, 2014 WL 4702575, at *3 (N.D. Ga.

Sept. 22, 2014). To issue a preliminary injunction, Courts need not "find that the evidence

positively guarantees a final verdict in plaintiff's favor." Levi Strauss & Co. v. Sunrise Int'l

Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995). Rather, it requires the Plaintiff to meet the

following four factors:

> (1) a substantial likelihood of success on the merits; (2) a
> substantial threat of irreparable injury if the injunction were not
> granted; (3) that the threatened injury to the plaintiffs outweighs
> the harm an injunction may cause the defendant; and (4) that
> granting the injunction would not disserve the public interest.

Id. (citations and quotations omitted); accord Mesa Air Grp., Inc. v. Delta Air Lines, Inc.,

573 F.3d 1124, 1128 (11th Cir. 2009).

A temporary restraining order should issue here because this is a precisely the type of

case where the "preservation of the status quo is necessary in order to protect the court's ability

to render a meaningful decision on the merits." Louis v. Meissner, 530 F. Supp. 924, 925-26

(S.D. Fla. 1981); see also Royal v. Reese, No. 1:14-CV-0025-WSD, 2014 WL 49872, at *2

(N.D. Ga. Jan. 7, 2014) ("Fundamentally, TROs are designed to preserve the status quo until

there is an opportunity to hold a hearing on the application for a preliminary injunction."). Given

the grave risks to Plaintiff's safety, a temporary restraining order is necessary to prevent an

eventual decision in Plaintiff's favor from "becom[ing] mere useless dicta." Meissner, 530 F. Supp. at 926.

## ARGUMENT

## I.   PLAINTIFF MEETS THE STANDARD FOR PRELIMINARY RELIEF

### A.   Plaintiff is Likely to Succeed on the Merits of her Eighth Amendment Failure to Protect Claim

Plaintiff has a substantial likelihood of succeeding on the merits of her claim that Defendants failed to protect her from foreseeable sexual assault in violation of the Eighth Amendment. "A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success. Further, where the balance of the equities weighs heavily in favor of granting the injunction, the movant need only show a substantial case on the merits." World Triathlon Corp., Inc. v. SRS Sports Ctr. SDN.BHD, No. 804CV1594T24TBM, 2005 WL 3445526, at *2 (M.D. Fla. Dec. 14, 2005) (quotations and citations omitted).

"[U]nder the Eighth Amendment, 'prison officials have a duty to protect prisoners from violence at the hands of other prisoners.'" Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting Farmer v. Brennan, 511 U.S. 825, 833 (1994). As the U.S. Supreme Court made clear in Farmer – a seminal case concerning the sexual assault of a transgender woman, who like Plaintiff, was incarcerated in men's prison – this Eighth Amendment duty encompasses the duty to reasonably protect inmates from sexual assault. 511 U.S. at 833-34. Because Defendants have abdicated their constitutional duty to protect Plaintiff from "violence at the hands of other prisoners," id. at 833, Plaintiff can demonstrate all of the elements of an Eighth Amendment claim: "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Caldwell, 748 F.3d at 1099.

### 1.   Plaintiff Stands an Objectively Substantial Risk of Serious Harm

11

Plaintiff satisfies the first prong of the Eighth Amendment test because she is being "incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834; see Caldwell, 748 F.3d at 1099 (discussing objective standard). Plaintiff stands a substantial risk of serious harm in objective terms. "More than any other group, male-to-female transgender inmates (trans women) who are housed with men are at risk for sexual victimization and harassment." Ezie Decl. II. Ex. K at 2; accord Ezie Decl. II Ex. J (confirming vulnerability).

The danger that Plaintiff faces as a transgender woman has been heightened by Defendants' placement decisions: although Plaintiff is a non-violent offender, she has been repeatedly been housed alongside "closed-security" inmates with assaultive histories and gang affiliations, where the threats to her personal safety could hardly be more grave. GDC officials have openly acknowledged that Plaintiff, as a transgender inmate, cannot be kept safe in such settings. Ezie Decl. II. Exs. L & U. True to form, every time Plaintiff has been housed with closed-security inmates, she has been brutally sexually assaulted. See Diamond Decl. ¶¶ 3-13.

