**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **ASHLEY A. DIAMOND,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO. 5:15-CV-50 (MTT)** |
| | ) | |
| **BRIAN OWENS,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## ORDER

Plaintiff Ashley Diamond alleges she[1] is a transgender woman with gender dysphoria.  She alleges the Defendants, in various ways, violated her constitutional rights while she was an inmate in various Georgia prisons by failing to provide her with medical treatment and by failing to protect her from sexual assault.  Some of the Defendants have moved to dismiss some of Diamond's claims.  (Docs. 35; 38).  For the reasons discussed in detail below, the motions are **DENIED**.

## I.    INTRODUCTION

When she filed her complaint, Ashley Diamond was a "nonviolent" Georgia prison inmate who had been incarcerated after violating probation imposed after a theft conviction.  (Doc. 3, ¶¶ 8, 16).  In her 163 paragraph, 38 page verified complaint, Diamond alleges that officials in four different prisons repeatedly violated her constitutional rights by failing to provide her with medical treatment for her gender dysphoria and by failing to protect her from sexual assaults.  As a result, she alleges

---

[1] All parties refer to Diamond with feminine pronouns.  Consequently, the Court does the same.  This should suggest nothing other than consistency.

that on many different occasions she attempted suicide, attempted to castrate herself, was raped, and was otherwise sexually assaulted by inmates at the maximum security prisons in which she was housed.  Her complaint attacks in particular the Georgia Department of Corrections' Standard Operating Procedure on the Management of Transsexuals (the "Transgender SOP").  Diamond claimed that although the Transgender SOP recognized that gender dysphoria is a serious medical need requiring special medical evaluations and appropriate treatment, the Transgender SOP nevertheless limited treatment to specific inmates, specifically those inmates who had been identified as transgender during their intake screenings, and even then treatment was limited to "'maintenance.'"  (Doc. 3, ¶¶ 47-49).  She calls this type of policy a "freeze-frame policy."  (Doc. 3, ¶ 142).

Shortly after Diamond filed her complaint, the Department of Justice filed a Statement of Interest of the United States.  (Doc. 29).  "[T]o assist the Court in evaluating" Diamond's motion to enjoin the enforcement of the Transgender SOP, the United States argued that "proscriptive freeze-frame policies are facially unconstitutional under the Eighth Amendment because they do not provide for individualized assessment and treatment."  (*Id.* at 2).  Shortly after that, during a hearing on Diamond's motion for a temporary restraining order, defense counsel announced, to the surprise of Plaintiff's counsel and the Court, that the freeze-frame policy had been "rescinded, I want to say, two days ago."  (Doc. 40 at 33).  The Court has heard nothing further from the United States so it assumes that the rescission of the policy has satisfied the United States "interests."  It did not, however, resolve Diamond's claims for injunctive and declaratory relief unrelated to the freeze-frame policy.  Then, on August

31, 2015, the Georgia Department of Corrections released Diamond from custody.  That resolved Diamond's remaining claims for injunctive and declaratory relief.  (Docs. 67; 68).  The Court now turns to the Defendants' remaining issues raised by the motions to dismiss.

## II.  BACKGROUND[2]

### A.  Gender Dysphoria

Ashley Diamond suffers from gender dysphoria.  Gender dysphoria "is a medical condition in which an individual's gender identity and … identification differ from the gender assigned at birth."  (Doc. 3, ¶ 25).  Diamond alleges medical professionals agree that gender dysphoria is a serious medical condition requiring treatment conforming to the "Standards of Care."[3]  (Doc. 3, ¶¶ 27-28).  These standards provide that transgender persons should be assessed individually and given appropriate treatment, which may consist of outward expression of "one's internal sense of gender identity," hormone therapy, and/or sex reassignment surgery, but not psychotropic drugs or counseling alone.  (Doc. 3, ¶¶ 31-34).  If left untreated or if treatment is discontinued, there is a "severe risk" the individual will experience "suicidality[,] the impulse to engage in self-castration and self-harm, … clinically significant depression, anxiety, and mental impairment."  (Doc. 3, ¶¶ 27, 32, 34).

---

[2] The facts are taken from the allegations in the complaint (Doc. 3) and accepted as true for purposes of the motions.

[3] The Standards of Care are published by the World Professional Association of Transgender Health and recognized as "the authoritative and clinically accepted treatment … by the American Psychiatric Association, the American Medical Association, courts that have considered the issue, and members of the medical community at large."  (Doc. 3, ¶¶ 28-29).

**B. GDOC's Policies on Transgender Inmates**

GDOC's now rescinded "Transgender SOP" recognized gender dysphoria as a serious medical condition and "discuss[ed] the treatment regimen described in the Standards of Care." (Doc. 3, ¶¶ 46-47). However, only inmates identified as transgender at intake were eligible for treatment. (Doc. 3, ¶ 48). Even if an inmate was classified at intake as transgender, the Transgender SOP limited treatment to "'maintenance' of existing treatments—preventing healthcare personnel from initiating medical treatment that in their judgment is medically required for an inmate based on the Standards of Care." (Doc. 3, ¶ 49). Pursuant to the Transgender SOP, "inmates who [were] diagnosed with gender dysphoria after their initial diagnostic screening[ ] or who cannot show a history of treatment" were ineligible for treatments. (Doc. 3, ¶ 50). This policy, described as a "freeze-frame policy," prevented medical professionals from initiating treatment for gender dysphoria. (Doc. 3, ¶¶ 48-49, 142).

The Transgender SOP also discussed "securing proper placements for transgender inmates" and outlined procedures to reduce the risk of harm. (Doc. 3, ¶ 52). The SOP obligated the Statewide Medical Director, Defendant Sharon Lewis, to address housing placements for transgender inmates, particularly when safety issues arose. (Doc. 3, ¶¶ 52-53). The Prison Rape Elimination Act ("PREA") and GDOC's policies on PREA and sexual assault (the "Sexual Assault SOPs") also provide guidelines to ensure transgender inmates' safety from sexual assault.[4] (Doc. 3, ¶ 54). Pursuant to the Sexual Assault SOPs, personnel must immediately notify wardens, Sexual Assault Response Team ("SART") personnel, and Defendant Lewis when sexual

---

[4] Diamond alleges that the Transgender SOP, PREA, and GDOC's Sexual Assault SOPs are provided to all GDOC personnel, and thus the Defendants were familiar with them. (Doc. 3, ¶¶ 46, 54).

abuse allegations are reported.  (Doc. 3, ¶ 60).  Finally, the Sexual Assault SOPs impose on wardens and SART personnel the "responsibility to arrange for medical and mental health examinations of suspected sexual assault victims[ ] and revised housing placements."  (Doc. 3, ¶ 61).

### C.  Diamond's Background and Incarceration

Since childhood, Diamond has "strongly identified" as female rather than her "assigned [male] gender."  (Doc. 3, ¶ 36).  After attempting suicide at the age of 15, Diamond was diagnosed with gender dysphoria.  (Doc. 3, ¶¶ 38-39).  Since then, she has lived and expressed herself as female.  (Doc. 3, ¶ 39).  At 17, she began hormone treatments, and that treatment continued for over 17 years.  (Doc. 3, ¶¶  40, 42).  As a result, she has developed female secondary sex characteristics, including "full breasts, a feminine shape, soft skin, and … a reduction in male attributes."  (Doc. 3, ¶ 40).

On March 27, 2012, Diamond's hormone therapy and "female expression"[5] were terminated after she was placed in GDOC's custody for a non-violent offense.  (Doc. 3, ¶¶ 42, 45).  At intake, despite her female characteristics and GDOC's knowledge that she was a transgender woman on hormone therapy, "Diamond was not evaluated for gender dysphoria, referred for treatment, or given a reasonably safe or appropriate housing placement."  (Doc. 3, ¶ 64).  Despite her non-violent offender status, GDOC housed Diamond at Macon State Prison—a "closed-security facility for adult male felons" with frequent gang activity and assaults.[6]  (Doc. 3, ¶¶ 64-66).  Within a month, Diamond was "brutally sexually assaulted" by six gang members.  (Doc. 3, ¶ 69).

---

[5] Female expression means just what it suggests—dressing and otherwise presenting oneself as a woman.

[6] A closed-security facility is what GDOC calls its maximum security facilities.  (Doc. 3, ¶ 65).

GDOC then transferred her to Baldwin State Prison, which is also a closed-security facility.  (Doc. 3, ¶ 70).  There, inmates again sexually assaulted Diamond.  (Doc. 3, ¶ 71).  Diamond reported these assaults, but personnel were slow to respond, lost her complaints and physical evidence of the assaults, failed to investigate, and told her she "brought her assaults upon herself" because she was transgender.  (Doc. 3, ¶ 71).  Pursuant to GDOC policies, Lewis was notified after each assault but "took no action."[7]  (Doc. 3, ¶¶ 60, 71).

GDOC mental health professionals diagnosed Diamond with post-traumatic stress disorder ("PTSD") and recommended a transfer to a medium-security facility because her transgender status made her more vulnerable to sexual assaults at a closed-security facility.[8]  (Doc. 3, ¶ 72).  They also diagnosed Diamond with gender dysphoria, noted her history of treatment and self-harm attempts, and recommended ongoing treatment.  (Doc. 3, ¶ 73).  No treatment was provided.  (Doc. 3, ¶ 73).  Diamond attempted suicide on February 28, 2013.  (Doc. 3, ¶ 73).  Two months later, GDOC healthcare providers reconfirmed Diamond's gender dysphoria and PTSD.  (Doc. 3, ¶ 74).  GDOC psychologist Stephen Sloan also performed an individualized assessment of Diamond pursuant to the Standards of Care.  (Doc. 3, ¶ 75).  He

---

[7] Several of Diamond's allegations are prefaced by "upon information and belief."  The Defendants do not specifically contend these allegations are conclusory *because* they are based "upon information and belief."  Rather, they consistently argue Diamond's allegations are generally conclusory.  Allegations based on information and belief can be problematic if they are merely conclusory.  But Diamond's information and belief allegations are buttressed by specific facts and otherwise supported by inferences derived from other well-pled allegations, which make the "upon information and belief" allegations plausible.  *See Sneed v. SEI/Aaron's, Inc.*, 2013 WL 6669276, at *2 (N.D. Ga.).  For example, Diamond alleges that, upon information and belief, Lewis was notified after each incident of sexual assault pursuant to GDOC policy.  (Doc. 3, ¶¶ 69, 71).  This allegation is buttressed by Diamond's specific allegation that GDOC's sexual assault policies require personnel to immediately notify Lewis about sexual assault allegations.  (Doc. 3, ¶ 60).

[8] Diamond alleges that sexual assaults against transgender inmates are infrequent at medium-security facilities, which house non-violent offenders.  (Doc. 3, ¶¶ 68, 77).

concluded Diamond "stood a substantial risk of self-harm and suicide" without treatment and recommended Diamond receive hormone therapy and be permitted female gender expression.  (Doc. 3, ¶ 75).  Lewis "refused to authorize treatment," and Diamond's visits with Dr. Sloan were discontinued.  (Doc. 3, ¶ 76).

### D.  Rutledge State Prison

On October 1, 2013, Diamond was transferred to Rutledge State Prison, a medium-security facility for non-violent inmates.  (Doc. 3, ¶ 77).  Upon Diamond's arrival, Defendants Warden Shay Hatcher, Deputy Warden of Care and Treatment Ruthie Shelton, and John Thompson and Donna Silver, healthcare providers at Rutledge, received her records of "sexual assaults, gender dysphoria diagnosis, history of hormone treatment, past attempts at self-harm, and requests for ongoing care."  (Doc. 3, ¶ 78).

Diamond informed Thompson and Silver about her prior hormone therapy, Dr. Sloan's assessment, and her "muscle spasms, chronic pain, and compulsion to engage in self-castration" from lack of treatment.  (Doc. 3, ¶¶ 79-80).  They denied her request for hormone treatments.  (Doc. 3, ¶¶ 81, 84).  In November 2013, Diamond contacted Shelton about the availability of treatment for gender dysphoria.  (Doc. 3, ¶ 82).  Shelton replied that "the Department does not offer therapy for this at this time" and also advised personnel that GDOC's policy permits counseling but not the initiation of hormone therapy.  (Doc. 3, ¶ 83).  Diamond then contacted Warden Hatcher and requested treatment.  (Doc. 3, ¶ 85).  Shelton, on Hatcher's behalf, wrote a letter acknowledging Diamond "was suffering from the denial of medical care" but only advised her "to develop better coping mechanisms."  (Doc. 3, ¶ 86).

After Diamond filed a grievance about the denial of treatment, Hatcher placed her in solitary confinement twice: once for "pretending to be a woman" and then again after attorneys visited her.  (Doc. 3, ¶¶ 88-89).  Hatcher visited Diamond in solitary in December 2013, and Diamond told him she was suicidal from lack of treatment.  (Doc. 3, ¶ 89).  When Hatcher left her in solitary, Diamond attempted suicide and self-castration, and she was "hospitalized on an emergency basis."  (Doc. 3, ¶ 90).  Diamond alleges Hatcher and Lewis were told of her suicide and castration attempts.  (Doc. 3, ¶ 90).  Lewis subsequently informed Diamond that GDOC personnel "had handled matters appropriately" and instructed personnel "to continue their blanket policy of refusing to initiate gender dysphoria treatment[ ] and offering counseling in lieu of medically necessary treatment called for by the Standards of Care."  (Doc. 3, ¶ 91).