Plaintiff's recent placement at GSP – a facility that leads GDC in incidences of sexual assault, and houses "problematic male adult offenders" – only serves to exacerbate these safety risks. Ezie Decl. II. ¶ 4. Two days after her arrival, Plaintiff narrowly escaped her eighth sexual assault in GDC custody, and continues to face an endless torrent of sexual violence, abuse, and harassment. Diamond Decl. ¶¶ 23-33. Although GDC officials have threatened Plaintiff with solitary confinement, this is not a constitutionally adequate remedy to her risk of serious harm from sexual assault, as it places Plaintiff at an equally grave risk of suicide and self-harm. See Diamond Decl. ¶¶ 40-41; Ezie Decl. II Ex. W (documenting Plaintiff's history of suicidality in solitary confinement); Belcher v. City of Foley, Ala., 30 F.3d 1390, 1396 (11th Cir. 1994) ("prisoners have . . . a right to be protected from self-inflicted injuries, including suicide.").

Accordingly, unless and until Defendants provide her with a reasonably safe placement, Plaintiff will remain at an imminent risk of sexual assault and physical injury. Id.

### 2. Defendants Have Shown Deliberate Indifference to Plaintiff's Substantial Risk of Serious Harm

#### a. Defendants knew of Plaintiff's substantial risk of sexual assault

Prison officials violate the Eighth Amendment when they have subjective knowledge of an inmate's substantial risk of serious harm, but "disregard[] that known risk by failing to respond to it in an (objectively) reasonable manner." Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 617 (11th Cir. 2007). Whether prison officials had knowledge of an inmate's serious risk of harm is a question of fact that may be demonstrated "in the usual ways, including inference from circumstantial evidence." Farmer, 511 U.S. at 842 (internal quotations omitted). Moreover, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that *the risk was obvious*." Id. (emphasis added).

Here, the evidence is beyond dispute that Defendants had actual knowledge of Plaintiff's substantial risk of sexual assault, particularly when housed with closed-security inmates: Defendants received formal notifications every time Plaintiff was sexually assaulted; Plaintiff's assaults were documented in GDC records; Plaintiff wrote the Commissioner regarding the threats of harm she was experiencing due to her placements and the failure of GDC staff to follow PREA; Plaintiff filed a pro se lawsuit concerning GDC's failure to protect her and widely publicized the sexual assaults she was experiencing; and Plaintiff exhausted all of the administrative procedures available to her and begged for safekeeping. See Facts, supra.

As in Farmer, knowledge on the part of Defendants can also be inferred because the risks of sexual assault to transgender inmates in men's prisons are known and obvious. Farmer, 511 U.S. at 842, 848 (finding subjective knowledge element could be met where plaintiff was a "non-violent transsexual … likely to experience a great deal of sexual pressure in prison") (citations

13

and quotation marks omitted). Defendants also knew that transgender inmates at GDC were at an increased risk of harm due to a pattern of misconduct by GDC staff, as evidenced by the spate of recent lawsuits filed by transgender inmates in GDC custody. Ezie Dec. II. ¶ 3.

### b. Defendants responded to Plaintiff's risk of sexual assault in an objectively unreasonable manner

"Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." Farmer, 511 U.S. at 834 (quotations omitted). Therefore, deliberate indifference can be shown when prison officials fail to act despite knowing of an inmate's substantial risk of serious harm. Id. at 842. Defendants in this case – who exercise authority over Plaintiff's housing placements and care – violated the Eighth Amendment by failing to protect Plaintiff from her substantial risk of sexual assault in at least four ways.