### E.  Valdosta State Prison

On December 31, 2013, Diamond was transferred to Valdosta State Prison, a closed-security facility.  (Doc. 3, ¶ 92).  Upon her arrival, Defendants Warden Marty Allen and David McCracken, the Director of Mental Health Services and PREA coordinator at the prison, received records "detailing her history of sexual assaults, gender dysphoria diagnosis, history of hormone treatment, past attempts at self-harm, and requests for ongoing care."  (Doc. 3, ¶¶ 20, 92).

In January and February 2014, Drs. Moody and Harrison, medical personnel at Valdosta State Prison, concluded Diamond "stood a high risk for suicide and self-harm" if she did not receive hormone therapy.  (Doc. 3, ¶¶ 95-96).  Dr. Moody advised Lewis of their conclusions and "sought to initiate treatment."  (Doc. 3, ¶ 97).  But, adhering to the Transgender SOP, Lewis only permitted counseling.  (Doc. 3, ¶ 97).  Diamond was

hospitalized in March 2014 after again attempting suicide and self-castration.  (Doc. 3, ¶ 104).  Diamond then contacted GDOC Commissioner Brian Owens,[9] Allen, and McCracken regarding her lack of treatment.  Diamond explained to the Commissioner her medical history and GDOC's repeated denial of treatment, but he refused to authorize treatment and continued to enforce GDOC's policy.  (Doc. 3, ¶¶ 107, 109, 135).  Allen responded with ridicule, disciplined her for her female expression, and "encouraged his staff to ridicule" her.  (Doc. 3, ¶ 111).  McCracken "deferred and delayed any action."  (Doc. 3, ¶ 103).

In addition, GDOC personnel at Valdosta State Prison failed to provide Diamond with "safety accommodations."  (Doc. 3, ¶ 93).  Rather, she was simply told at intake that the prison "lacked the means to safely house transgender persons" and that she should "guard [her] booty" because she "stood a high likelihood of being sexually assaulted based on the inmate population, which included many gang members."  (Doc. 3, ¶ 93).

The day after her transfer to Valdosta State Prison, Diamond was sexually assaulted by her cellmate.  (Doc. 3, ¶ 94).  Still, no action was taken, and she remained housed with the perpetrator who continued to sexually harass and coerce her.  (Doc. 3, ¶ 94).  Diamond was sexually assaulted again on February 9, 2014, and she was twice sexually assaulted in April 2014.  (Doc. 3, ¶¶ 99, 106).

Lewis, Allen, and McCracken were notified after each report of sexual assault pursuant to GDOC's policy, but they did not adjust Diamond's placement or take other

---

[9] Homer Bryson replaced Brian Owens as Commissioner after Diamond filed her complaint.  Because Owens was sued only in his official capacity, Bryson was automatically substituted for Owens.  In this Order, Owens is referred to as the Commissioner.  The Commissioner has been dismissed from this action.  (Doc. 68).

safeguarding measures.  (Doc. 3, ¶¶ 60, 94, 99).  Specifically, Dr. Harrison told Allen

and McCracken that Diamond should be transferred because she stood a high risk of

sexual assault given Valdosta's inmate population.  (Doc. 3, ¶ 98).  Diamond also

personally contacted Allen and McCracken about her safety.  In April 2014, Diamond

told Allen of the assaults, but he "refused to act."  (Doc. 3, ¶ 105).  In February, May,

and June of 2014, Diamond told McCracken about the assaults and requested a

transfer.  (Doc. 3, ¶¶ 102-103, 114).  But McCracken "deferred and delayed any action,"

resulting in further "sexual harassment and coercion."  (Doc. 3, ¶¶ 103, 114-15).

Diamond also contacted the Commissioner twice about her repeated sexual assaults at

closed-security prisons and requested a transfer to a medium-security facility, but

Diamond remained at Valdosta State Prison.  (Doc. 3, ¶¶ 101, 107).  After filing a pro se

lawsuit against Allen and McCracken, Diamond was transferred back to Baldwin, where

she had previously been sexually assaulted.  (Doc. 3, ¶¶ 119-20).

## III.   DISCUSSION

Diamond asserts four claims in her complaint.  (Doc. 3).  She alleges (1) all

defendants were deliberately indifferent to her serious medical needs by denying her

medically necessary treatment for her gender dysphoria; (2) Lewis violated her Eighth

Amendment rights by enacting and enforcing an unconstitutional "freeze-frame policy"

regarding gender dysphoria treatment; (3) Lewis, Allen, and McCracken failed to protect

her from a substantial risk of sexual assault; and (4) Lewis failed to train GDOC

personnel regarding transgender inmates' health and safety.  Hatcher, Allen, and

McCracken argue Diamond failed to exhaust her administrative remedies with respect

to Count 1.  Allen and McCracken argue Diamond failed to exhaust her administrative

remedies with respect to Count 3.  Allen, Shelton, McCracken, Thompson, and Silver move to dismiss Count 1 for failure to state a claim, and Allen, Shelton, Lewis, and Hatcher argue they are entitled to qualified immunity.  Lewis and McCracken move to dismiss Count 3 for failure to state a claim, and Lewis argues she is entitled to qualified immunity.  Lewis moves to dismiss Count 4 for failure to state a claim and asserts qualified immunity.

### A.  Failure to Exhaust Administrative Remedies

42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  "[W]hen a state provides a grievance procedure for its prisoners, as Georgia does here, an inmate alleging harm suffered from prison conditions must file a grievance and exhaust the remedies available under that procedure before pursuing a § 1983 lawsuit."  *Johnson v. Meadows*, 418 F.3d 1152, 1156 (11th Cir. 2005) (internal quotation marks and citation omitted).  Grievances should provide prison officials with fair notice of a problem and thus an opportunity to address the problem before a lawsuit is filed.  *Chandler v. Crosby*, 379 F.3d 1278, 1287 (11th Cir. 2004).  In determining whether a plaintiff has exhausted administrative remedies, the Court can resolve factual disputes using evidence from outside the pleadings.  *Bryant v. Rich*, 530 F.3d 1368, 1376 (11th Cir. 2008).

The resolution of a failure-to-exhaust administrative remedies defense typically involves two steps.  *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008).  The court first looks to the parties' factual allegations.  *Id.*  If they conflict, the court takes the

plaintiff's version of the facts as true. *Id.* "If, in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed." *Id.* If the complaint is not subject to dismissal under the plaintiff's version of the facts, the court must proceed to the second step, making specific findings of fact to resolve the disputed factual issues related to exhaustion. *Id.* At this step, the Defendants have the burden to prove Diamond failed to exhaust her administrative remedies. *Id.* Here, however, the Parties mostly do not dispute the facts relevant to Diamond's grievances. Rather, the Defendants contend these facts establish that Diamond failed to exhaust. In the absence of factual disputes, the Court will simply determine whether the allegations establish Diamond exhausted her administrative remedies as to the specific claims against the Defendants. However, in some instances, the Defendants disagree with Diamond's interpretation of the facts, and, where necessary, the Court will treat their disagreement as a factual dispute and resolve that dispute as required by step two of the *Turner* analysis. *See Toenninges v. Ga. Dep't of Corr.*, 600 F. App'x 645, 649 (11th Cir. 2015).

GDOC's grievance procedure requires inmates to follow a two-step process to exhaust their administrative remedies. They must (1) file an original grievance no later than 10 days from the date of the incident giving rise to the grievance; and (2) if the original grievance is rejected, file an appropriate appeal within seven days of receiving the rejection. (Doc. 35-3, ¶¶ 6-17). The untimeliness of a grievance may be waived for good cause. (Doc. 35-2 at 15). As discussed more fully below, when a grievance alleges sexual assault, "the grievance process is terminated and the matter is forwarded

to the Internal Investigation Unit and/or the PREA coordinator for review."  (Docs. 35-2 at 18; 35-3, ¶ 20).

### 1. Whether Diamond Exhausted Her Claims for Deliberate Indifference to Medical Needs

Diamond contends Grievance #163506, which she filed at Rutledge State Prison and which the Court will call the "Rutledge grievance," exhausted her claims for deliberate indifference to medical needs against Hatcher at Rutledge State Prison and Allen and McCracken at Valdosta State Prison.  Diamond also contends Grievance #173610, which she filed at Valdosta State Prison, exhausted her claims for deliberate indifference against Allen and McCracken.  Diamond fully exhausted both grievances pursuant to GDOC's two-step grievance process.  Hatcher, Allen, and McCracken, however, contend those grievances did not exhaust Diamond's administrative remedies because they did not raise the same issues Diamond alleges against them in her complaint.

Diamond's deliberate indifference claims against Hatcher, Allen, and McCracken are based on the following allegations.  Diamond alleges that Hatcher, Allen, and McCracken were aware from GDOC's Transgender SOP that gender dysphoria is a serious medical condition that can require hormone therapy and female gender expression.  (Doc. 3, ¶¶ 46-47).  Upon Diamond's transfer to Rutledge State Prison on October 1, 2013, Hatcher received records detailing Diamond's gender dysphoria diagnosis, history of hormone treatment, and requests for ongoing care.  (*Id.* at ¶¶ 77-78).  After being denied gender dysphoria treatment by medical professionals and being told by them and by Defendant Shelton that she would receive no treatment for gender dysphoria at Rutledge, Diamond wrote a letter to Hatcher explaining her gender

dysphoria and her ongoing need for treatment.  (*Id.* at ¶¶ 79-85).  Shelton, on Hatcher's behalf, responded that they "acknowledged [she] was suffering from the denial of medical care" and advised her "to develop better coping mechanisms" instead of referring her for treatment.  (*Id.* at ¶ 86).  *Thereafter*, Diamond filed the Rutledge grievance in which she grieved the "denial of treatment for her serious medical needs." (Docs. 3, ¶ 87; 49-4 at 9).  "In response" to the grievance, Hatcher put Diamond in solitary confinement for nearly a week for "'pretending to be a woman.'"  (Doc. 3, ¶ 88). Hatcher again put Diamond in solitary confinement after she was visited by attorneys who learned of her denial of treatment.  (*Id.* at ¶ 89).  During that period of confinement, Diamond told Hatcher "she was not simply 'pretending to be a woman,' but had serious medical needs requiring treatment."  (*Id.*).  Diamond also told Hatcher she was suicidal because she had been denied the care.  (*Id.*).  Still, Hatcher refused to refer Diamond for treatment.  (*Id.* at ¶ 90).  Immediately after that, Diamond attempted suicide and tried to sever her penis.  (*Id.*).

Diamond was then transferred to Valdosta State Prison where Allen and McCracken were provided with "a transfer summary detailing [Diamond's] history of sexual assaults, gender dysphoria diagnosis, history of hormone treatment, past attempts at self-harm, and requests for ongoing care."  (*Id.* at ¶ 92).  Mental health professionals at Valdosta State Prison performed individualized assessments of Diamond and concluded that she should receive treatment for her gender dysphoria and that she was experiencing withdrawal because treatment had been denied.  (*Id.* at ¶ 96).  Further, they concluded the denial of medical care created a "high risk for suicide and self-harm."  (*Id.*).  However, she does not allege that Allen and McCracken were

aware of these conclusions.  She does allege that she told McCracken about her gender dysphoria and that she needed medical care.  (*Id.* at ¶ 102).  She asked McCracken to transfer her to a facility where she could receive gender dysphoria care. (*Id.* at ¶ 103).  In May 2014, Diamond "personally contacted Defendant Allen again regarding her gender dysphoria and ongoing need for treatment, but, in response, Defendant Allen began subjecting Ms. Diamond to harassment on account of her being transgender."  (*Id.* at ¶ 110).[10]  Specifically, Allen ridiculed Diamond and encouraged staff to ridicule her for her female gender expression.  (*Id.* at ¶ 111).  On May 15, 2014, he disciplined her for her gender expression.  (*Id.*).  Diamond then alleges she complained about "Allen's conduct and her ongoing denial of medical care."  (*Id.* at ¶ 112).  This is an apparent reference to Grievance #173610.  In May and June 2014, Diamond continued to speak with McCracken about her need for care.  (*Id.* at ¶ 114).

### a.  The Rutledge grievance

In the Rutledge grievance, Diamond stated:

I met with the [psychologist] Dr. Thomson and [psychiatrist] Dr. Silver in regards to treatment for [gender dysphoria].  They told me that they weren[']t going to treat [gender dysphoria] at Rutledge.  I am grieving the denial of treatment for my serious medical needs.  I also the same day received a letter from the Warden of Care and [T]reatment saying the same.