First, Defendants repeatedly housed Plaintiff with inmates known to be the most dangerous in GDC custody – inconsistent with GDC's classification policies, and without any penological purpose. Classification and placement decisions are of acute significance because they concern "the danger posed by violent inmates to non-violent inmates." Laube v. Haley, 234 F. Supp. 2d 1227, 1235 (M.D. Ala. 2002). Courts have repeatedly found deliberate indifference on the part of prison officials who make "no realistic attempt . . . to separate violent, aggressive inmates from those who are passive or weak." Williams v. Bennett, 689 F.2d 1370, 1375 (11th Cir. 1982) (citations omitted). See, e.g., Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1584-85 (11th Cir. 1995) (denying summary judgment to prison officials who "fail[ed] to classify or segregate violent from non-violent inmates"); Laube, 234 F. Supp. 2d at 1235 (granting preliminary injunction to plaintiffs who alleged, inter alia, that inmates who did not pose security threats were housed with inmates "more dangerous than themselves").

These principles apply with even greater force where transgender inmates are concerned:

In Greene v. Bowles, the Sixth Circuit found that prison officials could be held liable under the Eighth Amendment for the assault of a transgender inmate who was housed alongside a high-security inmate despite being a non-violent offender. 361 F.3d 290, 293-94 (6th Cir. 2004). In Farmer, the Supreme Court vacated a decision granting summary judgment to prison officials based on similar facts, noting – "having stripped [inmates] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." 511 U.S. at 833. Given Plaintiff's track record of sexual assaults in closed-security environments – seven sexual assaults in all – these circumstances are eerily present.

Second, after assigning Plaintiff housing placements that placed her in continued danger, Defendants violated the Eighth Amendment and "evolving standards of decency" by taking *no corrective action whatsoever* when she was sexually assaulted. Jackson v. Stevens, 694 F. Supp. 2d 1334, 1339 (M.D. Ga. 2010) (citations omitted); accord Farmer, 511 U.S. at 542 (liability can be premised on the failure to act). In doing so, Defendants also ignored PREA and GDC polices designed to provide for an inmates' safekeeping– acts which amount to deliberate indifference, and exposed Plaintiff to continued threats of serious harm. See, e.g, Goebert v. Lee Cnty., 510 F.3d 1312, 1329 (11th Cir. 2007) (denying summary judgment where inmate miscarried after prison official ignored prison policy on medical care); Newsome v. Higham, No. 7:08-CV-8 (HL), 2010 WL 1258013, *5 (M.D. Ga. Mar. 29, 2010) (denying summary judgment where senior official disregarded state law regarding the training of corrections officers and an inmate was sexually assaulted).

Third, Defendants displayed deliberate indifference to Plaintiff's safety needs by condoning the routine practice of GDC staff of mistreating transgender inmates and denying

15

them protection and adequate medical care. When Defendants were confronted with complaints and lawsuits alerting them to the pattern of constitutional violations [4] by staff, they failed to intervene and ratified personnel's actions. See, e.g., Skinner v. Uphoff, 234 F. Supp. 2d 1208, 1216 (D. Wyo. 2002) (Holding the "[f]ailure to discipline subordinates whose behavior violates the constitutional rights of inmates can amount to deliberate indifference," and senior officials were liable where they failed to enforce prison policies designed for inmate safekeeping). Defendants also failed to take corrective measures or to train staff on inmate health and safety needs after lawsuits and a widespread pattern of misconduct made the need obvious. See Greason v. Kemp, 891 F.2d 829, 838-39 (11th Cir.1990) (prison officials could be held liable for deliberate indifference when they failed to train staff or implement preventive measures after incident where medically necessary care was withheld); Newsome, 2010 WL 1258013, at *5 (prison official could be held liable for inmate sexual assault based on his failure to train).