(49-4 at 9).  For relief, she requested "[t]reatment for my Disorder by transferring me to a facility that has [doctors qualified] to treat me."  (*Id.*).  During the grievance investigation, Defendant Shelton characterized Diamond's allegations as follows: "Inmate alleges that he is not receiving proper treatment for his serious medical needs. He says he met with [Dr. Silver] and Dr. Thompson in regards to receiving treatment for

---

[10] Despite Diamond's suggestion that she *again* asked Allen about the denial of medical care, there is no evidence of an earlier communication with Allen about medical care.  She does allege she contacted Allen about safety concerns.  (*Id.* at ¶ 105).

[gender dysphoria] and he was told that that type of treatment is not done here." (*Id.* at 5). The grievance coordinator similarly characterized Diamond's grievance: "Inmate alleges that he is not receiving proper treatment for his medical needs. He says that he met with Dr. Silver and Dr. Thompson in regards to receiving treatment for [gender dysphoria] and was told that this treatment is not done at this facility." (*Id.* at 4). Hatcher denied the grievance, and Lewis denied Diamond's appeal. (*Id.* at 2-3).

Seizing on a single paragraph in Diamond's complaint, Hatcher and Allen argue that the deliberate-indifference-to-medical-needs claim against them is based on their alleged punishment of Diamond for "expressing her female gender, a medical necessary form of treatment." (Doc. 3, ¶ 130). Based on this interpretation of Diamond's claim, they argue the Rutledge grievance does not involve "the exact same issue," and thus the grievance could not have exhausted her claim for their conduct subsequent to the filing of the Rutledge grievance. (Doc. 56 at 3). McCracken claims that the Rutledge grievance did not exhaust the claim against him because it concerned treatment by other medical providers at another prison. (Doc. 57 at 5). Citing *Parzyck v. Prison Health Services, Inc.,* 627 F.3d 1215 (11th Cir. 2010), Diamond contends that the Rutledge grievance exhausted her deliberate indifference claims against all three.

In *Parzyck*, the plaintiff grieved that he was being denied consultations for severe back pain. 541 F.3d at 1218. During the pendency of his grievance appeal, a new doctor assumed responsibility for the plaintiff's care. *Id.* The plaintiff requested a consultation with the new doctor, but he denied the request just as the previous doctor had done. *Id.* After the denial of his appeal, the plaintiff sued. *Id.* The Eleventh Circuit reversed the district court's conclusion that the plaintiff failed to exhaust any claim

based on the second doctor's denial of treatment.  *Id.* at 1218-19.  The Eleventh Circuit reasoned the first grievance accomplished the exhaustion requirement's purpose to alert prison officials to a problem because the issue raised in the first grievance was the "exact same issue" the plaintiff alleged against the second doctor.  *Id.* at 1219 ("Parzyck was not required to initiate another round of the administrative grievance process on the exact same issue each time another request for an orthopedic consultation was denied.").  The court further noted that "[n]othing in the [agency's] grievance procedures requires inmates to file new grievances addressing every subsequent act by a prison official that contributes to the continuation of a problem already raised in an earlier grievance."  *Id.*

As in *Parzyck*, nothing in GDOC's grievance procedures "requires inmates to file new grievances addressing every subsequent act by a prison official that contributes to the continuation of a problem already raised in an earlier grievance."  *Id.*  Further, GDOC's grievance procedure does not require a particular level of factual specificity for inmates' grievances or that each defendant implicated by the grievance be named.  "[A] grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought" and gives prison officials an opportunity to resolve it.  *Doe v. Wooten*, 2010 WL 2821795, at *2 (N.D. Ga.); *see also Parzyck*, 627 F.3d at 1218-19; *Chandler*, 379 F.3d at 1287; *Brown v. Sikes*, 212 F.3d 1205, 1210 (11th Cir. 2000).  Therefore, if a grievance alerts a prison official to an issue, the prisoner need not again grieve the "exact same issue."  *Parzyck*, 627 F.3d at 1218-19.

However, and directly contrary to Hatcher's assertion, Diamond's claim against him is not based only on his disciplining of her after she filed the Rutledge grievance.

Before she filed the grievance, she wrote Hatcher regarding her ongoing request for treatment.  (Doc. 3, ¶¶ 79-85).  Shelton, on Hatcher's behalf, acknowledged Diamond's letter, but prison officials at Rutledge still refused to refer her for treatment.  (*Id.* at ¶ 86).  Thus, Diamond alleges that Hatcher was directly involved in the conduct she complains about in the Rutledge grievance.  He was not, as in *Parzyck*, an actor who only entered the picture after Diamond filed the Rutledge grievance.  Thus, it is not necessary to turn to *Parzyck* to find that the grievance alerted prison officials at Rutledge State Prison, including Hatcher, to her deliberate indifference claims.

That Diamond alleges that Hatcher, while the grievance process was ongoing, placed her in solitary for "pretending to be a woman" and personally told her she would receive no treatment even though she was suicidal (*Id.* at ¶ 89) certainly buttresses Diamond's claim against Hatcher.  But those allegations do not raise a new claim raising an issue different than the issue she raised in the Rutledge grievance.[11]  Indeed, it was Hatcher himself who denied Diamond's grievance shortly after he visited her in solitary.  (Doc. 49-4 at 3).  Hatcher's alleged conduct during the grievance process that contributed to the ongoing denial of gender dysphoria treatment constitutes subsequent "harmful incident[s] in a string of related occurrences."  *See Toenninges*, 600 F. App'x at

---

[11] The Eleventh Circuit in *Parzyck* relied on the Fifth Circuit's decision in *Johnson v. Johnson*, 385 F.3d 503 (5th Cir. 2004).  In discussing whether inmates are obligated to file subsequent grievances regarding the same issue, the Fifth Circuit cites to authority recognizing that "[r]igid 'issue exhaustion'" is "inappropriate when the fundamental issue is one of medical care from the same injury."  *Sulton v. Wright*, 265 F. Supp. 2d 292, 298 (S.D.N.Y. 2003), *abrogated on other grounds by Scott v. Gardner*, 287 F. Supp. 2d 477 (S.D.N.Y. 2003).  Other persuasive authority addressing the same have also refused to break down allegations involving different "aspects" of the defendant's conduct that serve as the basis of a single deliberate indifference claim against him.  *See Gomez v. Wilson*, 177 F. Supp. 2d 977, 982 (N.D. Cal. 2001) (refusing to divide allegations of inadequate treatment into distinct claims requiring separate grievances where the allegations are aspects of the single claim); *Torrence v. Pelkey*, 164 F. Supp. 2d 264, 277-78 (D. Conn. 2001) ("[T]he failure to disclose, monitor[,] or treat plaintiff's HCV status was part of the same conduct and temporally congruent with his other deliberate indifference claims against Dr. Stein, and fairly encompassed in the *pro se* allegation [in his grievance] that 'medical neglect … has caused damage to my … liver.'" (citation omitted)).

649. Thus, the Court easily finds that the Rutledge grievance exhausted Diamond's claim against Hatcher for deliberate indifference to her serious medical needs.

Diamond's deliberate indifference claims against Allen and McCracken, however, are based on events at Valdosta State Prison. Obviously, the Rutledge grievance complained only of the denial of treatment at Rutledge, and prison officials who investigated the grievance characterized the issue as the denial of treatment at Rutledge. Relying on *Parzyck*, Diamond argues the Rutledge grievance covered all staff indifference to Diamond's medical needs at subsequent prisons. The Court disagrees. *Parzyck* cannot reasonably be extended to allow an inmate to use a single grievance, complaining of a condition of confinement at a specific prison, as an "umbrella grievance" to cover all similar conditions of confinement at any subsequent prison the inmate is housed during the duration of his confinement within GDOC facilities.

Indeed, cases from the Tenth and Fifth Circuits on which the Eleventh Circuit relied in *Parzyck* limit their holdings to continuing violations of the same issue raised in an earlier grievance where the inmate remained in the same situation or where the subsequent conduct at the same prison occurred within a short duration after the grievance was filed. *See Howard v. Waide*, 534 F.3d 1227, 1244 (10th Cir. 2008) (holding a grievance exhausted continuing violations of the issue occurring within the inmate's housing wing up until he was transferred out of the prison, but when he was transferred back to the prison to a different housing wing, the earlier grievance did not exhaust continuing violations within the different wing); *Johnson*, 385 F.3d at 521 n.13 ("We pause to observe that we do not here hold that a grievance filed in response to

one particular incident automatically exhausts claims that arise from future incidents of the same general type."); *see also Pinson v. St. John*, 2013 WL 765639, at *1 (N.D. Ala.) ("Since one of the purposes of the grievance process is to place the prison administration on notice of the problem and to give the administration the opportunity to resolve the issue without the need for litigation, it is axiomatic that the plaintiff cannot now claim exhaustion by referring to a grievance process that occurred at a wholly different location and involved individuals other than those named as defendants in the complaint herein.").

While the Fifth Circuit in *Johnson v. Johnson* acknowledged the notice-purpose of exhaustion, the court stated that "at the same time, the grievance must provide administrators with a fair opportunity under the circumstances to address the problem that will later form the basis of the suit, and for many types of problems this will often require, as a practical matter, that the prisoner's grievance identify individuals who are connected with the problem."  385 F.3d at 522.  Here, although conduct of the same general type also occurred at Valdosta State Prison, the Rutledge grievance did not provide facts connecting prison officials at Valdosta State Prison with the problem or otherwise put prison officials on notice of an internal problem at Valdosta State Prison. *See Goebert v. Lee Cty.,* 510 F.3d 1312, 1324 (11th Cir. 2007) ( "[T]he exhaustion requirement in the PLRA seeks to afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case" (internal quotation marks and citation omitted)).  Thus, the Rutledge grievance did not provide prison officials with a fair opportunity to address the problem that later formed the basis of the claims against Allen and McCracken.  Accordingly, the Court finds the Rutledge

grievance did not exhaust Diamond's administrative remedies with respect to the deliberate indifference claims against Allen and McCracken.

### b. Grievance #173610

Diamond also contends Grievance #173610 exhausted her administrative remedies with respect to her deliberate indifference claims against Allen and McCracken. In this grievance, she complained that on May 15, 2014, she was told by the warden, presumably Allen, "that he didn't like my eyebrows and we aren[']t going to do that[.] 'This is a man's facility.'" (Doc. 49-5 at 4). Citing her "well-documented" transgender status, Diamond asked for a transfer to a facility "that can house 'my kind' efficiently and safely." (*Id.*). She noted that she had requested transfer for safety and medical reasons numerous times. (*Id.*). She contended gender dysphoria is a serious condition and that she "deserve[d] fair impartial treatment [and] respect." (*Id.*). She specifically requested transfer to a facility better equipped to handle transgender inmates, claiming that she was entitled "to have GDC staff respect trans[gender] community by [referring] to them as proper pronoun and treating [their] disorder." (*Id.*). When the "Warden/Superintendent" rejected the grievance, Diamond appealed claiming "there is a medical reason for my eyebrow adornment[.] It is called Gender Identity Disorder. (*Id.* at 3). Valdosta State Prison is providing me [with] no treatment." (*Id.*).

Allen and McCracken contend that Grievance #173610 raises only the issue of a purportedly offensive comment by Allen about Diamond's eyebrows. (Docs. 35-1 at 7-8 n.5; 38-1 at 7-8). This is not a fair reading of Grievance #173610. While the grievance addressed gender expression, Diamond claimed that she was entitled to treatment for her disorder. In her appeal, she explained "[t]here is a medical reason for my eyebrow

adornment.  It is called Gender Identity Disorder.  Valdosta State Prison is providing me [with] no treatment …."  (Doc. 49-5 at 3).  In response to her grievance, either Allen or the superintendent[12] (1) quoted the policy that facial adornments are prohibited unless medically indicated and attached the policy with the response; (2) stated Diamond had no medical need for her facial adornments; and (3) told Diamond she was male and had to follow the rules.  (*Id.* at 5).  In her appeal, Diamond further explains that her medical condition is the reason for her feminine eyebrows.  (*Id.* at 3).  The response to Diamond's appeal acknowledged the policy permitting facial adornments when medically necessary but denied the appeal.  (*Id.* at 2).

The Court finds Grievance #173610 alerted prison officials to the fact that (1) Diamond is an inmate with gender dysphoria requesting treatment for her disorder; (2) Valdosta State Prison allegedly cannot adequately treat this disorder; and (3) Allen prohibits female gender expression, which Diamond alleges is a treatment for gender dysphoria, because "we aren't going to do that[.]  'This is a man's facility.'"  (*Id.* at 4).  Diamond alleges the same in her complaint.  Specifically, Diamond alleges she is a transgender inmate who requires gender dysphoria treatment including hormone therapy and the expression of her female gender.  (Doc. 3, ¶¶ 2-3).  But Allen and McCracken refused to provide gender dysphoria treatment, and Allen ridiculed and disciplined her for her gender expression.  (*Id.* at ¶¶ 97, 102, 110-14).  Given that Grievance #173610 alerted prison officials to the same issues that underlie the deliberate indifference claims against Allen and McCracken, the Court finds Grievance #173610 exhausted Diamond's deliberate indifference claims against them.