Finally, Defendants showed deliberate indifference to Plaintiff's risk of sexual assault by orchestrating her transfer to a GDC facility housing problematic offenders and boasting one of GDC's highest incidences of sexual assault. See Facts IV, supra. Defendants' decision to transfer Plaintiff was based on annoyance with her lawsuit, not considerations of safety, id., and has placed her at an exceedingly high risk of sexual abuse. In the past two weeks, Plaintiff has endured an attempted rape and been subjected to a torrent of relentless yet foreseeable sexual abuse. Given their knowledge of Plaintiff's assaults and ongoing risk of harm, Defendants cannot "escape liability merely by showing that [they] did not know [Plaintiff] was likely to be assaulted

---

[4] See, e.g., Green v. Hooks, No. 6:13-CV-17, 2013 WL 4647493, at *2-3 (S.D. Ga. Aug. 29, 2013) (finding that transgender inmate stated a plausible Eighth Amendment claim based on the failure of GDC officials to protect from sexual assault); see also Lynch v. Lewis, No. 7:14-CV-24, 2015 WL 1296235, *4 (M.D. Ga. Mar. 23, 2015) (finding that transgender inmate stated a plausible Eighth Amendment claim based on the failure of GDC officials to provide her hormone therapy and gender dysphoria care).

or that an assault would be committed by the specific prisoner." <u>Hale</u>, 50 F.3d at 1583; <u>Farmer</u>, 511 U.S. at 548-49 (advance notice of threat not required). Instead, it is sufficient that Defendants had knowledge of Plaintiff's "generalized, substantial risk of serious harm from inmate violence," and failed to take reasonable steps to abate it. <u>Hale</u>, 50 F.3d at 1583.

### 3.  Defendants' Actions and Omissions Have Caused Plaintiff Physical Injury

Plaintiff also satisfies the causation requirement. The "critical question is whether [the defendant] was in a position to take steps that could have averted the [harm] . . . but, through deliberate indifference, failed to do so." <u>Rodriguez</u>, 508 F.3d at 622 (citations omitted). A causal link is established by evidence showing a defendant "had the means substantially to improve prisoner safety"; "knew that the actions he undertook would be insufficient to provide [the inmate] with reasonable protection from violence," and had "other means …available to him which he nevertheless disregarded." <u>LaMarca v. Turner</u>, 995 F.2d 1526, 1539 (11th Cir. 1993) (finding a causal link based in part on "the lack of adequate reporting procedures for rapes and assaults . . . the presence of obvious and rampant indicia of homosexual activity, and … a lack of supervision of officers leading to corruption and incompetence"); <u>Hale</u>, 50 F.3d at 1584-85 (causal link could be shown where Sheriff failed to "classify or segregate violent from non-violent inmates, assign inmates to cells or beds, adequately train the jailers, and adequately supervise and monitor the inmates").

Here, GDC Policy gives Defendant Lewis special responsibility with respect to the care and placement of transgender inmates. Defendant Lewis had the authority to provide Plaintiff a safe, appropriate placement within GDC; however, she ignored Plaintiff's ongoing risk of assault and approved her transfer to one of GDC's most dangerous facilities. Because Defendant Lewis helped bring about the ongoing threats to Plaintiff's safety – threats she has the power to remedy

– Defendant Lewis is a proper subject for the injunctive relief requested. The Commissioner, who exercises policy and decisionmaking authority over GDC and its personnel – is likewise a cause of Plaintiff's injury and in a position to remove it. The Commissioner took no preventive action after learning about Plaintiff's ongoing assaults, and further imperiled her by approving her GSP transfer. The Commissioner also failed to address the pattern of unconstitutional conduct by staff that evinced a clear need for additional training. Where, as here, the failure to train, supervise, or discipline is a moving force behind a constitutional violation, an injunction directed at the commissioner is an appropriate remedy. See Skinner, 234 F. Supp. 2d at 1214-16.

### B.  Plaintiff Will Suffer Irreparable Injury Absent Injunctive Relief

An injury is irreparable for purposes of Rule 65 "if it cannot be undone through monetary remedies." Scott v. Roberts, 612 F.3d 1279, 1295 (11th Cir. 2010) (citation omitted). There can be no dispute that sexual assault falls into this category, as "[d]amages are plainly not an adequate remedy" for continued sexual and physical abuse. Pocklington v. O'Leary, No. 86 C 2676, 1986 WL 5748, *1 (N.D. Ill. May 6, 1986). Plaintiff's risk of irreparable injury from sexual assault is actual and imminent: in her three years in GDC custody, Plaintiff has been sexually assaulted seven times, and has been made even more vulnerable to assault since the filing of her lawsuit by her retaliatory transfer to GSP. In her two short weeks at the new facility, Plaintiff has been molested, harassed, attacked, masturbated on, threatened in sexually explicit letters, and nearly raped in a prison stairwell. Diamond Decl. ¶¶ 22-35. Plaintiff cannot simply "await the conclusion of the litigation to get injunctive relief," given these threats. Id.