---

[12] It is unclear whose signature is on the "Warden's/Superintendent's Grievance Response" form.  (Doc. 49-5 at 5).

Accordingly, Hatcher, Allen, and McCracken's motions to dismiss Count I for failure to exhaust are **DENIED**.

### 2. Whether Diamond Exhausted Her Failure-to-Protect Claims against Allen and McCracken

Diamond contends Grievance #180025, filed at Valdosta State Prison ("the Valdosta failure-to-protect grievance"[13]), and Grievances #189277, #189275, and #189273, filed at Baldwin State Prison ("the Baldwin grievances"), exhausted her failure-to-protect claims against Allen and McCracken.[14]  Allen and McCracken argue the Valdosta failure-to-protect grievance did not put prison officials on notice of the problems underlying Diamond's failure-to-protect claims against them.  They argue the Baldwin grievances were untimely.

Diamond first contends the Valdosta failure-to-protect grievance sufficiently put prison officials on notice of the allegations underlying her failure-to-protect claims arising from events at Valdosta State Prison.  In support of that claim, Diamond alleges that upon her transfer to Valdosta State Prison on December 31, 2013, Allen and McCracken received records detailing her history of sexual assaults.  (Doc. 3, ¶ 92). The next day Diamond was sexually assaulted by her cellmate.  (*Id.* at ¶ 94).  She reported the assault and alleges that Allen, as warden, and McCracken, as the leader of the Sexual Assault Response Team ("SART"), were made aware of the assault.  (*Id.*). Nevertheless, she remained housed with the perpetrator "who subjected her to continued sexual harassment and coercion."  (*Id.*).  Medical personnel advised Allen

---

[13] Of course, calling it this does not establish that the grievance was a proper failure to protect grievance. This is simply a way to avoid confusing references to multiple grievances by six digit numbers.

[14] Diamond also contends Grievance #173610 exhausted her failure-to-protect claims against Allen and McCracken.  As discussed below, the Valdosta failure-to-protect grievance and the Baldwin grievances exhausted her failure-to-protect claims against these Defendants, and thus the Court does not address Grievance #173610.

and McCracken of Diamond's "ongoing safety issues and need for a transfer to a safer facility, based on [the] conclusion that Ms. Diamond stood a substantial risk of continued sexual assault at Valdosta based on the inmate composition."  (*Id.* at ¶ 98).
Nevertheless, Allen and McCracken "deferred and delayed" action on the recommendations to revise Diamond's placement.  (*Id.* at ¶ 103).

Diamond was again assaulted on February 9, 2014, and she alleges that Allen and McCracken were notified of the assault.  (*Id.* at ¶ 99).  They again refused to revise Diamond's placement.  (*Id.*).

On February 26, 2014, "Diamond personally contacted Defendant McCracken regarding her safety."  (*Id.* at ¶ 102).  She told McCracken that she had been repeatedly sexually assaulted and that she feared for her safety.  (*Id.*).  Diamond asked McCracken to arrange for her transfer to a safer facility, but again McCracken "deferred and delayed action."  (*Id.* at ¶ 103).

In April 2014 Diamond contacted Allen about her safety concerns.  (*Id.* at ¶ 105).
She told Allen about the sexual assaults and her "ongoing fears for her safety" and asked to be transferred to a safer facility.  (*Id.*).  Allen refused.  (*Id.*).  Also in April 2014, Diamond was sexually assault two more times.  (*Id.* at ¶ 106).  These assaults were also reported, and Allen and McCracken were notified of the assaults "pursuant to GDC policy."  (*Id.*).  They still took no action.  (*Id.*)

In May and June 2014, Diamond again spoke with McCracken about the repeated sexual assaults and the continued sexual harassment and coercion that she was experiencing.  (*Id.* at ¶ 114).  She again asked McCracken to arrange for her transfer, but he again "delayed and deferred any action."  (*Id.* at ¶ 115).

Diamond incorporates these allegations in her failure-to-protect claim against Allen and McCracken and generally alleges that they along with certain other defendants were aware of her many assaults and their obligations under PREA and GDOC policy to take reasonable steps to protect her from such assaults.  She specifically alleges that Allen and McCracken were deliberately indifferent to her "safety needs by, *inter alia*, disregarding their obligations under PREA and the Sexual Assault SOPs to assess the needs of sexual assault victims and provide appropriate placements; failing to take action after receiving notification of [Diamond's] ongoing sexual assaults; and unreasonably denying, delaying, or deferring [her] requests for protection."  (*Id.* at ¶ 152).

### a.  The Valdosta failure-to-protect grievance

Diamond filed the Valdosta failure-to-protect grievance on August 20, 2014,[15] after placing what she called "videos for help" on YouTube.  (Doc. 49-6 at 6).  According to Diamond, the YouTube video series documented "her and other inmates' pleas for help regarding sexual abuse and sexual assault."  (Doc. 49 at 37-38).  Her grievance stated:

> I am grieving my personal safety and mental health being housed at Valdosta State Prison, "pending investigation but because of staff involv[ement] w[ith] making videos to supposedly" help us[.] The safety of me (all) is a big concern as well as retaliation for disclosing info[rmation] about staff involvement in filming. There can be fatal consequences for all involved unless Internal Affairs moves me and does a full investigation on our pleas for help.

(Doc. 49-6 at 6).  The grievance coordinator acknowledged that Diamond "is grieving his personal safety while being housed at Valdosta SP and fears retaliation because of the pending investigations of the video on you tube.  Inmate stated there can be fatal

---

[15] Allen and McCracken do not contend the grievance was untimely.

consequences for all involved unless [Internal Affairs] move him and do a full investigation of their pleas for help." (*Id.* at 8).  In his response to the grievance, Allen stated: "You are housed in Tier I at this time.  [Y]ou have not provided the names of any staff involved in the making of the YouTube videos.  We would be happy to provide any information you wish to give to Internal Affairs for their review and investigation." (*Id.* at 7).  In her appeal of the grievance denial, Diamond reiterated her safety concerns and emphasized that "Internal Investigations should have been involved from the beginning" and that "Valdosta State Prison failed to respond to any and all sexual abuse allegations, and even returned grievances involving sexual abuse allegations." (*Id.* at 5).  She wrote that the grievance intake officer only asked her why she "got the inmates in trouble." (*Id.*).

The appeal was denied without any specific mention of Diamond's sexual assault allegations. (*Id.* at 2).  Rather, the response suggested that Diamond's safety concerns were based upon her fear of "retaliation for disclosing information about staff involvement in the making of the videos." (*Id.*).  Noting that the grievance intake officer said Diamond did not provide information "about staff who allegedly aided in the videos or any specific safety concerns," the grievance was denied because there was no evidence "that staff placed your safety and mental health at risk due to you allegedly disclosing staff involvement in the making of videos that were placed on youtube." (*Id.*)

Accusing Diamond of "plucking select phrases out of context," Allen asserts that the Valdosta failure-to-protect grievance did not complain about sexual assault but rather "in Plaintiff's own words, [expressed] a concern for her 'personal safety and mental health' at Valdosta '*because of* staff involvement in making videos to supposedly

help us.'" (Doc. 56 at 4).  In even more conclusory fashion, McCracken simply argues that the Valdosta failure-to-protect grievance addressed only YouTube videos and Diamond's fear of retaliation for staff involvement in the videos.  (Doc. 38-1 at 8).

It is apparent that it is Allen and McCracken who have plucked words out of context.  The Valdosta failure-to-protect grievance does not say that Diamond is grieving her personal safety because of staff involvement with the YouTube videos. While Diamond acknowledged that she had been placed in isolation "pending investigation for phone activity," she grieved "my personal safety and mental health being housed at Valdosta State Prison, "pending investigation but because of staff involv[ement] w[ith] making videos to supposedly 'help us.'" (Doc. 49-6 at 6).  She says her safety is "a big concern, as well as retaliation for disclosing info about staff involvement in filming." (*Id.*).  The grievance coordinator read Diamond's grievance to grieve her personal safety *and* fear of retaliation because of investigations of the YouTube videos.  He understood Diamond to be asking for an Internal Affairs investigation of "their pleas for help." (*Id.* at 8).  The reference to Internal Affairs by Diamond and the grievance coordinator is significant because grievances involving sexual assault "are automatically forwarded … to Internal Investigation Unit." (Doc. 35-2 at 18).

Based on these facts, the Court concludes that the Valdosta failure-to-protect grievance was sufficient to put prison officials on notice of Diamond's allegations that the prison officials at Valdosta State Prison failed to protect her from sexual assault. That prison officials for some reason ultimately decided to treat the grievance as one for

fear of retaliation does not establish that Diamond did not complain in her grievance about sexual assaults.  That, after all, was the entire point of the YouTube videos.

The only facts offered by Allen and McCracken to counter Diamond's allegations regarding the Valdosta failure-to-protect grievance is an affidavit from the warden of care and treatment at Valdosta State Prison who testifies that Diamond never filed a grievance regarding incidents of sexual assault.  (Doc. 35-3, p. 10 at ¶ 30).  With regard to the Valdosta failure-to-protect grievance specifically, the warden simply says that Diamond "complained that he was concerned for his health and safety and feared retaliation in connection with his disclosure of information about staff involvement in inmate Diamond's making of videos posted on YouTube."  (Doc. 35-3, p. 8 at ¶ 25). The affidavit provides no new facts but rather, like Allen and McCracken, argues that the grievance did not raise sexual assault allegations.  Nevertheless, treating these arguments as facts, the Court easily draws the factual conclusion that the grievance raised Diamond's concern for her safety as a result of "sexual abuse and sexual assaults," which Diamond maintains were "documented in the YouTube video series." (Doc. 49 at 38).  While prison officials may have been more concerned about improper phone use that apparently involved prison staff, the clear fact remains that Diamond was complaining about sexual assaults.

Accordingly, the Valdosta failure-to-protect grievance placed prison officials on notice of the safety and sexual assault problems underlying Diamond's failure-to-protect claims against Allen and McCracken.[16]

---

[16] Based on their interpretation of the Valdosta failure-to-protect grievance – that it grieved a fear of retaliation for phone activity – the Defendants argue that if the grievance is also read to grieve the failure to protect from sexual assault, then the grievance raised multiple issues.  As discussed, the Court agrees the Valdosta failure-to-protect grievance raised Diamond's fears for her safety and sexual assault at

### b.  The Baldwin grievances

After Diamond was transferred from Valdosta State Prison to Baldwin State Prison, she filed the three Baldwin grievances alleging she was sexually assaulted at Valdosta State Prison on multiple occasions.  Allen and McCracken contend these grievances were untimely and thus did not exhaust Diamond's failure to protect claims against them.[17]

Diamond argues that pursuant to PREA there is no time limit to file grievances for sexual assault and, she says, GDOC officials conceded this point in their testimony during a hearing on her motion for a preliminary injunction.  (Doc. 49-11 at 100:5-10, 105:19-106:2).  Further, Diamond argues the grievance coordinator waived any time bar by accepting and reviewing the grievances on the merits.  (Doc. 39 at 30-31).  Treating these arguments as allegations that the Court must take as true for the purpose of the *Turner* analysis, Allen and McCracken are not entitled to the dismissal of Diamond's failure to protect claims in step one of the *Turner* analysis.

---

Valdosta State Prison which she maintains she "documented" in the YouTube video.  An appeal that further explains her fears for safety cannot be said to include a "new" issue.  However, even if the grievance raised multiple issues, prison officials nevertheless reviewed the grievance on its merits, denied it on its merits, and then again on appeal.  (Doc. 49-6).  Diamond's grievance and appeal were not denied because of a procedural deficiency, and the Defendants have produced no evidence to the contrary.  *See Reed-Bey v. Pramstaller*, 603 F.3d 322, 325 (6th Cir. 2010) ("When prison officials decline to enforce their own procedural requirements and opt to consider otherwise-defaulted claims on the merits, so as a general rule will we.").  Accordingly, the Court remains unpersuaded the grievance failed to exhaust the failure to protect claims.

[17] The Defendants also argue these grievances failed to put the prison officials on notice of Diamond's safety issues at Valdosta State Prison that serve as the basis for her failure-to-protect claims against Allen and McCracken.  The Court is unpersuaded by this argument.  These grievances specifically referenced multiple incidents of sexual assault at Valdosta State Prison, and Diamond's claims center around the Defendants' failure to protect her from sexual assault.  Further, because the time limit may be waived, a transfer to another prison does not prevent an inmate from grieving an incident that occurred at a prison where the inmate was previously housed.  *See Bryant*, 530 F.3d at 1373 ("We recognize that a grievance filed after Priester's transfer to GSP would have been untimely.  But the relevant grievance procedures provide inmates with the opportunity to request consideration of untimely grievances for good cause.  Thus, Priester could have exhausted his administrative remedies by filing a grievance at GSP and then by showing good cause for its tardiness.").