Although Plaintiff's near-imminent threat of sexual assault prompted this emergency motion, the Court "need not await a tragic event" before it may act. Helling v. McKinney, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to

them."). It is enough that Defendants are "knowingly and unreasonably disregarding an objectively intolerable risk of harm and will continue to do so absent a court order directing otherwise." Toliver v. Colvin, No. 12-CV-00227A(F), 2014 WL 1660609, at *7 (W.D.N.Y. Apr. 24, 2014) (issuing a TRO where gay inmate faced continued threats of sexual abuse while housed in the general prison population); see also Wyatt By & Through Rawlins v. Poundstone, 892 F. Supp. 1410, 1423 (M.D. Ala. 1995) (granting a preliminary injunction where patients at a mental hospital faced gang intimidation and continued threats of physical and sexual abuse).[5]

### C.  The Threatened Harm to Plaintiff Outweighs Any Harm to Defendants

Plaintiff's substantial risk of continued sexual assault, harassment, and physical and psychological harm far outweigh any harm to Defendants stemming from Plaintiff's request for injunctive relief. Being asked to fulfill one's constitutional obligations is not a cognizable harm at all. See Scott, 612 F.3d at 1297 (enjoining unconstitutional conduct does not harm state actors but serves the public interest). Nor can the substantial threat of harm to Plaintiff here "be outweighed by the risk of financial burden or administrative inconvenience to the defendants." Laube, 234 F. Supp. 2d at 1252.

### D.  Injunctive Relief will Serve the Public Interest

The public interest likewise supports Plaintiff's request for injunctive relief because "there is a strong public interest in requiring that [a] plaintiffs' constitutional rights no longer be violated, as well as in prevention of the foreseeable violence that will occur if present conditions persist." Laube, 234 F. Supp. 2d at 1252; accord Phillips, 731 F. Supp. at 800-01 (finding "the public interest will be served by safeguarding Eighth Amendment rights"); League of Women

---

[5] Absent an injunction, Plaintiff will also suffer irreparable injury in the form of the continued deprivation of her Eighth Amendment rights. See Laube, 234 F. Supp. 2d at 1251 ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm.") (citations omitted).

19

<u>Voters of Fla. v. Browning</u>, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) ("The vindication of constitutional rights . . . serve[s] the public interest almost by definition."); <u>see also</u> <u>KH Outdoor, LLC</u>, 458 F.3d at 1272 (enjoining unconstitutional conduct is "plainly [] not adverse to the public interest.").

## II.     THE BOND REQUIREMENT SHOULD BE WAIVED

The Court should require no bond or at most a nominal bond under Fed. R. Civ. P. 65(c), as Plaintiff is indigent and her inability to pay a bond should not serve as a bar to the relief requested. <u>See</u> <u>BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Servs., LLC</u>, 425 F.3d 964, 971 (11th Cir. 2005) ("[I]t is well established that the amount of security required by the rule is a matter within the discretion of the trial court, and the court may elect to require no security at all.") (quotations and markings omitted).

## CONCLUSION

For the foregoing reasons, this Court should issue a temporary restraining order and/or preliminary injunction directing Defendants to take immediate steps to protect Plaintiff from continued sexual assault, including, but not limited to arranging her transfer from GSP to a facility where she can be afforded reasonable safety. Given the current threats to Plaintiff's safety, this is a necessary and narrowly tailored remedy that extends no further than necessary to safeguard Plaintiff from continued injury. <u>See</u> 18 U.S.C. § 3626(a).

Dated: March 31, 2015                                  Respectfully submitted,

                                                       /s/ A. Chinyere Ezie
                                                       A. Chinyere Ezie