Pointing to GDOC's general requirement that grievances must be filed within ten days the inmate "knew, or should have known, of the facts giving rise to the grievance," Allen and McCracken argue the Court should find as a matter of fact that the Baldwin grievances were untimely.  But, as noted, GDOC officials testified there is no time limit for filing grievances for sexual assault.  Allen and McCracken do not object to this testimony on the grounds that it constitutes a legal conclusion, or any other ground for that matter, and the Court does not take the testimony as a legal interpretation of PREA's requirements.  Rather, the GDOC officials testified, as a matter of fact and without any contradiction by the Defendants, that GDOC's grievance procedures do not impose a deadline for filing grievances alleging sexual assaults.  Consequently, Allen and McCracken have not carried their burden to establish that the Baldwin grievances were untimely.

Moreover, the evidence Allen and McCracken offer in support of their timeliness argument establishes that GDOC waived any deadline that may have existed.  When Diamond filed the Baldwin grievances, she acknowledged they were not filed within ten days of the assaults.  (Docs. 49-8 at 4; 49-9 at 4; 49-10 at 4).  She explained that she suffered from post-traumatic stress disorder and argued that there was no time limit to file sexual assault grievances.  (*Id.*).  Instead of denying the grievances as untimely, the grievance coordinator determined that each grievance involved an alleged incident of sexual assault and thus forwarded the grievances to internal affairs.  This was pursuant to GDOC's procedures.[18]  (Docs. 35-2; 49-8; 49-9; 49-10).  Referring the grievances to

---

[18] Pursuant to GDOC procedure,

> [a]t any time before the Warden's Grievance decision is delivered to the offender, the Warden may refer the matter to the Internal Investigations Unit.  If an offender files a grievance involving sexual assault … [,] such actions automatically end the grievance

internal affairs was the "final action … taken on the [g]rievance[s] and terminate[d] the grievance procedure." (Doc. 35-2 at 18). In other words, the grievance coordinator accepted and reviewed the grievances on the merits.[19] Given these facts, GDOC waived any deadline for filing the Baldwin grievances.[20]

Accordingly, Allen's and McCracken's motions to dismiss Count III for failure to exhaust is **DENIED**.

### B. Failure to State a Claim and Qualified Immunity

#### 1. Motion to Dismiss Standard

To avoid dismissal pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1261 (11th Cir. 2006) (internal quotation marks and citation omitted). However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

---

process. These grievances are automatically forwarded … to the Internal Investigations Unit and/or the PREA Coordinator for review and whatever action is deemed appropriate. (Doc. 35-2 at 18).

[19] Pursuant to GDOC procedure, the grievance coordinator's actions ended the grievance process, relieving Diamond of the obligation to take further action. (Doc. 35-2). Further, GDOC procedure does not require the grievance coordinator to explicitly state that untimeliness has been waived.

[20] The grievance coordinator's handling of the Baldwin grievances is entirely consistent with the testimony of GDOC officials that there is no time limit for filing sexual assault grievances. It is also consistent with Diamond's argument that PREA bars prisons from imposing such a deadline. *See* 28 CFR § 115.52(b)(1). GDOC's grievance procedure incorporates PREA's guidelines that inmates do not have a time limit to submit a grievance regarding sexual assault. "If an offender files a grievance involving sexual assault …[,] such actions automatically end the grievance process. These grievances are automatically forwarded … to Internal Investigation Unit and/or the PREA Coordinator for review." (Doc. 35-2 at 18). This is what happened in Diamond's case, and this closed the grievance process.

complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"

*Iqbal,* 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  "[C]onclusory allegations,

unwarranted deductions of facts or legal conclusions masquerading as facts will not

prevent dismissal."  *Oxford Asset Mgmt., Ltd. v. Jaharis,* 297 F.3d 1182, 1188 (11th Cir.

2002).  The complaint must "give the defendant fair notice of what the ... claim is and

the grounds upon which it rests."  *Twombly,* 550 U.S. at 555 (internal quotation marks

and citation omitted).  Where there are dispositive issues of law, a court may dismiss a

claim regardless of the alleged facts.  *Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas

Dist.,* 992 F.2d 1171, 1174 (11th Cir. 1993).

### 2.  Qualified Immunity Standard

"Qualified immunity offers complete protection for individual public officials

performing discretionary functions 'insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have

known.'"  *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting *Harlow v.

Fitzgerald*, 457 U.S. 800, 818 (1982)).  "'Once discretionary authority is established, the

burden then shifts to the plaintiff to show that qualified immunity should not apply.'"[21]

*Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City of W.

Palm Beach,* 561 F.3d 1288, 1291 (11th Cir. 2009)).  To meet this burden, a plaintiff

must establish that "the officer's conduct amounted to a constitutional violation" and "the

right violated was 'clearly established' at the time of the violation."  *Lewis*, 561 F.3d at

---

[21] For each assertion of qualified immunity, there is no dispute the Defendants were acting within their
discretionary authority.  Accordingly, the Court assumes for each assertion of qualified immunity that the
Defendants have established they were acting within their discretionary authority.

1291.  This two-step analysis may be done in whatever order is deemed most appropriate for the case.  *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

The clearly established law[22] must provide a defendant with "fair warning" that her conduct deprived the plaintiff of a constitutional right.  *Hope v. Pelzer*, 536 U.S. 730, 739-41 (2002).  A plaintiff "can demonstrate that the contours of the right were clearly established in several ways."  *Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012).  First, a plaintiff can show that "a materially similar case has already been decided."  *Id.* (internal quotation marks and citations omitted).  Second, a plaintiff can point to a "broader, clearly established principle [that] should control the novel facts [of the] situation."  *Id.* (internal quotation marks and citation omitted).  "Finally, the conduct involved in the case may 'so obviously violate[ ] th[e] constitution that prior case law is unnecessary.'"  *Id.* (citation omitted).  "Exact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law."  *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011).

### 3.  Deliberate Indifference to a Serious Medical Need

Diamond alleges that all Defendants were deliberately indifferent to her serious medical needs by refusing to provide or refer her for gender dysphoria treatment they knew was medically necessary.  Allen, Shelton, McCracken, Thompson, and Silver argue that Diamond failed to sufficiently allege they violated her Eighth Amendment rights.  Allen and Shelton further maintain they are entitled to qualified immunity.  Lewis

---

[22] Clearly established law in this circuit means decisions of the United States Supreme Court, the Eleventh Circuit, and the highest court of the pertinent state.  *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

and Hatcher do not contend Diamond failed to state a claim against them but argue they are entitled to qualified immunity.[23]

### a. Whether Diamond Has Alleged a Constitutional Violation

Allen, Shelton, McCracken, Thompson, and Silver argue Diamond's deliberate indifference claims against them fail because she has not sufficiently alleged they had subjective knowledge of a substantial risk of serious harm.  (Docs. 35-1 at 11; 38-1 at 11-12, 14).  "'[D]eliberate indifference to [the] serious medical needs of [a] prisoner[ ] constitutes the unnecessary and wanton infliction of pain ... proscribed by the Eighth Amendment.'"  *Farrow v. West,* 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)).  "[A] prisoner must shoulder three burdens" to bring a claim for deliberate indifference.  *Goebert,* 510 F.3d at 1326.  First, the prisoner must satisfy an objective component by alleging there was a serious medical need.  *Id.* (citing *Bozeman v. Orum,* 422 F.3d 1265, 1272 (11th Cir. 2005)).  Second, he must satisfy the subjective component by alleging that the prison official was deliberately indifferent to

---

[23] A comment about Lewis, Allen, Hatcher and Shelton's joint brief is appropriate.  (Doc. 35-1).  They jointly filed a one paragraph motion to dismiss in which they argue Diamond's complaint should be dismissed "on the basis of failure to state a claim, qualified immunity, and other grounds as set forth in the brief filed herewith."  (Doc. 35).  In their joint brief, Lewis and Hatcher do not argue that Count 1 fails to state a claim for deliberate indifference against them.  Allen does not argue that Count 3 fails to state a failure-to-protect claim against him, nor does he argue that he is entitled to qualified immunity for that claim.  Naturally enough, this led Diamond, when summarizing the motions in her brief, to acknowledge that Lewis and Hatcher did not contend Count 1 failed to state a claim and that Allen did not contend that Count 3 failed to state a claim or that he was entitled to qualified immunity for that claim.  (Doc. 49 at 8-9).  Lewis, Hatcher and Allen have never challenged this characterization.  The Court does not think for a moment that counsel have attempted to "sandbag" Diamond or the Court.  Still, the Court notes that the joint brief states that Diamond's allegations establish that the Defendants were acting in their discretionary authority and that the "burden thus shifts to the Plaintiff to show that Defendants are not entitled to qualified immunity."  (Doc. 35-1 at 25).  It would not be plausible for Lewis, Hatcher, and Allen to now argue that this assertion should have alerted Diamond that she had to address the two prongs of qualified immunity as to Lewis, Hatcher, and Allen that they never raised.  Nevertheless, the Court notes that the allegations against Lewis and Hatcher in Count 1, as summarized in footnotes 26 and 27, are clearly sufficient to state a claim.  Further, the allegations against Allen in Count 3, as summarized in Section III.A.2, are clearly sufficient to state a claim against him.  Additionally, as discussed in Section III.B.4.b., clearly established law provided Allen, like Lewis, with fair warning his conduct violated Diamond's Eighth Amendment right to be protected from assaults by other inmates.

the serious medical need.  *Id.* (citing *Bozeman,* 422 F.3d at 1272).  Third, the prisoner

must allege that the defendant's wrongful conduct caused the injury.  *Id.* (citing *Hale v.*

*Tallapoosa Cty.*, 50 F.3d 1579, 1582 (11th Cir. 1995)).

GDOC medical professionals diagnosed Diamond with gender dysphoria while

incarcerated, and the Defendants do not deny that gender dysphoria constitutes a

serious medical need.[24]  (Doc. 3, ¶¶ 74-75).  Accordingly, Diamond's allegations satisfy

the objective inquiry.  *See Farrow,* 320 F.3d at 1243.  To satisfy the subjective inquiry,

Diamond must sufficiently allege three elements: "'(1) subjective knowledge of a risk of

serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross]

negligence.'"  *Bozeman,* 422 F.3d at 1272 (quoting *Brown v. Johnson,* 387 F.3d 1344,

1351 (11th Cir. 2004)).  Ultimately, "[t]he facts alleged must do more than contend

medical malpractice, misdiagnosis, accidents, and poor exercise of medical judgment."

*Simpson v. Holder*, 200 F. App'x. 836, 839 (11th Cir. 2006) (citing *Estelle,* 429 U.S. at

104–07).  Subjective knowledge requires that a defendant "was 'both [ ] aware of facts

from which the inference could be drawn that a substantial risk of serious harm exists,

and [ ] must also [have] draw[n] the inference.'"  *Burnette v. Taylor*, 533 F.3d 1325,

1330 (11th Cir. 2008) (alteration added by Eleventh Circuit) (quoting *Farmer v. Brennan*,

511 U.S. 825, 837 (1994)).  A defendant cannot be held liable for a constitutional

violation for failing to alleviate a significant risk that he should have perceived but did

not.  *Id.* at 1331 (citing *Farmer*, 511 U.S. at 837).  However, a factfinder may infer from

circumstantial evidence or from "'the very fact that the risk was obvious'" that the

---

[24] While Allen and Shelton do not deny that gender dysphoria constitutes a serious medical need in their discussion of the elements of a claim for deliberate indifference to medical needs, in a footnote in their qualified immunity argument, they say they are unaware of any binding authority establishing that "transsexualism or GID is a serious medical need."  (Doc. 35-1 at 26 n.10).  That, of course, is a different issue than whether Diamond has sufficiently alleged gender dysphoria is a serious medical need, which, again, the Defendants do not dispute.

defendant had subjective knowledge.  *Goebert*, 510 F.3d at 1327 (quoting *Farmer*, 511 U.S. at 842).

Here, Diamond alleges: (1) all Defendants were aware of the medically accepted and recognized treatment for gender dysphoria pursuant to the Standards of Care, which includes hormone therapy and gender expression; (2) all Defendants knew psychotropic drugs and counseling alone were medically inadequate pursuant to the Standards of Care; (3) Allen, Shelton, McCracken, Thompson, and Silver received Diamond's records detailing her gender dysphoria diagnosis, history of hormone treatment, and requests for ongoing care; (4) Diamond personally contacted Allen about the denial of treatment, and he responded with discipline and ridicule for her female expression; (5) Shelton recognized Diamond "suffer[ed] from the denial of medical care" but refused to provide gender dysphoria treatment; (6) Diamond explained her lack of treatment to McCracken who "deferred or delayed any action"; (7) Diamond told Thompson and Silver about her prior history, Dr. Sloan's assessment, and her physical and psychological harm, but they denied her treatment or a referral for an evaluation; and (8) all Defendants were aware of her repeated attempts to commit suicide and self-castration while she was without treatment.  (Doc. 3, ¶¶ 33-34, 46-47, 78-81, 83, 86, 92, 103, 111).

In their own conclusory fashion, the Defendants argue Diamond's allegations are merely conclusory.  However, her allegations, taken as true, sufficiently show the Defendants were subjectively aware of a substantial risk of serious harm should Diamond remain without medically adequate treatment.  Indeed, in *Kothmann v. Rosario*, the Eleventh Circuit held similar allegations to be sufficient to state a claim for

deliberate indifference to the medical needs of a transgender inmate.  558 F. App'x 907 (11th Cir. 2014).  There, the inmate alleged (1) "the medically-accepted and appropriate treatment" for gender dysphoria included hormone treatment, gender expression, and sex reassignment surgery; (2) the defendant was "aware of the medically necessary treatment"; (3) the defendant knew about the inmate's hormone treatment history and the symptoms he suffered from lack of treatment; but (4) the defendant denied him hormone treatment or a referral to staff who could prescribe treatment.  *Id.* at 908.  The Eleventh Circuit held these allegations were sufficient to satisfy the subjective inquiry. *Id.* at 911.

Similarly, Diamond has alleged the Defendants knew the medically accepted and recognized gender dysphoria treatment pursuant to the Standards of Care; knew about Diamond's diagnosis, treatment history, and attempts to commit suicide and self-harm; and communicated with her directly about her gender dysphoria.  But they knowingly and repeatedly refused her requested treatment, refused to refer her for treatment, and, at most, prescribed or authorized treatment—psychotropic drugs and counseling—they knew was medically inadequate.  *See McElligott v. Foley*, 182 F.3d 1248, 1256 (11th Cir. 1999) (holding that "knowingly provid[ing] grossly inadequate care, and at times no care" while knowing of a substantial risk of harm constitutes deliberate indifference); *Ancata v. Prison Health Servs.*, 769 F.2d 700, 704 (11th Cir. 1985) ("Deliberate indifference … is shown when prison officials have prevented an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment." (internal quotation marks and citation omitted)).

Diamond alleges this repeated denial of treatment resulted in suicide ideation and compulsion to castrate herself, multiple suicide and castration attempts, clinically significant depression, anxiety, mental anguish, and a "regression of hormonally-induced physical effects," as well as "chest pain, muscle spasms, heart palpitations, severe vomiting," and other physical symptoms.  (Doc. 3, ¶¶ 73, 90, 104, 121, 138-39). Clearly, Diamond has sufficiently alleged Allen, Shelton, McCracken, Thompson, and Silver were deliberately indifferent to Diamond's serious medical needs by their repeated refusal to provide, authorize, or refer her for treatment they knew was medically necessary, thus causing and perpetuating psychological and physical harm.[25]

### b.  Whether the Constitutional Right was Clearly Established

Allen, Shelton, Lewis,[26] and Hatcher[27] contend they are entitled to qualified immunity because no clearly established law gave them fair warning their conduct

---

[25] Thompson, Silver, and McCracken also contend the deliberate indifference claims against them fail because they were adhering to policy and had no "means to cure the alleged risk."  (Doc. 38-1 at 12-15). The Court is not persuaded by this "simply following orders" defense.  Following the Transgender SOP does not insulate them from potential liability.  Diamond alleges that despite their knowledge of her medical condition and her compulsion to castrate and harm herself, they did not exercise any independent medical judgment, inform any competent authorities about Diamond's need for care, or make a referral or recommendation for treatment, as other GDOC medical providers, such as Drs. Sloan, Moody, and Harrison, had done.  *See Waldrop v. Evans*, 871 F.2d 1030, 1036 (11th Cir. 1989) (holding there was a genuine issue of fact whether a doctor who treated the plaintiff's medical needs was deliberately indifferent to the plaintiff's psychiatric needs by failing to notify competent authorities about such needs because "prison officials have an obligation to take action or to inform competent authorities once the officials have knowledge of a prisoner's need for medical or psychiatric care.").  The Court also rejects Thompson and Silver's argument that Diamond's claim fails because they prescribed her counseling and psychotropic drugs and thus did not disregard her medical needs.  At this stage in the litigation, Diamond has sufficiently alleged the Defendants knew psychotropic drugs and counseling alone were inadequate treatments pursuant to the Standards of Care.  (Doc. 3, ¶¶ 33-34, 46-47).  *See also Kothmann*, 558 F. App'x at 910-12 (rejecting the same argument at the motion to dismiss stage).  It can also reasonably be inferred they were aware that in Diamond's specific case, drugs and counseling had not alleviated her compulsion to commit self-harm.  (Doc. 3, ¶¶ 78, 80).

[26] Although Lewis does not contend Diamond failed to state a claim against her, the allegations pertaining to her are relevant to whether Lewis violated a clearly established right.  Diamond alleges Lewis: (1) knew the medically accepted and recognized gender dysphoria treatment, as well as what medical care was inadequate, pursuant to the Standards of Care; (2) "refused to authorize treatment" despite medical professionals' recommendations to provide Diamond with hormone treatment and permit her female gender expression; (3) approved the conduct of GDOC personnel after Hatcher placed Diamond in

violated Diamond's right to constitutionally adequate care for her serious medical needs. The Eleventh Circuit has "consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference." *Adams v. Poag*, 61 F.3d 1537, 1543-44 (11th Cir. 1995) (citing *Carswell v. Bay Cty.*, 854 F.2d 454, 457 (11th Cir. 1988); *see also H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1086 (11th Cir. 1986) ("[T]he failure to provide diagnostic care and medical treatment known to be necessary [i]s deliberate indifference."); *Ancata*, 769 F.2d at 704. Put another way, "[a] core principle of Eighth Amendment jurisprudence … is that prison officials with knowledge of the need for [medical] care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." *McElligott*, 182 F.3d at 1257. Diamond, citing the Eleventh Circuit's unpublished opinion in *Kothmann*, argues these clearly established "core" principles gave the Defendants fair warning that their refusal to provide Diamond with treatment they knew was medically necessary for her gender dysphoria violated her constitutional right to adequate medical care. *See Kothmann*, 558 F. App'x at 912 (reasoning the same).

Although "mindful of *Kothmann*," the Defendants argue the Eleventh Circuit denied qualified immunity because of the case's specific facts which they contend are

---

solitary where she continued to complain about the denial of treatment and her suicidal impulses and actually attempted suicide and self-castration; and (4) continued to enforce the Transgender SOP despite the recommendations of medical professionals and Diamond's suicide attempts. (Doc. 3, ¶¶ 33-34, 46-47, 76, 90-91, 97).

[27] The allegations as to Hatcher, who also does not contend Diamond failed to state a claim against him, are relevant to whether he violated a clearly established right. Diamond alleges Hatcher: (1) knew the medically accepted and recognized gender dysphoria treatment, as well as what medical care was inadequate, pursuant to the Standards of Care; (2) received Diamond's records detailing her gender dysphoria diagnosis, history of hormone treatment, and requests for ongoing care; (3) was contacted by Diamond about her gender dysphoria and suicidal impulses; (4) refused to refer Diamond for treatment after he visited Diamond in solitary where she explained her gender dysphoria and suicidal impulses without treatment. (Doc. 3, ¶¶ 33-34, 46-47, 78, 85, 88-90).

distinguishable from Diamond's, and at a minimum, "nothing in *Kothmann*, or in any binding authority … suggests that 'gender expression' is a necessary treatment for gender dysphoria."  (Doc. 35-1 at 27-28).  This argument misconstrues the Eleventh Circuit's qualified immunity analysis.  As discussed, Kothmann, like Diamond, alleged the defendant (1) knew "hormone treatment was the recognized, accepted, and medically necessary treatment" for gender dysphoria; (2) knew Kothmann's hormone treatment history and continued need for it; but (3) knowingly refused to provide this treatment. *Kothmann*, 558 F. App'x at 911-12.  The Eleventh Circuit held these allegations sufficiently stated the violation of a clearly established constitutional right. *Id.*  Specifically, the court rejected the defendant's argument that she did not violate a clearly established right because no prior binding precedent had recognized that transgender inmates have a right to hormone treatment.  *Id.*  Relying on binding precedent,[28] the Eleventh Circuit reasoned "the state of the law was sufficiently clear to put [the defendant] on notice that refusing to provide [the transgender inmate] with what she knew to be medically necessary hormone treatments was a violation of the Eighth Amendment."  *Id.* at 912.

Here, for the same reasons, the law was sufficiently clear to give the Defendants fair warning that their refusal to provide Diamond with treatment they knew was medically necessary or to refer her for treatment violated Diamond's Eighth Amendment right to adequate medical care.  And, as noted in *Kothmann*, binding precedent establishing that transgender inmates have a right to receive the specific treatment at issue—in this case, hormone therapy and female gender expression—is not required to

---

[28] *McElligot*, 182 F.3d at 1255; *Jarrard*, 786 F.2d at 1086; *Ancata*, 769 F.2d at 704.

overcome the Defendants' qualified immunity defense.[29]  *Id.* at 911-12.  Accordingly,

Allen, Shelton, Lewis, and Hatcher are not entitled to qualified immunity from Diamond's

deliberate-indifference-to-medical-needs claim.

### 4.  Failure to Protect

Diamond alleges Lewis, Allen, and McCracken were deliberately indifferent to a

substantial risk of serious harm Diamond faced in closed-security facilities.  Lewis and

McCracken argue Diamond failed to state a claim against them.  Lewis also contends

she is entitled to qualified immunity.[30]

### a.  Whether Diamond Has Alleged a Constitutional Violation

Under the Eighth Amendment, prison officials have a duty to "take reasonable

measures to guarantee the safety of the inmates."  *Caldwell v. Warden, FCI Talladega*,

748 F.3d 1090, 1099 (11th Cir. 2014) (quoting *Farmer,* 511 U.S. at 832).  More to the

point, they "have a duty to protect prisoners from violence at the hands of other

prisoners."  *Id.* (quoting *Farmer*, 511 U.S. at 833) (internal quotation marks omitted).  Of

course, not every injury an inmate suffers at the hands of another inmate gives rise to

constitutional liability.  "A prison official violates the Eighth Amendment 'when a

substantial risk of serious harm, *of which the official is subjectively aware,* exists[,] the

official does not respond reasonably to the risk,'" and the official's actions or inaction

causes the injury.  *Id.* (quoting *Carter v. Galloway,* 352 F.3d 1346, 1349 (11th Cir.

---

[29] As also noted in *Kothmann*, at this stage in the litigation, the Court need not decide whether "hormone treatment [and gender expression] in fact [were] medically necessary to treat" Diamond's gender dysphoria or whether the Defendants "knew in fact" that these treatments were medically necessary for Diamond.  *Id.* at 911.  Rather, the Court need only decide whether Diamond has sufficiently alleged a plausible violation of a clearly established constitutional right, which she has.  *See id.* at 911-12.

[30] Allen does not contend Diamond failed to state a claim against him and does not assert qualified immunity.

2003)); *see also Goodman v. Kimbrough,* 718 F.3d 1325, 1331 (11th Cir. 2013) (internal

quotation marks omitted).   The prison official must be both aware of the risk and draw

the inference.   *Farmer,* 511 U.S. at 837; *Caldwell*, 748 F.3d at 1099-1100.

Here, Diamond alleges (1) she was sexually assaulted numerous times at three

closed-security facilities which housed violent offenders and had a history of frequent

assaults;[31] (2) Lewis and McCracken were aware Diamond, as a non-violent,

transgender female inmate, faced a substantial risk of sexual assault at closed-security

facilities because the risk was obvious; (3) Lewis and McCracken were aware from

PREA and the Transgender SOP that "transgender inmates face a substantial

vulnerability to sexual assault"; (4) Lewis, as Statewide Medical Director, and

McCracken, as PREA Coordinator at Valdosta State Prison, were notified after each

sexual assault which obligated them to review Diamond's housing placement pursuant

to the Transgender SOP, the Sexual Assault SOPs, and PREA; (5) Lewis was aware

from notifications and McCracken was aware from Diamond's GDOC records that she

was repeatedly sexually assaulted at two other closed-security facilities before being

transferred to Valdosta State Prison; (6) Lewis and McCracken took no action after

Diamond was sexually assaulted by her cellmate the day after intake at Valdosta State

Prison, by gang members in February 2014, and twice in April 2014; (7) Dr. Harrison

specifically told McCracken that Diamond stood a high risk of sexual assault at Valdosta

State Prison given its population; and (8) in February, May, and June of 2014, Diamond

---

[31] The Court notes that Diamond was not sexually assaulted at Rutledge State Prison, a medium-security facility which houses non-violent inmates, before the filing of her complaint.  (Doc. 3, ¶ 77).  Diamond alleges generally that sexual assaults against transgender inmates at medium-security facilities are infrequent.  (Doc. 3, ¶ 68).

told McCracken about her sexual assaults.  (Doc. 3, ¶¶ 18, 20, 52-55, 60-61, 65-67, 69, 71, 92, 94, 98-99, 102-03, 106, 114-15, 146).

Lewis and McCracken contend these allegations are insufficient to demonstrate they had the requisite "subjective knowledge required by the deliberate indifference standard."[32]  (Docs. 35-1 at 19; 38-1 at 15-16).  Lewis specifically argues the allegations that she failed to follow policy[33] and that she was notified after each assault are insufficient to establish subjective awareness.[34]  The Supreme Court in *Farmer* held that circumstantial evidence and the obviousness of the substantial risk of harm, not just

---

[32] The Defendants do not contend Diamond failed to allege a substantial risk of serious harm.  Nor could they.  Diamond has alleged she is a transgender inmate who has been continually sexually harassed and sexually assaulted at closed-security facilities.  Diamond has easily satisfied the objective inquiry.  *See Farmer*, 511 U.S. at 833 ("[G]ratuitously allowing the beating or rape of one prisoner by another serves no 'legitimate penological objectiv[e].'" (citation omitted) (alteration in original)).

[33] Lewis's argument that she cannot be held liable simply because she disregarded her obligations under PREA and GDOC policy is based on a misreading of Diamond's allegations.  She does not allege Lewis is liable simply because she violated rules and policies, but rather alleges that these rules and policies were among the many factors and facts upon which she bases her claims.

[34] In her motion, Lewis also argues Diamond's "apparent attempt to impose supervisory liability" based on an alleged widespread pattern of abuse fails.  (Doc. 35-1 at 20-21).  In her reply brief, Lewis argues Diamond waived any argument regarding Lewis's contention that Diamond's allegations are insufficient to "state a supervisory claim against her."  (Doc. 56 at 10 n.5).  In her response brief, Diamond states that she is alleging Lewis had actual knowledge, not constructive knowledge.  (Doc. 49 at 14).  This response does not amount to a waiver.  It is true supervisors cannot be held liable under § 1983 "for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks and citation omitted).  A supervisor can only be held liable if the supervisor participated directly in the unconstitutional conduct or if a causal connection exists between the supervisor's actions and the alleged constitutional violations. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).

> [C]ausal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.  Alternatively, the causal connection may be established when a supervisor's custom or policy … result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

*Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (quoting *Cottone*, 326 F.3d at 1360).  The Court interprets Diamond's argument to be that sufficient facts support an inference Lewis knew subordinates would act unlawfully and failed to stop them from doing so.  To the extent Diamond has alleged Lewis was aware Diamond faced a substantial risk of harm based on a widespread pattern of abuse, that claim is subsumed by the failure-to-train claim against Lewis in her individual capacity and is addressed below.

actual notification, may be used to establish subjective awareness.  511 U.S. at 842-44.

Further, allegations suggesting the substantial risk was "long-standing, pervasive, [or]

well-documented" and the defendants "had been exposed to information concerning the

risk and thus must have known about it … could be sufficient … to find that [the

defendants] had actual knowledge of the risk."  *Id.* at 842-43 (internal quotation marks

and citation omitted).  When analyzing subjective awareness, courts have considered

the obviousness of the risk to inmate safety, the defendant's knowledge about the

vulnerability of certain types of inmates to risk of harm, prison policies pertaining to such

inmates, and their housing placements.  *See Greene v. Bowles*, 361 F.2d 290, 294 (6th

Cir. 2004); *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81-82 (6th Cir. 1995); *Green v.

Hooks*, 2013 WL 4647493, at *2-*3 (S.D. Ga.); *Shaw v. District of Columbia*, 944 F.

Supp. 2d 43, 59-60 (D.D.C. 2013) ("Plaintiff … points … to [reports, regulations, and

professional guidelines] … to provide factual grounding to support the inference that the

risk to transgender detainees was obvious, well-documented, and known to

[d]efendants." (internal quotation marks and citation omitted)); *Newsome v. Higham*,

2010 WL 1258013, at *3-*4 (M.D. Ga.); *Farmer v. Carlson*, 685 F. Supp. 1335, 1342

(M.D. Penn. 1988) ("Clearly, placing plaintiff, a twenty-one year old transsexual, into the

general population at … a [high-]security institution, could pose a significant threat to

internal security in general and to plaintiff in particular.").

In her complaint, Diamond has covered the waterfront with her allegations

tending to prove subjective awareness.  She has alleged that a transgender inmate's

vulnerability to assault at a closed-security male facility was obvious to Lewis and

McCracken and that PREA and GDOC policies made clear transgender inmates are

highly vulnerable to sexual assault.  Further, she alleges Lewis and McCracken spoke

with her directly about her transgender status and were aware from notifications and

records[35] she was repeatedly sexually assaulted at three different closed-security

facilities.  Diamond met with McCracken at least three times about her sexual assaults,

and Dr. Harrison contacted him directly about Diamond's vulnerability to assault at

Valdosta State Prison given its population of violent offenders.[36]

Diamond's allegations paint a picture dramatically different than the typical

failure-to-protect claim asserted by inmates.  The usual failure-to-protect claim involves

a single assault.  Thus, the inmate must allege facts tending to establish the requisite

subjective awareness before that single assault occurred.  As the cases cited by the

Defendants illustrate, this can be a difficult task.  But here Diamond alleges a series of

assaults.  While she does not concede that Lewis and McCracken did not have

subjective awareness of the risk of harm before the first assault that occurred on their

respective watches, she alleges that after they received notice of that assault, and then

the next, and the next, and so on, they clearly had subjective awareness of the risk of

harm she faced as a transgender inmate housed with violent offenders.  Repeatedly,

she alleges, they continued to receive notice of her sexual assaults.  Clearly, at this

stage of the litigation, these facts are sufficient to establish that Lewis and McCracken

were subjectively aware of the risk of harm Diamond faced.  *See Farmer*, 511 U.S. at

842-43; *Bugge v. Roberts*, 430 F. App'x 753, 761 (11th Cir. 2011) ("[T]he pervasive and

---

[35] Diamond alleges only McCracken received Diamond's GDOC records detailing Diamond's history of sexual assault.

[36] McCracken argues Diamond does not allege "Dr. McCracken was subjectively aware of this particularized risk *prior to* the subject incident." (Doc. 38-1 at 16).  However, taking the allegations as true, the Court disagrees.  Indeed, Diamond alleges she was sexually assaulted at least two more times in April 2014 after her February meeting with McCracken.  (Doc. 3, ¶¶ 102, 106).

widespread nature of the conditions … suggest [the defendant] 'had been exposed to information concerning the risk and thus must have known about it.'" (quoting *Farmer*, 511 U.S. at 842-43)).

In sum, these allegations are not threadbare recitations of the subjective awareness element.  Rather, Diamond alleges the full gamut of facts *Farmer* contemplated to show subjective awareness.  Yet, despite being aware of the risk of sexual assault and despite having the authority and obligation to take reasonable safety measures after each incident, Lewis and McCracken, according to Diamond, failed to take any action.  As a result, the substantial risk of harm remained unabated, and Diamond suffered further sexual assaults.  Clearly, Diamond has sufficiently alleged a plausible failure-to-protect claim against Lewis and McCracken.

### b.  Whether the Constitutional Right was Clearly Established

Lewis is not entitled to qualified immunity if clearly established law gave her fair warning her conduct violated Diamond's Eighth Amendment right to be protected from assault by other inmates.  "A prisoner has a right, secured by the eighth … amendment[], to be reasonably protected from constant threat of violence and sexual assault by his fellow inmates[.]"  *Purcell ex rel. Estate of Morgan v. Toombs Cty., Ga.*, 400 F.3d 1313, 1320 (11th Cir. 2005) (internal quotation marks and citation omitted); *see also Farmer*, 511 U.S. at 833-34.  Diamond argues *Farmer* gave Lewis fair warning that her failure to take any action to protect Diamond from the substantial risk of sexual assault she faced violated her Eighth Amendment right to be reasonably protected from sexual assault.  (Doc. 49 at 23 n.10).  There, a transgender inmate, allegedly known to be vulnerable to sexual assault, complained prison officials were deliberately indifferent

to a substantial risk of sexual assault by placing her in general population at a "higher security facility" known for its violent environment and history of assaults. *Farmer*, 511 U.S. at 825. The Supreme Court emphasized the constitutional right of prisoners to be reasonably protected from the violence of other inmates. *Id.* at 833 ("[G]ratuitously allowing the beating or rape of one prisoner by another serves no 'legitimate penological objectiv[e].'" (citation omitted)). The Supreme Court ultimately held that "a prison official may be held liable under the Eighth Amendment … if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847.[37]

Again, Diamond alleges Lewis was aware Diamond was a transgender female, knew she had been repeatedly sexually assaulted at closed-security male facilities, and knew she continued to be repeatedly sexually assaulted at Valdosta State Prison. Still, Lewis took no action. Therefore, Lewis, being aware of the substantial risk of sexual assault, had fair warning that her failure to take reasonable measures to abate that risk violated Diamond's clearly established right to be protected from sexual assault. *Id.* at 833-34, 837. Accordingly, Lewis is not entitled to qualified immunity from Diamond's failure-to-protect claim.

---

[37] In cases involving the protection of inmates (or pretrial detainees) from rape or sexual assault, numerous courts have relied on *Farmer* when analyzing the second prong of qualified immunity. *See, e.g.*, *Walton v. Dawson*, 752 F.3d 1109, 1118 (8th Cir. 2014) ("There is no doubt the right at issue—a pretrial detainee's right to be protected from sexual assault by another inmate—is clearly established."); *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) ("[T]he constitutional right to be free from deliberate indifference to assault and sexual abuse was clearly established at the time of the alleged constitutional violation."); *Howard*, 534 F.3d at 1242 ("The Supreme Court [in *Farmer*] and the Tenth Circuit have repeatedly and unequivocally established an inmate's Eighth Amendment right to be protected from substantial risks of sexual assault by fellow prisoners."); *Velez v. Johnson*, 395 F.3d 732, 736 (7th Cir. 2005) ("Although Velez and Johnson disagree over how the constitutional right at issue here should be characterized, we believe it is plainly the right to be free from deliberate indifference to rape and assault. There can be no debate that this right was clearly established at the time." (citing *Farmer*, 511 U.S. at 833)).

### 5.  Failure to Train

Diamond alleges Lewis failed to adequately train subordinates regarding the medical treatment and safety of transgender inmates.  Lewis contends Diamond failed to sufficiently allege a failure-to-train claim, and she is entitled to qualified immunity.

### a.  Whether Diamond Has Alleged a Constitutional Violation

Diamond alleges Lewis, as GDOC's Statewide Medical Director, was a final policy- and decision-maker regarding the care and safety of transgender inmates and responsible for implementing policies and providing training regarding the same.  (Doc. 3, ¶18).  "[U]nder § 1983, a supervisor can be held liable for failing to train his or her employees only where the failure to train amounts to deliberate indifference to the rights of persons with whom the officers come into contact."  *Keith v. DeKalb Cty., Ga.*, 749 F.3d 1034, 1052 (11th Cir. 2014) (alteration, citation, and internal quotation marks omitted).  To sufficiently allege a supervisor violated a plaintiff's constitutional rights for failing to train subordinates, a plaintiff "must demonstrate that the supervisor had 'actual or constructive notice that a particular omission in their training program causes [his or her] employees to violate citizens' constitutional rights,' and that armed with that knowledge the supervisor chose to retain that training program."  *Id.* (quoting *Connick v. Thompson,* 131 S. Ct. 1350, 1360 (2011)).  A plaintiff establishes a supervisor's notice when the need for more or different training is obvious—such as when there has been a history of widespread abuse by subordinates that has put the supervisor on notice of the need for corrective measures, or when the failure to train is likely to result in a constitutional violation.  *See Williams v. Limestone Cty. Ala.*, 198 F. App'x 893, 896 (11th Cir. 2006); *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir. 1985).

Diamond premises her failure-to-train claims against Lewis on two alleged deficiencies in training.  Diamond alleges Lewis: (1) inadequately trained subordinates to provide constitutionally adequate gender dysphoria treatment to transgender inmates, and (2) inadequately trained subordinates to reasonably protect and safely house transgender inmates.  Specifically, Diamond contends Lewis was aware of these inadequacies from a widespread pattern of abuse by subordinates.  Lewis argues that Diamond's allegations are formulaic recitation of the elements for a failure-to-train claim and that case law requires more than Diamond's own experiences to establish a "pattern" or "widespread abuse."  (Docs. 35-1 at 23; 56 at 11).

The Court is unaware of any Supreme Court or Eleventh Circuit authority, and Lewis cites none, requiring a plaintiff to establish a widespread pattern of abuse based on prior incidents involving *other* inmates who suffered the same abuse.  It is true that in cases involving an inmate alleging a widespread pattern of abuse at a prison, the Eleventh Circuit has looked to whether the plaintiff points to the experiences of other inmates to determine whether the plaintiff's experience was simply an isolated occurrence.  *See, e.g.*, *Goebert*, 510 F.3d at 1332; *Craig v. Floyd*, 643 F.3d 1306, 1310-11 (11th Cir. 2011).  These cases often involve a prisoner alleging a single isolated incident at a specific prison or occasional, isolated occurrences within a single prison.  *See, e.g.*, *Harrison v. Culliver*, 746 F.3d 1288, 1299-1300 (11th Cir. 2014); *Goebert*, 510 F.3d at 1332; *Craig*, 643 F.3d at 1310-11.

But Diamond's complaint is different.  Diamond's allegations involve repeated incidents alleging failure-to-protect from sexual assaults at multiple GDOC prison facilities over a continued duration by specifically identified individuals.  Regardless of

whether the alleged pattern involves single or multiple inmates or single or multiple facilities, the critical inquiry here is whether Diamond has sufficiently alleged a widespread pattern of abuse *by prison officials* that put Lewis on notice.  *See, e.g.*, *Belcher*, 30 F.3d at 1397-98 ("Failure to train can amount to deliberate indifference … when there exists a history of abuse *by subordinates* that has put the supervisor on notice of the need for corrective measures." (italics added)); *Thornton v. El-Amin*, 2012 WL 529998, at *13 (N.D. Ga.) ("Plaintiff has not submitted any evidence of a widespread pattern of abuse *by officers* of the DeKalb County Police Department." (italics added)).  That the pattern of abuse involved only Diamond does not mean the pattern was insufficient to put Lewis on notice of the problem.

"The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant[,] and of continued duration, rather than isolated occurrences." *West v. Tillman*, 496 F.3d 1321, 1329 (11th Cir. 2007).  For example, at the motion to dismiss stage, allegations of multiple incidents of abuse may sufficiently demonstrate a pattern.  *See Buckley v. Barbour Cty., Ala.*, 624 F. Supp. 2d 1335, 1344 (M.D. Ala. 2008).  Also, where a plaintiff alleges a defendant was aware of allegedly inadequate supervision from a prior incident, from complaints related to the inadequate supervision, and from information the plaintiff faced a risk of harm from the inadequacy, the Eleventh Circuit has held the plaintiff sufficiently alleged the official "acted with deliberate indifference toward [the plaintiff's] rights in failing to ensure that competent officials took steps to protect [the plaintiff]." *Greason v. Kemp*, 891 F.2d 829, 837 & n.18, 838 (11th Cir. 1990).  In contrast, where the need for training is not "so obvious" and where the plaintiff bases her failure-to-train claim on a single incident,

courts have held the plaintiff failed to sufficiently allege a widespread pattern of abuse. *See, e.g., Weiland*, ___F.3d___, 2015 WL 4098270, at *10 (11th Cir.).

With this precedent in mind, the Court will address the allegedly inadequate training regarding the medical treatment of transgender inmates and the reasonable protection of transgender inmates in turn.

### 1) Inadequate training regarding the medical treatment for transgender inmates

Diamond alleges Lewis was aware of inadequate training as a result of the widespread pattern of abuse by prison officials who "repeatedly denied inmates with gender dysphoria treatment of any kind" but took no corrective action. (Doc. 3, ¶¶ 158-59). Contrary to Lewis's assertion, Diamond's allegations are not a formulaic recitation. Rather, with factual specificity, she alleges "numerous instances of abuse …, separated in time, involving distinct [GDOC] officials and personnel at four different [GDOC] facilities, all based on her status as a transgender woman." (Doc. 49 at 26). Specifically, Diamond alleges the Standards of Care and GDOC's own policies, all of which GDOC personnel were aware, recognize that inmates with gender dysphoria require treatment, which may include hormone therapy and female gender expression. (Doc. 3, ¶¶ 31-32, 41, 43, 46-47). Despite this, GDOC personnel across four facilities repeatedly denied Diamond adequate treatment. (Doc. 3, ¶¶ 64, 73-76, 81, 85-86, 97, 102, 107, 109-13, 116-17). Some, such as Defendants Hatcher and Allen, expressly forbade female gender expression, and Allen did so by disciplining and ridiculing her. (Doc. 3, ¶¶ 87-90, 110-113). Also, GDOC officials flatly ignored the recommendations of multiple medical professionals at different facilities that Diamond needed treatment. (Doc. 3, ¶¶ 73, 75-76, 96-97, 110-111, 116-17). Because of this inadequate training,

Diamond alleges she went without treatment at each facility and experienced intensifying suicide ideation and impulses to commit self-harm, among other physical and psychological harm.  (Doc. 3, ¶¶ 5, 73, 75, 90, 96, 104, 118, 121-22).  *See Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami, Fla.*, 637 F.3d 1178, 1189 (11th Cir. 2011) ("[A] plaintiff must also demonstrate that constitutional violations were likely to recur without training.").

These allegations are not simply threadbare recitations there was a widespread pattern of abuse that resulted in deliberate indifference or allegations based on a single incident of abuse.  Rather, Diamond has provided specific factual support to allege a widespread pattern that GDOC personnel over a period of three years repeatedly denied her gender dysphoria treatment based on her status as a transgender woman. Thus, Diamond has sufficiently alleged Lewis was aware of the need "to remedy an unconstitutional condition" but failed to do so.  *Cf. Marsh v. Butler Cty., Ala.*, 268 F.3d 1014, 1037 (11th Cir. 2001) ("Unless a policymaker knows of the need [to remedy an unconstitutional condition], no liability can arise from failure [to do so].", *abrogated on other grounds*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

Diamond has also sufficiently alleged Lewis deliberately chose not to remedy the inadequate training or otherwise take institutive corrective measures.  According to Diamond, Lewis repeatedly directed subordinates to refuse treatment and only offer counseling based on a blanket practice to deny gender dysphoria treatment to transgender inmates, even if GDOC medical professionals have confirmed an inmate suffers from gender dysphoria.  (Doc. 3, ¶¶ 76, 91, 97, 117).  *See Valdes v. Crosby*, 450 F.3d 1231, 1236 (11th Cir. 2006) ("Supervisory liability under 1983 occurs … when

there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation. … A causal connection may be established when … facts support an inference the supervisor directed subordinates to act unlawfully." (internal quotation marks and citations omitted)).  Accordingly, at this stage in the litigation, Diamond has sufficiently alleged a plausible claim that Lewis failed to train subordinates to provide adequate medical treatment to transgender inmates and that this failure led to the deliberate indifference to Diamond's medical needs.

### 2) Inadequate training regarding the safety and placement of transgender inmates

Diamond alleges that Lewis, as a final policy- and decision-maker, inadequately trained subordinates regarding the safety and protection of transgender inmates. Diamond argues a widespread pattern of abuse by prison officials put Lewis on notice of the deficiency in training.  Lewis contends Diamond's allegations are a formulaic recitation of the elements of a failure-to-train claim.  But contrary to Lewis's assertion, Diamond alleges "numerous instances of abuse …, separated in time, involving distinct [GDOC] officials and personnel at [three] different [GDOC] facilities, all based on her status as a transgender woman."  (Doc. 49 at 26).  Specifically, Diamond alleges Lewis was aware from GDOC's own policies that transgender inmates are highly vulnerable to sexual assaults and that their housing placements are to be reviewed by personnel when safety issues arise.  (Doc. 3, ¶¶ 52-61).  Despite these policies, Diamond alleges she was placed at three closed-security facilities and was repeatedly sexually assaulted at each one.  (Doc. 3, ¶¶ 65-71).  Diamond alleges at least six specific incidents of sexual assault across three of GDOC's facilities and persistent sexual harassment and coercion over the duration of her confinement within these facilities.

Diamond then alleges GDOC personnel repeatedly failed to reasonably respond to the substantial risk of sexual assault: they failed to review her placement pursuant to PREA and Sexual Assault SOP guidelines, delayed and deferred any action after the incidents of assault, ignored her sexual assault complaints and requests to transfer, and disregarded mental health professionals' conclusions she "faced continued vulnerability to sexual assault" at closed-security facilities.  (Doc. 3, ¶¶ 70-72, 92-94, 98-103, 106-107, 119-120).  Indeed, Diamond alleges that intake personnel at Valdosta State Prison directly told her the prison could not "safely house transgender persons" and that she "stood a high likelihood of being sexually assaulted based on the inmate population." (Doc. 3, ¶ 93).  In sum, these allegations are not simply threadbare recitations there was a widespread pattern of abuse.  Rather, Diamond has provided sufficient factual support to show a widespread, flagrant, obvious pattern of a continued duration that GDOC officials failed to reasonably respond to multiple incidents of sexual assaults or to the substantial risk of assault Diamond faced at closed-security facilities.

Further, Diamond has sufficiently alleged Lewis deliberately chose not to remedy this inadequate training despite her responsibility to review the placement of transgender inmates and train subordinates regarding their safety.  According to Diamond, Lewis was notified pursuant to GDOC policy that Diamond had been repeatedly sexually assaulted at each closed-security facility where she had been housed.  (Doc. 3, ¶¶ 60, 69, 71, 94, 100, 106, 149).  But Diamond continued to be transferred to closed-security facilities where she experienced sexual assault, and Lewis otherwise failed to institute corrective measures to ensure that subordinates took steps to protect Diamond from the risk of sexual assault.  *See Am. Fed'n of Labor &*

*Cong. of Indus. Orgs.*, 637 F.3d at 1189 ("[A] plaintiff must also demonstrate that constitutional violations were likely to recur without training.").

Accordingly, at this stage in the litigation, Diamond has sufficiently alleged a plausible claim that Lewis failed to train subordinates regarding the safety of transgender inmates and that this failure resulted in deliberate indifference to Diamond's constitutional right to reasonable protection.

### b.  Whether the Constitutional Right was Clearly Established

Lewis is not entitled to qualified immunity if clearly established law gave her fair warning her failure to train subordinates was unlawful.  Lewis simply argues she is "unaware of any clearly established law holding that [officials] such as … Lewis can be held liable for a failure to train despite an absence of widespread abuse or repeated violations of which [Lewis was] aware."  (Doc. 35-1 at 25).  As discussed, Diamond has sufficiently alleged a pattern of widespread abuse of which Lewis was aware.  In *Valdes*, the Eleventh Circuit held that it was clearly established that a supervisor "charged with directing the governance, discipline, and policy of the prison and enforcing its orders, rules, and regulations" could "face liability under § 1983 predicated on his failure to take reasonable steps in the face of a history of widespread abuse or his adoption of custom or policies which result in deliberate indifference."  450 F.3d at 1244.  Again, Diamond alleges Lewis, as Statewide Medical Director for GDOC, is the final policy- and decision-maker regarding the care, treatment, and housing decisions for transgender inmates and victims of sexual assault; has the authority to grant or deny medical care to inmates with gender dysphoria; and is responsible for the implementation of policies and the training of subordinates regarding the same.  (Doc.

3, ¶ 18). Thus, Lewis was responsible for "directing … the policy" and "enforcing [the] orders, rules, and regulations" that apply to all facilities within GDOC. *See Valdes*, 450 F.3d at 1244.

With respect to the allegedly inadequate training regarding the medical treatment of transgender inmates, it was clearly established Lewis's failure to adequately train subordinates or otherwise take reasonable institutive corrective measures "in the face of a history of widespread abuse" was unlawful. *See id.* at 1244. As discussed, Diamond has sufficiently alleged that Lewis was on notice from a widespread pattern of abuse that GDOC personnel across multiple facilities were denying gender dysphoria treatment in a deliberately indifferent manner. But despite her notice from this pattern and despite her responsibilities as supervisor, Lewis failed to train subordinates or otherwise take institutive corrective action. *See Greason*, 891 F.2d at 838-39 (holding the supervisor liable where after staff abruptly terminated an inmate's psychiatric care, the supervisor took no corrective action despite notice of a prior incident where staff similarly denied psychiatric care and being specifically put on notice of inadequacies leading to this termination of care). Indeed, as discussed, Lewis repeatedly enforced the blanket practice to deny gender dysphoria treatment. Accordingly, Lewis is not entitled to qualified immunity from the failure-to-train claim regarding medical treatment.

Likewise, with respect to the allegedly inadequate training regarding the safety and placement of transgender inmates, it was clearly established Lewis's failure to take reasonable institutive corrective procedures "in the face of a history of widespread abuse" was unlawful. *See Valdes*, 450 F.3d at 1244. As discussed, Diamond has sufficiently alleged that Lewis was on notice that GDOC personnel across multiple

- 56 -

facilities repeatedly ignored the substantial risk of harm Diamond faced as a transgender inmate at closed-security facilities with violent offenders, continued to place her at such facilities, ignored her sexual assault reports, and otherwise delayed action and review when safety issues arose.  But despite her notice from this pattern and despite her responsibilities as a supervisor, Lewis failed to train subordinates or enact institutive corrective action.  *See LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993) (holding a supervisor's conduct unlawful when he failed to take institutive corrective measures after receiving numerous reports that inmates were subjected to a continuous threat of violence, including sexual assault); *see also Brown v. Smith*, 2006 WL 1890192, at *7 (M.D. Ga.) ("After the Eleventh Circuit recognized in *LaMarca* that a prison supervisor can be held liable for his failure to train and supervise his employees to prevent inmate violence, any reasonable prison or jail supervisor would conclude that his failure to implement training and supervisory measures to prevent sexual assaults by his own employees could also subject him to supervisory liability under § 1983."). Accordingly, Lewis is not entitled to qualified immunity on the failure-to-train claim regarding the safety and placement of transgender inmates.

## IV.   CONCLUSION

For the reasons stated above, the Defendants' motions to dismiss are **DENIED**. (Docs. 35; 38).

**SO ORDERED**, this 14th day of September, 2015.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT